UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRENDA KOEHLER

    Plaintiff,

vs.

INFOSYS TECHNOLOGIES LIMITED
INCORPORATED, D/B/A
INFOSYS LIMITED

    Defendant.

Case No.
Case Code:

Trial by jury demanded.

## CLASS ACTION COMPLAINT

Plaintiff Brenda Koehler ("Ms. Koehler" or "Plaintiff"), through her attorneys, brings this action in her individual capacity and on behalf of a class of similarly situated individuals to remedy broad, ongoing national origin discrimination by Defendant Infosys Technologies Limited Incorporated, d/b/a Infosys Limited ("Infosys"), and alleges as follows:

### Introduction

1. Infosys has engaged in systematic, company-wide discrimination against individuals based upon their national origin. Specifically, Infosys has discriminated against individuals who are not of South Asian (including but not necessarily limited to India, Nepal, Bangladesh) descent. Infosys discriminates against these individuals through disparate treatment in hiring and disparate impact in hiring in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et seq.* ("Title VII").

2. Infosys's discrimination is stunning in its scope and effect. Infosys employs more

than 15,000 individuals in the United States and approximately 90 percent of these employees are of South Asian descent (including individuals of Indian, Nepalese, and Bangladeshi descent). Infosys has reached this grossly disproportionate workforce by directly discriminating against individuals who are not of South Asian decent in hiring, by abusing the H-1B visa process to bring workers of South Asian descent into the country rather than hiring qualified individuals already in the United States, and by abusing the B-1 visa system to bring workers of South Asian descent into the United States to perform work not allowed by their visa status rather than hiring individuals already in the United States to perform the work.

3. Plaintiff Koehler is a United States citizen, born in the United States and not of Indian or South Asian descent, who applied for a position at Infosys. Ms. Koehler has advanced college education, training, and job experience in information technology (IT), met the requirements for the job that were posted by Infosys, and was, therefore, qualified for the position to which she applied. Infosys discriminated against Ms. Koehler, choosing to hire an individual of South Asian descent for the position.

4. Infosys's discrimination as set out in this Complaint is continuing in nature. Plaintiff seeks, on behalf of herself and the class of similarly situated individuals, declaratory and injunctive relief, compensatory, nominal, and punitive damages, and attorneys' fees, costs, and expenses to redress Infosys's pervasive pattern and practice of discriminatory employment policies, practices, and procedures.

## The Parties

5. Plaintiff Brenda Koehler is a citizen of the United States of America, born in the United States, and of American national origin and ancestry. Plaintiff was at all material times to this cause of action a resident of the State of Wisconsin, and a resident of the United States. As

set forth more fully below, Plaintiff has advanced college education, training, and job experience in Information Technology (IT) and computer work. Plaintiff applied and interviewed for an IT job with Infosys for which she was qualified, and Infosys denied her that job opportunity.

6. Defendant Infosys (NASDAQ: INFY), headquartered in Bangalore, India, is a large company which, according to the company's website is "a global leader in consulting, technology and outsourcing with revenues of US$ 7.075 billion (LTM Q1 FY13)." Infosys has approximately 130,000 employees worldwide, and approximately 15,000 employees in the United States. Infosys's clients in the U.S. include major corporations. Infosys regularly transacts business in this District.

7. At all times relevant to this action, Infosys was and is an "employer" as defined by Title VII.

## Jurisdiction and Venue

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended, to redress and employment practices of Defendants in violation of Title VII.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states (or between a citizen of a state and foreign corporation).

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million and involves at least one class member who is a citizen of a state and is brought against a corporation that is from a different state or a foreign state.

11. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)-

(c) and 42 U.S.C. § 200e-5(f)(3) because a substantial portion of the complained of activities herein occurred in this District, Defendant conducts business in this District, and Plaintiff would have been employed in this District.

12. Plaintiff has exhausted her administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing charges with the Wisconsin Equal Rights Division, alleging the discrimination complained of herein. That complaint was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Notice of Right To Sue on May 6, 2013.

**Factual Allegations**

**I.  Individual Allegations**

13. Ms. Koehler is an experienced information technology professional with considerable academic and professional experience. Ms. Koehler has two degrees in Information Systems, including a Bachelor of Science degree from Marquette University and a Master of Science degree from the University of Wisconsin, Milwaukee.

14. Ms. Koehler has been employed in information technology positions since 1996 and has extensive experience in multiple fields. As a result of her training and experience, Ms. Koehler has a wide array of skills that include expertise with operating systems, server management software, computer and server hardware, and IT consulting.

15. One area of expertise for Ms. Koehler is VMware. Ms. Koehler is a VMware Certified Professional and has had prior job responsibilities that included installing and supporting VMware applications.

16. In April 2012, Ms. Koehler applied for a position as a "Lead VMware/Windows Administrator" with Infosys.

17. Ms. Koehler was qualified for the position to which she applied as she has extensive experience with VMware and Windows administrations and she met all of the requirements set forth in the job posting.

18. On April 18, 2012, Ms. Koehler received an electronic message from Infosys acknowledging that her application had been received, that it was complete, and that it was under review.

19. On April 20, 2012, Ms. Koehler received an electronic message from Infosys informing her that she had been selected for a telephonic interview. The message set the interview to occur at 10 a.m. eastern time on April 24, 2012. The message stated that Infosys would contact Ms. Koehler at the telephone number she had provided with her application.

20. On the morning of April 23, 2012, Ms. Koehler received another electronic message from Infosys confirming the telephonic interview would occur at 10 a.m. eastern time on April 24. This message again confirmed that Infosys would contact Ms. Koehler at her telephone number.

21. On April 24, 2012, at approximately 9 a.m. eastern time, an Infosys representative called Ms. Koehler at the telephone number she had provided with her application. The representative stated that Infosys was "verifying" that Ms. Koehler would be present at that telephone number for her interview that was to begin in approximately one hour. Ms. Koehler confirmed that she would be available at that telephone number for the interview.

22. At approximately 9:50 a.m. eastern time – 10 minutes before the interview was set to begin – Infosys sent Ms. Koehler an email. That email abruptly changed the plan for the interview, instituting a dial-in conference call (as opposed to Infosys calling Ms. Koehler directly). This was the first time that Infosys stated that Ms. Koehler would need to dial-in for

5

the interview. Had Ms. Koehler not been monitoring her email, she likely would have missed the telephonic interview in light of the last-minute change by Infosys.

23. Ms. Koehler dialed into the conference call number provided to her at the last minute and participated in the telephonic interview. The interview lasted approximately 45 minutes. While the job posting indicated that VMware would be the primary role for the position, Infosys's representatives spent a considerable amount of time asking about other subjects, including DNS and Active Directory. Ms. Koehler has experience in those areas and explained to Infosys's representative that she had considerable experience with those areas, including explaining the particular types of work she had performed.

24. Almost immediately after Ms. Koehler explained her experience with Active Directory, one of Infosys's representatives sighed and stated (incorrectly) that Ms. Koehler had no Active Directory experience.

25. Infosys did not hire Ms. Koehler.

26. Upon information and belief, after Ms. Koehler was rejected, Infosys continued to interview candidates for the position for a period of nearly two months.

27. Infosys ultimately hired an individual of South Asian descent. Specifically, Infosys hired an individual of Bangladeshi national origin to fill the position.

## II. Pattern And Practice Allegations

28. Infosys's discrimination against Ms. Koehler was not an isolated event; Infosys has engaged in a systemic pattern and practice of discriminating against individuals who are not of South Asian descent in hiring.

### A. Infosys's Grossly Disproportional Workforce

29. Much of Infosys's work involves providing technology support to other

companies by, among other things, developing and supporting technology enterprise systems. To perform these tasks, Infosys employees will often spend considerable time in residence at a client site.

30. Worldwide, Infosys has over 130,000 employees and the vast majority of the employees are Asian. According to one former employee, 98 percent of Infosys's employees are Asian with less than 1 percent of its employees being Americans.

31. A substantial portion of Infosys's employees are located in the United States. Specifically, Infosys employs approximately 15,000 employees in the United States, including both locally hired employees and employees brought to the United States on work visas.

32. Infosys's employees in the United States often travel from their homes to perform work at client sites, often involving long-distance travel. As a result of this structure, Infosys can hire employees nationwide and then staff projects by sending employees to the locations where they are needed.

33. Infosys's workforce in the United States is made up predominantly of individuals of South Asian descent. In response to a whistleblower complaint filed by one of its employees – Jay Palmer – Infosys retained the services of an attorney named Mitch Allen to conduct an investigation. Mr. Allen testified that there are fewer "Americans than Indians" employed by Infosys in the United States.

34. A former Infosys employee who worked in human resources – Linda Manning – testified that approximately 90 percent of Infosys's employees in the United States are foreign-national workers and the vast majority of those workers are of Indian national origin.

35. The demographics among Infosys's employees demonstrate a concerted effort to discriminate against individuals who are not of South Asian descent. During the year 2010

Census, all Asian subgroups combined made up 4.8 percent of the United States population. Individuals of South Asian descent made up between 1 and 2 percent of the United States population. Among individuals with bachelor's degrees – a requirement for many jobs at Infosys – individuals of South Asian descent made up only a little more than 2 percent of the population.

36. Available data also suggest that individuals of South Asian descent make up a very small portion of the information technology professionals in the United States. The Association of Information Technology Professionals ("AITP") – an IT professional organization – conducted a demographic study of its members in 2007 and found that only 2 percent of the membership was of Asian ethnic origin.

37. Upon information and belief, the demographics of individuals who apply for a job at Infosys mirror those of the general population or of the demographics reported by the AITP.

38. The gross disparity between the demographics of the applicant pool and Infosys's workforce is the result of intentional discrimination against individuals who are not of South Asian descent.

**B.  Infosys's Reliance on Foreign Workers**

39. Infosys has brought considerable numbers of foreign workers to the United States to perform jobs for which there are qualified individuals of American national origin.

**i.  Infosys's Misuse of H-1B Visas**

40. Under the Immigration and Nationality Act ("INA"), an employer may, under certain circumstances, employ a foreign worker in certain specialty professions. These employees are referred to as H-1B employees because they are allowed to work pursuant to H-1B visas.

8

41. Congress strictly limits the number of H-1B employees who may be employed nationwide during each year and generally puts a cap on the number of H-1B employees that a single employer may hire.

42. The H-1B visa program is intended to be used to bring foreign workers to the United States when there are insufficient "local" workers to perform the specialized jobs at issue. The program is expressly not intended to be used to displace qualified American workers with cheaper foreign workers.

43. To prevent employers from using the H-1B visa process to cut labor costs by bringing in lower-cost foreign workers, the law requires the sponsoring employer to certify that it will pay the foreign workers the higher of either the prevailing wage for the particular job in the location the employee will work, or the wages paid by the employer to any non-immigrant performing the same job.

44. An employer sponsoring an H-1B employee must sign a Labor Condition Application attesting that the employee will be paid the required wage and that the use of the H-1B employee will not adversely affect the working conditions of any non-immigrant employees.

45. Infosys has a long history of abusing the H-1B visa system by hiring disproportionate numbers of foreign workers – nearly all of them from South Asia – to perform jobs for which there are qualified American workers available.

46. In fact, Infosys has repeatedly been among the top ten H-1B employers in the United States, generally applying for thousands of new H-1B employees each year.

47. Upon information and belief, Infosys was using the H-1B visa system as a means to improperly pay low wages and import foreign workers who would displace American workers at lower wages.

48. According to congressional testimony, in the year 2009, Infosys had an H-1B visa crisis as it only had approximately 400 H-1B visas approved.

49. In subsequent years, Infosys has again had thousands of H-1B visa applications approved on an annual basis.

50. Infosys's use and misuse of the H-1B visa system have contributed to its grossly disproportionate workforce and have had a disparate impact on individuals of American national origin, who by definition cannot be hired pursuant to these programs.

      ii.      **Infosys's Misuse of B-1 Visas**

51. Upon information and belief, Infosys has also engaged in the plainly illegal practice of obtaining "business visitor" (B-1) visas for its foreign workers to visit the United States and then used these individuals to perform improper long-term work in the United States.

52. The INA authorizes visitor visas for individuals "having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business." 8 U.S.C § 1101(a)(15)(B).

53. The regulations make clear that an individual entering on a B-1 visa is allowed to perform only very limited "business" functions: "The term 'business,' as used in INA 101(a)(15)(B), refers to conventions, conferences, consultations and other legitimate activities of a commercial or professional nature. It does not include local employment or labor for hire." 22 CFR § 41.31(b)(1).

54. A company may send a foreign worker to the United States under a B-1 visa to perform the tasks authorized under the regulations (e.g., attending conferences, training, or consulting with colleagues), but the foreign worker may not come to the United States to perform longer-term work than these tasks.

55. According to the congressional testimony of an Infosys employee whistleblower, Infosys abused the B-1 visa program by sending its employees from India to the United States to perform work at client sites. Infosys used B-1 visa holders because they could be paid considerably lower wages than other workers including American-born workers.

56. At some point, United States consulate officials began to demand "welcome letters" from Americans to confirm that Infosys's B-1 visa applicants were being invited to perform tasks that are allowed under the regulations. Based upon the testimony of the Infosys whistleblower, Infosys encouraged its employees to provide fraudulent "welcome letters" to facilitate the issuance of B-1 visas for foreign workers to come to the United States to work.

57. Infosys's use and misuse of B-1 visas have had a disparate impact on individuals of American national origin, who by definition will not be brought to the United States for work under these programs.

### iii. Government and Congressional Investigations

58. Upon information and belief, Infosys Defendants' practices relating to visas and employment of foreign-national workers in the United States are subject to extensive investigations by multiple Federal Government authorities, including for potential criminal violations.

59. Congress also held hearings regarding Infosys's misuse of the visa system and heard the testimony Mr. Palmer – a company whistleblower – about Infosys's practices.

### C. Infosys's "Affirmative Action" Programs

60. Apparently recognizing the impropriety of over-reliance on foreign workers, Infosys has adopted an "affirmative action" program.

61. Nandita Gurjar, who is the head of Infosys's Human Resources Department global

wide and also serves on Infosys's Executive Council, testified in a deposition about Infosys's current recruitment "policy" as to job applicants for U.S.-based jobs. Gurjar asserted that Infosys gives targets to job recruiters that "60 to 70 percent of all the hiring should be local hiring," and clarified that this "local" requirement meant "Visa independent" workers.

62. Based on Gurjar's referenced policy, "local" recruitment is not necessarily targeted to include fair or proportionate recruitment of persons of American origin and ancestry. That is, the described "local" policy would still include significant recruitment of individuals of South Asian descent who are now located in the United States.

63. On information and belief, Infosys's "local" recruitment policy continues to target a significant number of individuals of South Asian descent who are either naturalized citizens or green-card holding permanent residents.

64. By way of example, Infosys hired a "local" person of Bangladeshi descent to fill the job to which Ms. Koehler applied.

65. Infosys Technologies Limited itself has filed over 1,400 green card applications to the Federal Government between 2001-2012, with the vast majority approved, according to a website with public information about immigration- filings (http://www.myvisajobs.com/Visa-Sponsor/Infosys-Technologies/263060.htm).

66. Upon information and belief, Infosys also employs green-card holding workers whose green cards were sponsored and procured by other employers not affiliated with Infosys.

67. On information and belief, even if Infosys's asserted "affirmative action" program has been implemented as claimed, Infosys continues to hire a grossly disproportionate number of individuals of South Asian descent to the detriment of individuals of American national origin.

68. Even under the asserted affirmative action policy, Infosys would continue to

target hiring 30 to 40 percent of its United States workforce from overseas, a policy that has a disparate impact on individuals of American national origin who are by definition excluded from this portion of the workforce.

### D. Particular Instances of Discrimination

69. Numerous instances of discriminatory intent have come to light.

70. While working on the assignment at Vinings, Georgia in December 2008, Infosys employee-whistleblower Jay Palmer claims that another Infosys employee wrote "Americans cost $," and "No Americans/Christians" on a whiteboard.

71. Palmer claims that he received a couple of telephone calls in which the caller asked, "Why are you doing this, you stupid American, we have been good to you." While Palmer does not know who made these calls, they came after he began to complain about Infosys's misuse of the visa system.

72. On February 28, 2011, while Palmer was working on a project in Alpharetta, Georgia, he claims that he found a typewritten note on his keyboard, and a Word document on his computer, both of which stated, "Just leave your [sic] not wanted here hope your journey brings you death stupid american."

73. On April 21, 2011, Palmer claims that he received an e-mail on his personal e-mail account stating, "if you make cause for us to sent [sic] back to india [sic] we will destroy you and your family."

74. Palmer claims that he was called a stupid American on one occasion by two Infosys employees.

75. Mr. Palmer brought these issues to the attention of Infosys, but Infosys did not take significant steps to investigate or prevent future issues.

76. During Mr. Palmer's lawsuit, another employee also testified that Americans generally were made to feel unwelcome at Infosys.

**Class Action Allegations**

77. Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive and monetary relief for the systemic pattern and practice of discriminatory hiring practices based upon applicants' national origin. This action is brought on behalf of the following class of individuals:

> All individuals who are not of South Asian descent who applied for and were denied a job at Infosys in the United States from January 1, 2009 through the date of final judgment in this action.

78. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiff, it is believed to be in the thousands. Furthermore, the class is readily identifiable from information and records in possession of the Defendant.

79. There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are: (a) whether Infosys has intentionally discriminated against individuals who are not of South Asian descent in making its hiring decisions; (b) whether Infosys has adopted a policy or practice of employing large numbers of foreign-born workers within the United States via H-1B visas, B-1 visas, and/or green-card worker recruitment; (c) whether Infosys has adopted a policy or practice of bringing large numbers of foreign-born workers to the United States on B-1 visas to perform work illegally; (d) whether Infosys's policy and/or practice of relying on foreign-born workers was adopted for the purpose of discriminating against American-born individuals or others who are not of South Asian descent; (e) whether Infosys's policy and/or practice of relying on foreign workers has had a disparate impact on American-born workers or others who are not of South Asian descent; (f)

whether the disparate impact of Infosys's policies and practices is justified by business or commercial necessity; (g) whether there were alternative, objective means for recruiting and hiring workers that would have had a less disparate impact on American-born workers or others who are not of South Asian descent than Infosys's policy of relying upon large numbers of South Asian-born workers; (h) whether Infosys has violated Title VII; and (i) whether equitable and injunctive relief is warranted for the Class.

80. Plaintiff's claim is typical of the claims of the members of the class. Plaintiff and all members of the class were damaged by the same discriminatory policies and procedures employed by Infosys, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with Infosys. Plaintiff and all members of the class have suffered harm including lost compensation, wages, back pay, and employment benefits.

81. Plaintiff will fairly and adequately protect the interest of other class members because she has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent her and the other members of the class.

82. Plaintiff and the Class she seeks to represent have suffered substantial losses in earnings and other employment benefits as a result of Infosys's actions and this action.

83. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Infosys has acted and/or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class as a whole. The Class members are entitled to declaratory and injunctive relief to end Infosys's systematic, common, uniform, unfair, and discriminatory policies and/or practices.

84. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue which predominates over individual issues of proof. The primary question common to the class is whether Infosys has discriminated on the basis of national origin in its hiring. This question is central to the case and predominates over individual issues among the members of the proposed class. Infosys has engaged in a common course of conduct – discriminating in hiring, relying on H-1B employees, relying on B-1 visa holders, and/or relying on green-card holders – in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

85. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Infosys's discrimination. Certification under this rule is also appropriate to decide whether Infosys has adopted a systemic pattern and practice of national origin discrimination in hiring.

## COUNT I
**(Disparate Treatment)**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)**
**(On Behalf of Plaintiff and the Class)**

86. Plaintiff re-alleges and incorporates Paragraphs 1 through 85 by reference as if fully set forth herein.

87. This claim is brought by Plaintiff on behalf of herself and the Class she seeks to represent.

88. Throughout the class liability period, Infosys has engaged in a pattern and practice of discriminating against individuals who are American-born or not of South Asian national origin by: (a) filling a disproportionately large percentage of its work force with individuals of South Asian national origin who are brought to the United States on either H-1B or B-1 visas even when there are qualified individuals available in the United States and (b) knowingly and intentionally favoring individuals who are of South Asian national origin even in "local" hiring.

89. As a direct and proximate result of Infosys's intentional discrimination, Plaintiff and the members of the Class have been denied employment and denied the fair opportunity to obtain employment with Infosys.

90. Infosys's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000, *et seq*.

**COUNT II**
**(Disparate Impact)**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)**
**(On Behalf of Plaintiff and the Class)**

91. Plaintiff re-alleges and incorporates Paragraphs 1 through 85 by reference as if fully set forth herein.

92. Throughout the class liability period, Infosys has used hiring practices, *e.g.*, the reliance upon H-1B, B-1, and/or green-card employees, that have had a disparate impact on the basis of national origin (discriminating against workers who are American-born or not born in South Asia) that are neither job-related for the positions at issue nor consistent with business necessity.

93. The foregoing conduct constitutes unlawful discrimination in violation of 42 U.S.C. § 2000, *et seq.*

## COUNT III
### (Disparate Treatment)
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)
### (On Behalf of Plaintiff)

94. Plaintiff re-alleges and incorporates Paragraphs 1 through 85 by reference as if fully set forth herein.

95. Infosys intentionally discriminated against Plaintiff on the basis of her national origin in declining to hire her for a job for which she was qualified. Plaintiff is an American-born individual and a member of a protected class, she was qualified for the position to which she applied, Infosys did not hire her, Infosys continued to interview individuals after refusing to hire Plaintiff, and Infosys ultimately hired an individual of South Asian national origin for the position to which Plaintiff applied.

96. Infosys did not have any non-discriminatory basis for its hiring decision and its assertion that Plaintiff was not qualified is pretext.

97. The foregoing conduct constitutes unlawful discrimination in violation of 42 U.S.C. § 2000, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brenda Koehler and the Class pray for relief as follows:

98. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

99. Designation of Plaintiff Brenda Koehler as a representative of the Class;

100. Designation of Plaintiff's counsel as Class counsel;

101. A declaratory judgment that the practices complained of herein are unlawful and

violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.*;

102. A permanent injunction against Infosys and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

103. Order Infosys to adopt a valid, non-discriminatory method for hiring;

104. Order Infosys to post notices concerning its duty to refrain from discriminating against employees on the basis of national origin or ancestry;

105. Order Infosys to pay Plaintiff and the Class compensatory damages for the harm they suffered as a result of Infosys's violations of Title VII;

106. Award Plaintiff and the Class prejudgment interest at the prevailing rate on the compensatory damages as a result of Infosys's discriminating against them in violation of Title VII;

107. Award Plaintiff and the Class exemplary and punitive damages;

108. Award Plaintiff her reasonable attorney's fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

109. Award Plaintiff and the Class such other relief as this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 1st day of August, 2013.

                                                  Attorneys for Plaintiff

                                                s/Michael F. Brown
                                                Michael F. Brown
                                                WI Bar No. 1041753
                                                PETERSON, BERK, & CROSS, S.C.

200 E. College Ave.
Appleton, WI 54912
920-831-0300
920-831-0165 (fax)
mbrown@pbclaw.com

*Of Counsel* (applications for admission forthcoming)

Robert A. Klinck
Daniel A. Kotchen
KOTCHEN & LOW LLP
2300 M Street, NW
Suite 800
Washington, DC 20037
(202) 416-1848
(202) 280-1128 (fax)
dkotchen@kotchen.com
dlow@kotchen.com

Vonda K. Vandaveer
V.K. Vandaveer, P.L.L.C.
P.O. Box 27317
Washington, DC 20038-7317
202-340-1215
202-521-0599 (fax)
atty@vkvlaw.com