# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRENDA KOEHLER,      )
KELLY PARKER,      )
LAYLA BOLTEN,      )
&      )
GREGORY HANDLOSER      )
     )     Civil Action No. 2:13-cv-885
     Plaintiffs,      )
     )
v.      )
     )
INFOSYS TECHNOLOGIES LIMITED      )
INC., and INFOSYS PUBLIC SERVICES,      )
INC.      )
     )
     Defendants.      )
     )
     )

Trial by jury demanded.

---

## SECOND AMENDED CLASS ACTION COMPLAINT

---

1.      Brenda Koehler, Kelly Parker, Layla Bolten, and Gregory Handloser (collectively "Plaintiffs") bring this action on behalf of a class of similarly situated individuals to remedy pervasive, ongoing national origin and race discrimination by Infosys Technologies Limited Inc. ("Infosys") and Infosys Public Services, Inc. ("Infosys Public Services").

2.      Infosys is an Indian company that has roughly 15,000 employees in the United States.  While roughly 1-2% of the U.S. population is of South Asian descent, roughly 90% of Infosys's U.S. workforce is of South Asian descent (primarily Indian).  This disproportionate workforce is a result of Infosys's intentional employment discrimination against individuals who are not South Asian, including discrimination in the hiring, promotion, compensation, and

Case 2:13-cv-00885-CNC   Filed 09/09/14   Page 2 of 38   Document 16-2

termination of individuals. Infosys has gone to great lengths to obtain its primarily South Asian work force in the United States, including by engaging in visa fraud to bring South Asians (primarily Indians) into this country to replace or supplant non-South Asians.

3.     Little question exists that Infosys discriminates. As an Infosys hiring manager recently acknowledged: "There does exist an element of discrimination. We are advised to hire Indians because they will work off the clock without murmur and they can always be transferred across the nation without hesitation unlike [a] local workforce." *Another law suit against Infosys this time regarding hiring*, Sathiyam.TV (Aug. 6, 2013), http://sathiyam.tv/english/world/another-law-suit-against-infosys-this-time-regarding-hiring.

4.     Plaintiffs' experiences with Infosys demonstrate the insidious nature of Infosys's employment practices. For example, in 2012, Harley Davidson Motor Company ("Harley Davidson") restructured its IT department in Milwaukee by eliminating roughly 125 jobs and contracted with Infosys to perform IT services. Infosys then announced in 2012 that it would hire 125 employees in Milwaukee. Ms. Koehler lives in Milwaukee, has advanced educational and work experience pertinent to the position Infosys was looking to fill, interviewed with Infosys, and was denied a position in favor of a South Asian worker. Similarly, in 2012, Ms. Parker was contracted to work under the management of Infosys and was providing IT services to Harley Davidson from Tomahawk, WI, a small town in central Wisconsin. Ms. Parker was popular within Harley Davidson (Infosys's client), and had serviced the client well. Nonetheless, in September 2013, Infosys decided not to hire Ms. Parker permanently and terminated the contract under which Ms. Parker worked in favor of Kapil Kulkarni, a South Asian who Ms. Parker herself had trained and who moved to Tomahawk to replace her.

5.     In or around December 2012, Infosys Public Service won a $49.5 million contract

with the Washington, D.C. government to design and build the IT infrastructure supporting the D.C. Health Benefit Exchange, an online shopping center for health insurance created under the Affordable Care Act. A large portion of Infosys's work involved "testing" the system to find bugs. Ms. Bolten has considerable experience as a software tester, and interviewed for a job with Infosys Public Services. Although Ms. Bolten was told that she would serve as a "Test Lead," she was ultimately hired simply as a tester, a position that had less responsibility and lower pay than the Test Lead position. Ms. Bolten performed her job well and helped her co-workers to understand information that was critical to the job (*e.g.*, the relevance of social security numbers). Ms. Bolten also noticed that the vast majority of the "Test Lead" positions were filled with South Asian workers (predominantly Indians). These individuals had considerably less experience with software testing than Ms. Bolten. Ms. Bolten requested a promotion on multiple occasions including in more advanced testing fields for which she had considerable experience. Infosys instead promoted South Asian workers and brought additional Indian workers (who were in the country on visas) to perform work for the testing project in spite of the fact that these workers had no experience as software testers. Ms. Bolten was also harassed because she was not Indian, and her supervisors excluded her from work conversations by speaking Hindi. The harassment increased after Ms. Bolten complained that her co-workers were excluding her by speaking Hindi.

6. Mr. Handloser was hired by Infosys in 2004 as a Sales Manager. Mr. Handloser performed his job well. In or around 2011, Infosys began a concerted effort in the U.S. to purge non-South Asian employees in favor of South Asians, including in the sales force and other areas that had comparatively large numbers of non-South Asian employees. In 2011 and 2012, Infosys began to set unrealistic sales goals for Mr. Handloser, denied him his bonuses, and fired Mr.

3

Handloser soon after he finalized a contract with a major client. While Mr. Handloser was employed, his supervisors and co-workers regularly spoke Hindi in front of him, excluding him from work conversations, and removed positive statements about his work from e-mails before forwarding them on. Mr. Handloser is not alone; Infosys forced many of the non-Indian individuals from the company, often replacing them with South Asians.

7. Infosys's employment practices violate Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs seek, on behalf of themselves and the class of similarly situated individuals, declaratory and injunctive relief, compensatory, nominal, and punitive damages, and attorneys' fees, costs, and expenses to redress Infosys's pervasive pattern and practice of discriminatory employment policies, practices, and procedures.

### The Parties

8. Brenda Koehler is a U.S. citizen, of American national origin, and is Caucasian. Ms. Koehler lives in Milwaukee, Wisconsin. Ms. Koehler has exhausted her administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing a discrimination complaint against Infosys with the Wisconsin Equal Rights Division, which was cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"), and filing a timely claim of Title VII discrimination following receipt of a right to sue notice from EEOC.

9. Kelly Parker is a U.S. citizen, of American national origin, and is Caucasian. Ms. Parker lives in Minocqua, Wisconsin. Ms. Parker has exhausted her administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing a discrimination complaint against Infosys with the Wisconsin Equal Rights Division, which was cross-filed with

4

the U.S. Equal Employment Opportunity Commission ("EEOC"), and filing a timely claim of Title VII discrimination following receipt of a right to sue notice from EEOC.

10. Layla Bolten is a U.S. citizen, born in the Soviet Union, and is Caucasian. Ms. Bolten lives in Dickerson, Maryland. Ms. Bolten has exhausted her administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing a discrimination complaint against Infosys with the U.S. Equal Employment Opportunity Commission ("EEOC"), and filing a timely claim of Title VII discrimination following receipt of a right to sue notice from EEOC.

11. Gregory Handloser is a U.S. citizen, of American national origin, and is Caucasian. Mr. Handloser lives in Sarasota, Florida. Mr. Handloser has exhausted his administrative remedies and complied with the statutory prerequisites of filing a Title VII complaint by filing a discrimination complaint against Infosys with the U.S. Equal Employment Opportunity Commission ("EEOC"), and filing a timely claim of Title VII discrimination following receipt of a right to sue notice from EEOC.

12. Infosys Technologies Limited, Inc. ("Infosys") is headquartered in Bangalore, India and describes itself as a "global leader in consulting, technology and outsourcing with revenues of US $7.075 billion" in FY 2013. Infosys has approximately 15,000 employees in the United States. Infosys, in its own capacity and as a joint employer with Infosys Public Services, Inc. and other entities with which it contracts, exerted significant control over the hiring and employment decisions and actions discussed herein. Infosys, in its own capacity and as a joint employer, directed, knew of, or should have known of the discriminatory conduct described herein, and failed to take prompt corrective measures within its control.

13. Infosys Public Services, Inc. is a wholly-owned subsidiary of Infosys located in

Case 2:13-cv-00885-CNC   Filed 09/09/14   Page 6 of 38   Document 16-2

Rockville, Maryland, which employs more than 15 employees within the U.S. Upon information and belief, Infosys and Infosys Public Services share common management, interrelation of operations, centralized control of labor relations, common ownership and financial control, and Infosys exerts significant control over the hiring and employment decisions of Infosys Public Services and the hiring and employment decisions concerning the Plaintiffs.

## Jurisdiction and Venue

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended, to redress and employment practices of Defendants in violation of Title VII; and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states (or between a citizen of a state and foreign corporation).

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

17.     Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because Infosys conducts business in this District and Infosys engaged in discriminatory treatment of non-South Asians in this District.

## Factual Allegations

18.     Infosys has engaged in a systematic pattern and practice of discriminating against individuals who are not South Asians in hiring, compensation, promotion, and retention. In fact, an Infosys hiring manager, Ramesh Elumali, explained that "[t]here does exist an element of

discrimination. We are advised to hire Indians because they will work off the clock without murmur and they can always be transferred across the nation without hesitation unlike local workforce." *Another law suit against Infosys this time regarding hiring*, Sathiyam.TV (Aug. 6, 2013), http://sathiyam.tv/english/world/another-law-suit-against-infosys-this-time-regarding-hiring. As discussed in greater detail below, Samuel Marrero, an Infosys recruiter, received similar instructions. Mr. Marrero worked in Infosys's Talent Acquisition unit. Over the course of his employment, Mr. Marrero and his fellow recruiters were repeatedly and explicitly instructed by Infosys senior management to favor South Asians over Americans in their recruiting efforts.

*Infosys's Grossly Disproportionate Workforce*

19.     Infosys provides Information Technology ("IT") services to companies by, among other things, developing and supporting technology enterprise systems for end-clients, including Harley Davidson and other large companies.

20.     Worldwide, Infosys has over 158,000 employees. The vast majority of the employees are South Asian.

21.     Infosys employs approximately 15,000 employees in the United States. More than 90% of Infosys's employees in the United States are South Asian. This demographic data regarding Infosys's workforce demonstrates a concerted effort to discriminate against individuals who are not South Asian.

22.     Infosys's discrimination is companywide, and permeates its United States work locations. Infosys is required to report to the Federal government the demographic makeup of any location at which it employs at least 50 workers. For the year 2012, Infosys was required to report data for 59 client sites. These sites were located in states including: Wisconsin,

7

California, New York, New Jersey, Washington, Utah, Delaware, Maine, Pennsylvania, Arizona, Illinois, Rhode Island, Georgia, Connecticut, Texas, North Carolina, Oregon, Ohio, Virginia, Indiana, Minnesota, Kansas, Florida, Massachusetts, and Colorado. Despite these sites' vastly different demographics, in every case, the pattern of discrimination is apparent. For more than one third of the sites (21), Infosys reported that 100% of the employees are "Asian." And for 53 of the 59 sites, at least 94.5% of the employees were Asian. The lowest percentage of "Asian" employees at these client sites is 73.8%. Upon information and belief, the vast majority of these employees are of South Asian race or Indian, Bangladeshi, or Nepalese national origin.

23. Infosys's employee demographics stand in stark contrast to the population at large. During the year 2010 Census, all Asian subgroups combined made up 4.8 percent of the United States population. Individuals of South Asian descent made up between 1 and 2 percent of the United States population.

24. Available data also suggest that individuals of South Asian descent make up a very small portion of the information technology professionals in the United States. The Association of Information Technology Professionals ("AITP") – an IT professional organization – conducted a demographic study of its members in 2007 and found that only 2 percent of the membership was of Asian ethnic origin.

25. Infosys could not have achieved its grossly disproportionate workforce across its company and at each and every client site except through a pattern and practice of discrimination.

*Infosys's Talent Acquisition Unit Receives Explicit Instructions to Discriminate*

26. Infosys senior management instituted an explicit, company-wide policy to favor individuals of South Asian race and nation origin in hiring. This is one method Infosys has

Case 2:13-cv-00885-CNC   Filed 09/09/14   Page 9 of 38   Document 16-2

utilized in obtaining its grossly disproportionate workforce.

27.    Samuel Marrero worked as a recruiter in Infosys's United States Talent Acquisition unit from October 2011 through May 2013.  The Talent Acquisition unit employs approximately 75 individuals tasked with identifying and recruiting potential employees for positions throughout Infosys (including Infosys Public Services and other affiliate companies) within the United States.  Mr. Marrero observed that over 90% of the workers Infosys hired and employed within the United States were of South Asian national origin and race (predominately Indian).

28.    During Mr. Marrero's tenure with Infosys, Senior Vice President and Global Head Sanjay Jalona ("Mr. Jalona") and Global Enterprise Officer Lead Abhijit Shriyan ("Mr. Shriyan") led the Talent Acquisition unit.  Mr. Shriyan reported to Mr. Jalona and Mr. Jalona reported directly to lnfosys's CEO S.D. Shibulal.  On information and belief, both Mr. Jalona and Mr. Shriyan are of South Asian race and Indian national origin.

29.    As part of the Talent Acquisition unit's recruitment efforts, Mr. Jalona and Mr. Shriyan held weekly conference calls with the recruiting team.  During these calls, Mr. Jalona and Mr. Shriyan encouraged recruiters to focus their efforts on Indian candidates.  On one of the conference calls on approximately October 18, 2012, Mr. Jalona said recruiters should "stick to the talent we're used to."  In response to this, Mr. Marrero asked "are you saying you just want Indian talent?" Mr. Jalona said "Yes. They know our style and culture."  Mr. Shriyan made similar comments and confirmed that recruiting Indians was a priority.

30.    Between January 2012 and November 2012, Mr. Marrero and other recruiters frequently complained to both Mr. Jalona and Mr. Shriyan during the weekly conference calls that many of the highly qualified American candidates they had presented were being rejected in

9

favor of Indian candidates.  Mr. Jalona and Mr. Shriyan consistently dismissed their complaints. In approximately October 2012, in response to one of these complaints, Mr. Shriyan said "Americans don't know shit."

*Infosys's Overreliance On and Abuse of Visa Processes*

31.    One mechanism that Infosys has employed to discriminate against individuals who are not South Asian is to use the visa process to unnecessarily or improperly bring visa workers from South Asia to perform work in the United States for which American workers are available, willing, and qualified to perform.

32.    Infosys relies on securing visas from the Federal government, including H-1B, L-1, and B-1 visas for foreign workers, to support its discriminatory employment policies. According to Infosys's Form 6-K report filed with the U.S. Securities and Exchange Commission ("SEC") for the quarter ended December 31, 2011, "As of December 31, 2011, the majority of our technology professionals in the United States held either H-1B visas (approximately 10,211 persons, not including Infosys BPO employees or employees of our wholly owned subsidiaries), which allow the employee to remain in the United States for up to six years during the term of the work permit and work as long as he or she remains an employee of the sponsoring firm, or L-1 visas (approximately 1,958 persons, not including Infosys BPO employees or employees of our wholly owned subsidiaries), which allow the employee to stay in the United States only temporarily."  According to Infosys's Form 6-K report filed with the SEC for the quarter ended December 31, 2012: "As of December 31, 2012, the majority of our technology professionals in the United States held either H-1B visas (approximately 10,305 persons, not including Infosys BPO employees or employees of our wholly owned subsidiaries), which allow the employee to remain in the United States for up to six years during the term of

the work permit and work as long as he or she remains an employee of the sponsoring firm, or L-1 visas (approximately 1,793 persons, not including Infosys BPO employees or employees of our wholly owned subsidiaries), which allow the employee to stay in the United States only temporarily." Since 2012, Infosys's reliance on foreign workers has increased. Infosys's Form 20-F report filed with the SEC for the fiscal year ending March 31, 2014 states: "As of March 31, 2014, the majority of our professionals in the United States held either H-1B visas (12,769 persons) … or L-1 visas (1,322 persons)." In 2013, Infosys received the second most new H-1B visas of any company in the United States (6,157). *Top 10 users of H-1B visas at a glance*, Fox Business (July 6, 2014) http://www.foxbusiness.com/markets/2014/07/06/top-10-users-h-1b-visas-at-glance/.

33.    Infosys's Finance and/or Corporate Planning departments in India set annual growth targets for U.S. business units. In setting these targets, the departments budget for how many additional foreign-worker visas Infosys will need to secure to support the growth. The departments then set budgets for visa-related expenses the business units will incur to secure the visas. Thus, in effect, annual visa quotas are established in India for South Asian workers to be employed within the U.S., irrespective of the fact that qualified workers exist in the U.S. that Infosys could use to support its U.S. business.

34.    After the Finance and/or Corporate Planning departments set budgets, Infosys U.S. business units then have a specific number of budgeted new visas they need to secure to support Infosys's U.S. business.

35.    Infosys's visa policies and practices are discriminatory in intent, and involve hiring and employment practices that are preferential to South Asian workers to the detriment of Americans and other non-South Asians.

11

36.     Infosys's visa policies and practices have a disparate impact that is discriminatory in effect upon non-South Asians, even if the policies and practices were deemed lawful or neutral in intent with regard to race and national origin (neither of which is true as discussed herein).

37.     Infosys secures at least three types of visas: H-1B visas, L-1 visas and B-1 visas. Infosys knowingly misuses visa processes to secure visas.

38.     For example, an H-1B visa is intended to be used to bring foreign workers to the U.S. when there are insufficient U.S. workers to perform the specialized jobs at issue. H-1B visas are expressly not intended to displace qualified U.S. workers. 8 C.F.R. § 214.2(h)(1)(ii)(B). To prevent employers from using the H-1B process to cut labor costs by bringing in lower-cost foreign workers, the law requires the sponsoring company to certify in a labor condition application ("LCA") that it will pay the foreign worker the higher of either the prevailing wage for the particular job in the location the employee will work, or the wages paid by the employer to any worker with similar experience and qualifications performing the same job. Congress limits the number of H-1B employees who may be employed nationwide each year. Further, a company applying for H-1B visas must have proof that positions for which it is applying for visas exist.

39.     Similarly, a B-1 visa is a "business visitor" visa used for foreigners visiting the U.S. temporarily for business (such as attending a meeting) but is expressly not to be used for "local employment or labor for hire." 22 CFR § 41.31(b)(1); *see also* 8 U.S.C § 1101(a)(15)(B). In or around 2009, because Infosys was securing so many B-1 visas, U.S. consulate officials started to require that Infosys secure from clients "Welcome Letters" to ensure that the workers were only in the U.S. to perform for those clients tasks of the type that are allowed under the visa regulations.

40.     Each year, Infosys seeks and secures numerous employment-based visas for South Asian workers to work within the U.S., even if positions (or work) for which it seeks the visas do not exist. That is, through its visa program, Infosys ensures that is has a sufficient "inventory" (in Infosys parlance) of South Asian workers available to service U.S. business, even though qualified Americans (who are not South Asian) are available to perform the work. To satisfy government regulations or requirements, Infosys directs employees to secure from clients false "Invite Letters," "Welcome Letters," or other documents used to fraudulently indicate that positions (or work) exist for foreign workers when in fact that is not the case. To perpetuate Infosys's scheme, Infosys's clients have willingly provided false or generic letters (or other evidence) that Infosys falsely presents as proof to the U.S. government that positions or work exist that, in fact, do not exist.

41.     On information and belief, Infosys certified on LCAs that it was not displacing U.S. workers and that it took good faith steps to recruit U.S. workers before seeking H-1B visas. These certifications were false.

42.     In response to a whistleblower action brought by Jay Palmer, Infosys entered into a settlement with the United Stated Department of Justice on October 31, 2013 in which it agreed to pay a $34 million fine for charges of visa fraud – the largest fine of its kind in American history. Infosys Settlement Agreement at 9, https://www.ice.gov/doclib/news/releases/2013/131030plano.pdf; *Infosys to pay $34M fine to settle visa fraud charges, Justice Dept. to announce*, CBS News, http://www.cbsnews.com/news/infosys-to-pay-34m-fine-to-settle-visa-fraud-charges-justice-dept-to-announce/. Infosys has successfully used its visa program, including its misrepresentations and visa abuses, to further its discrimination in favor of South Asians. For

example, from 2005 to 2012, Infosys had approximately 14,008 H-1B petitions approved. Of those, approximately 13,861, or 99%, of the visa workers came from India. Infosys has then used these visa workers (as well as other South Asian workers) to replace or supplant American (non-South Asian) workers.

*Infosys's Discrimination In "Local" Hiring*

43. Aside from its abuse of the visa system, Infosys engaged in a systematic pattern and practice of discrimination in its so-called "local" hiring, *i.e.*, hiring of non-visa dependent individuals.

44. The statistics that Infosys has reported in SEC filings and to the EEOC demonstrate that at least 65% of its non-visa employees in the United States are Asian. Upon information and belief, the vast majority of these employees are of South Asian race or Indian, Bangladeshi, or Nepalese national origin.

45. Infosys's workforce is grossly disproportionate to the U.S. population, which is only 4.8 percent Asian and between 1 and 2 percent South Asian. Infosys could not have achieved its grossly disproportionate workforce of "local" hires except through a pattern and practice of discrimination.

46. Plaintiffs' experiences are representative of the harm stemming from Infosys's discriminatory practices, including discrimination that occurred with respect to specific client projects and at Infosys in general.

*The Harley Account:  Plaintiffs Koehler and Parker*

47. Plaintiffs Koehler and Parker were discriminated against after Infosys began offering IT services to Harley Davidson in Wisconsin.

48. Harley Davidson makes and sells motorcycles, is based in Milwaukee, and has

operations throughout Wisconsin (including in Tomahawk). In 2012, Infosys and Harley Davidson finalized a five-year engagement for IT services. As part of the arrangement, Infosys was to provide Harley IT services, including applications management, infrastructure support, and hosting services.

49.     As a result of its contract with Infosys, Harley Davidson announced that it was cutting 125 workers from its IT staff. Infosys publicly announced that it was hiring 125 workers in Milwaukee, primarily to provide IT services to Harley Davidson. In or around October 2012, Infosys also began providing IT support at Harley Davidson's Tomahawk, Wisconsin location. As part of Infosys's expansion to the Tomahawk location, Infosys began interviewing and retaining IT workers. In some instances, these new Tomahawk-based employees replaced Harley's existing IT staff and contracted workers.

50.     Infosys's systemic pattern and practice of discriminating against non-South Asian individuals permeated its staffing for the Harley Davidson project.

51.     As Infosys was preparing to provide IT services to Harley Davidson, it sought applicants for IT jobs, including a Lead VMWare/Windows Administrator. Ms. Koehler is an experienced IT professional with considerable academic and professional experience. Ms. Koehler has two degrees in Information Systems, including a Bachelor of Science degree from Marquette University and a Master of Science degree from the University of Wisconsin, Milwaukee.

52.     Ms. Koehler has been employed in information technology positions since 1996 and has extensive experience in multiple fields. As a result of her training and experience, Ms. Koehler has a wide array of skills that include expertise with operating systems, server management software, computer and server hardware, and IT consulting.

53. One area of expertise for Ms. Koehler is VMware. Ms. Koehler is a VMware Certified Professional and has had prior job responsibilities that included installing and supporting VMware applications.

54. In April 2012, Ms. Koehler applied for a position as a "Lead VMware/Windows Administrator" with Infosys.

55. Ms. Koehler was qualified for the position to which she applied as she has extensive experience with VMware and Windows administration and she met all of the requirements set forth in the job posting.

56. On April 18, 2012, Ms. Koehler received an electronic message from Infosys acknowledging that her application had been received, that it was complete, and that it was under review.

57. On April 20, 2012, Ms. Koehler received an electronic message from Infosys informing her that she had been selected for a telephonic interview. The message set the interview to occur at 10 a.m. eastern time on April 24, 2012. The message stated that Infosys would contact Ms. Koehler at the telephone number she had provided with her application.

58. On the morning of April 23, 2012, Ms. Koehler received another electronic message from Infosys confirming the telephonic interview would occur at 10 a.m. eastern time on April 24. This message again confirmed that Infosys would contact Ms. Koehler at her telephone number.

59. On April 24, 2012, at approximately 9 a.m. eastern time, an Infosys representative called Ms. Koehler at the telephone number she had provided with her application. The representative stated that Infosys was "verifying" that Ms. Koehler would be present at that telephone number for her interview that was to begin in approximately one hour. Ms. Koehler

confirmed that she would be available at that telephone number for the interview.

60.     At approximately 9:50 a.m. eastern time – 10 minutes before the interview was set to begin – Infosys sent Ms. Koehler an email.  That email abruptly changed the plan for the interview, instituting a dial-in conference call (as opposed to Infosys calling Ms. Koehler directly).  This was the first time that Infosys stated that Ms. Koehler would need to dial-in for the interview.  Had Ms. Koehler not been monitoring her email, she likely would have missed the telephonic interview in light of the last-minute change by Infosys.

61.     Ms. Koehler dialed into the conference call number provided to her at the last minute and participated in the telephonic interview.  The interview lasted approximately 45 minutes.  While the job posting indicated that VMware would be the primary role for the position, Infosys's representatives spent a considerable amount of time asking about other subjects, including DNS and Active Directory.  Ms. Koehler explained to Infosys's representative that she had considerable experience with those areas, and explained the particular types of work she had performed.

62.     Almost immediately after Ms. Koehler explained her experience with Active Directory, one of Infosys's representatives sighed and stated (incorrectly) that Ms. Koehler had no Active Directory experience.

63.     Infosys did not hire Ms. Koehler.

64.     Upon information and belief, after Ms. Koehler was rejected, Infosys continued to review and interview candidates for the position, including individuals of South Asian descent, for a period of nearly two months.

65.     Infosys ultimately hired a South Asian worker.  Specifically, Infosys hired an individual of South Asian race and Bangladeshi national origin to fill the position.

66. Ms. Parker has been employed as an IT professional since 2010. In 2009, Ms. Parker enrolled in Nicolet College, pursuing an Associates' Degree in IT Computer Support while also working full time to support her family. She received this degree in May 2012.

67. As a result of Ms. Parker's training and experience, she has a wide array of skills that include computer hardware and software analysis and repair, technical customer service, and data center maintenance.

68. Ms. Parker began providing IT help desk support at Harley Davidson's Tomahawk location in February 2012. Ms. Parker was initially employed at Harley Davidson through Enterforce, Inc., a staffing agency, under Harley Davidson's supervision and control. Ms. Parker performed her job responsibilities well and often received positive feedback from Harley representatives.

69. In or around October 2012, Infosys's workers began to perform Harley's IT services at its Tomahawk location. Infosys replaced much of Harley's IT staff with its own employees, and exercised significant hiring and supervisory control over the IT department.

70. In October 2012, Ms. Parker interviewed with Infosys for a permanent position on the IT Help Desk staff – a role she had been performing since February 2012. Infosys interviewed Ms. Parker but expressed little interest. Infosys did not hire Ms. Parker for a permanent position after her October 2012 interview. However, Infosys chose to retain Ms. Parker on a temporary basis through Enterforce. While Enterforce provided Ms. Parker's paychecks, Infosys's managers actively supervised, directed, and controlled Ms. Parker's employment.

71. Ms. Parker's direct supervisor was Charles Henrich, an Infosys employee. Mr. Henrich's supervisor was Saravanan Vivekanandan, an Infosys employee. On information and

belief, Mr. Vivekanandan is of South Asian race and Indian national origin.

72.     In May 2013, Infosys began utilizing SoftHQ, Inc., another staffing agency, for its staffing needs. Ms. Parker was again interviewed for the position she already held, this time by SoftHQ employees. In June 2013, Ms. Parker signed a long-term contract with SoftHQ to provide IT help desk duties at Harley Davidson, under Infosys's supervision and control. As before, Infosys's managers actively supervised, directed and controlled Ms. Parker's employment. Chris Weber, a local Infosys supervisor, referred to Ms. Parker as part of the "Infosys Team" he supervised.

73.     In August 2013, Ms. Parker was informed that she was being terminated, effective September 2013. Given Ms. Parker's excellent work performance, Mr. Henrichs and several Harley Davidson employees appealed to Infosys management on her behalf, but to no avail. Harley Davidson employees expressed shock at Infosys's decision. For instance, Patrick Tierney, a Harley Davidson IT worker, explained that he was "as confused as you [Ms. Parker] on this one" because "he had not heard of any issues or problems and always heard good things about your performance and customer service." Mr. Weber was also shocked, stating, "You're kidding me!" when Ms. Parker told him she had been fired.

74.     The only explanations Infosys gave for the termination were that (a) her desk and the IT area were not "tidy" (despite her not being responsible for cleaning the IT area) and (b) she had been late to work on one occasion. Ms. Parker had received no prior complaints, warnings, or disciplinary action from Infosys, Harley Davidson, or otherwise.

75.     During her last several weeks of employment, Infosys tasked Ms. Parker with training Kapil Kulkarni, a worker who later took over her position on the IT Help Desk. On information and belief, Mr. Kulkarni is of South Asian race and Indian national origin.

*The D.C. Government Contract: Plaintiff Bolten*

76.     In or around December 2012, Infosys Public Service won a $49.5 million contract with the Washington, D.C. government to design and build the IT infrastructure supporting the D.C. Health Benefit Exchange, an online shopping center for health insurance created under the Affordable Care Act.  The contract contained a possible extension, valued at an additional $36.5 million, for a total value of $86 million.  A large part of the work to be performed involved "testing" the system after it was operational.  Testing involves developing and running various "real world" scenarios to ensure that the software operates as it should.

77.     Infosys Public Service set up and staffed a facility in Washington, D.C. to begin work on the Exchange.  Upon information and belief, Infosys exerted significant control over Infosys Public Services' employment decisions.  As did Infosys, Infosys Public Service discriminated against non-South Asian individuals in its hiring, compensation, and promotion decisions.  Ms. Bolten's experience is representative of these practices.

78.     Ms. Bolten is an experienced IT professional with considerable academic and professional experience.  Ms. Bolten has a Bachelor of Science degree in Computer Science from Moscow University of Technology.

79.     Ms. Bolten has been employed in IT positions since 1996 and has extensive experience in multiple fields including software analysis and performance testing.  As a result of her training and experience, Ms. Bolten has a wide array of skills that include expertise with SQA and SAC review and analysis.

80.     In 2012, Ms. Bolten posted her resume to the website Monster.com in hopes of finding an IT position.  In late 2012, Infosys Public Services contacted Ms. Bolten and expressed a desire to interview her.  Ms. Bolten initially conducted a telephone interview for a Test Lead

position with Infosys in Washington, DC, working on the D.C. Health Benefit Exchange. Ms. Bolten's interviewer was impressed by her fifteen years of IT experience and she was selected for an in-person interview.

81.     Ms. Bolten attended her second interview with Infosys in December 2012, along with approximately 45 non-South Asian workers. South Asian workers were conducting the interviews, and only two non-South Asian workers who interviewed were hired by Infosys Public Services.

82.     Ms. Bolten performed well during her second interview with Infosys Public Services and she was hired in January 2013. Ms. Bolten's second interviewer stated that she would be a "Test Lead Analyst."

83.     However, Ms. Bolten's offer letter stated that she would be a "Test Analyst" – a position of considerably lesser pay and responsibility.

84.     The vast majority of Ms. Bolten's co-workers were visa workers from India. Of the approximately 100 Infosys and Infosys Public Services workers on the D.C. Health Benefit Exchange project, only three were American, including Ms. Bolten.

85.     Ms. Bolten's extensive experience served her well; she performed very well in her role, and was integral to the success of her project testing team. The majority of Ms. Bolten's Indian co-workers had little experience and they often relied on her to help them complete their work. For example, Ms. Bolten's Test Lead Analyst was an H-1B employee from India named Gheeta Kulkarni who had only three years of experience; Ms. Bolten had fifteen years of experience. Ms. Bolten's co-workers also lacked knowledge of basic facts that were necessary to perform the task for which Infosys was hired, including for example, the relevance of an individual's social security number. Ms. Bolten had to explain these basic details to her

co-workers.

86.     During the first month of her employment, Jayanta Gosh, an Infosys Limited employee and the Test Manager for Ms. Bolten's project, informed her he would make her a Test Lead and assign her two junior testers.  This promotion, to the position she had originally been promised, never occurred.

87.     After several months of working for Infosys, Infosys Public Services began promoting less experienced South Asian workers to Test Lead Analyst.  Ms. Bolten was not promoted.  Additionally, Ms. Bolten's responsibilities were gradually decreased until she was required to perform tasks generally required of entry-level Test Analysts.  Eventually, Ms. Bolten was assigned little to no work.  At the same time, Ajeet Mohanty, one of Ms. Bolten's managers, accused her of not working enough.

88.     Ms. Bolten repeatedly sent her resume to Infosys Public Services management, asking for more responsibility and a position commensurate with her experience and background.  Her requests were repeatedly denied and/or ignored.  For instance, Ms. Bolten learned that Mr. Gosh was assembling a performance testing team and looking for performance testers.  This position would have entailed an increase in pay and responsibility.  Ms. Bolten expressed her interest in an e-mail to Mr. Gosh and informed him that she had two years of performance testing experience with IBM.  Mr. Gosh never responded.  Rather, Infosys brought visa workers from India with little or no experience to fill the performance tester positions.

89.     Mr. Mohanty, Infosys Limited's project manager, was one of the managers to whom Ms. Bolten reported and he, Mr. Gosh, other executives, and Human Resources representatives of Infosys Limited made decisions that exerted significant control over Ms. Bolten's hiring, compensation, work opportunities, work duties, work assignments, work

conditions, supervision, reviews, ending of employment and other actions described herein.

90.     Ms. Kulkarni, Ms. Bolten's supervisor, and her other co-workers spoke Hindi at work, despite Ms. Bolten's request that they speak English.  This left Ms. Bolten isolated and unable to participate fully in her office environment.

91.     Ms. Bolten complained to John Santucchi, a non-South Asian supervisor about her co-workers speaking Hindi, including about the project and thereby preventing her from participating fully in the project and making her very uncomfortable.  Ms. Bolten asked that this conversation be kept confidential.

92.     Upon information and belief, Ms. Bolten's supervisor did not keep her complaint confidential.  Indeed, after she spoke with her supervisor, Ms. Bolten's co-workers created a hostile work environment and harassed her.

93.     Ms. Bolten's working environment became increasingly uncomfortable, with frequent taunts and rude remarks from her Indian co-workers and supervisors.  For instance, when Ms. Bolten took a sick day, Ms. Kulkarni commented to Ms. Bolten's friend to the effect that "those Americans are lucky because they can take sick days."  On another occasion, Mr. Mohanty publicly shamed Ms. Bolten by sending an e-mail to the entire project team pointing out an alleged mistake she had made.  Mr. Mohanty also required her to arrive at work by 8:30 a.m., earlier than any of her co-workers, despite assigning her little to no work.  Additionally, Ms. Bolten was required to move workstations several times and was transferred between three different work groups.

94.     By June 2013, Ms. Bolten's treatment had become unbearable and it was clear she had no hope of advancement, despite applying for a Test Lead position and repeatedly asking her managers for work commensurate with her experience.  Consequently, Ms. Bolten ended her

employment with Infosys Public Service.

95.　Upon information and belief, as a result of Infosys's use of inexperienced unqualified South Asian workers, it failed to adequately perform its job. Of note, D.C.'s health exchange system will not be able to determine whether individuals are eligible for Medicaid, a significant problem that testers failed to recognize until within weeks of the time that the system is to go online.

*The Sales Force: Plaintiff Handloser*

96.　Infosys has engaged in a systematic pattern and practice of discriminating against non-South Asian employees and in many instances replacing them with South Asian employees.

97.　In or around 2011, Infosys began a concerted effort in the U.S. to purge non-South Asian employees in favor of South Asians, including in the sales force and other areas that had comparatively large numbers of non-South Asian employees. This purge was accomplished through a number of means, including, for example: (a) by assigning non-South Asian employees more stringent performance goals as compared to South Asian employees; (b) by giving non-South Asian employees poor performance rankings relative to South Asians; (c) by subjecting more non-South Asians to performance improvement plans ("PIPs") or demotions compared to South Asians; (d) by giving non-South Asians reduced wages (*e.g.* reducing or eliminating bonuses), as compared to South Asian employees; and (e) by terminating non-South Asian employees without applying standard company policies (*e.g.* without giving progressive warnings or PIPs before termination). Relative to South Asians in the U.S., non-South Asians in the U.S. were disproportionately subject to these adverse actions.

98.　Mr. Handloser is an experienced sales professional with considerable academic and work experience. Mr. Handloser has a Bachelor's Degree from the University of Michigan.

99.     Mr. Handloser has been employed in sales since 1998.  As a result of his training and experience, Mr. Handloser has a wide array of skills that include expertise in client acquisition, consulting, and sales team management.

100.     Mr. Handloser started working for Infosys in August 2004 in the U.S. Automotive Industry unit as a Sales Manager.  In 2010, Mr. Handloser was asked to be Sales Manager of the Manufacturing Business Unit for several new industries related to Resources, a position that he held until his termination.

101.     By 2012, the Manufacturing Business Unit Client Services Group consisted of about 180 employees, approximately 96% of whom were South Asian.

102.     Mr. Handloser worked approximately 50% of the time from his home office in Florida, while spending approximately 50% of the time traveling between different Infosys offices and client locations in the United States.

103.     Infosys employees, including Mr. Handloser, were required to meet certain performance goals and were subject to biannual review and ranking through a program known as the Consolidated Relative Ranking ("CRR").  Employees would be assigned a CRR ranking, from 1 to 4 (1 being highest, 4 being lowest), and employees' bonus compensation was tied directly to their CRR ranking.  Employees who failed to meet a sufficient number of performance goals would be required to complete Performance Improvement Plans ("PIPs"), which consisted of additional performance goals that would need to be completed over a matter of months.  An employee who failed to complete his or her PIP was subject to termination.  Mr. Handloser's direct supervisor was Sudip Singh who was Head of Sales North America Manufacturing.  On information and belief, Mr. Singh is of South Asian race and Indian national origin.  Mr. Singh reported to Sanjay Jalona, who was then Senior Vice President of Hi-Tech &

Manufacturing. On information and belief, Mr. Jalona is of South Asian race and Indian national origin. Mr. Jalona reported to Ashok Vemuri, who during Mr. Handloser's employment was a member of Infosys's board and head of Infosys's American operations, and global head of manufacturing and engineering services. On information and belief, Mr. Vemuri is of South Asian race and Indian national origin.

104. Mr. Handloser's supervisors took a number of discriminatory actions against him. For example, Infosys managers would often speak Hindi in front of him at work, despite his requests that they not do so. Further, before forwarding e-mails to Mr. Handloser, Mr. Jalona would edit e-mails to eliminate positive feedback regarding Mr. Handloser. Further, Mr. Handloser's commission for Ford Motor Company in early 2011 was significantly reduced, even after he challenged the reduction before an official review board.

105. Mr. Handloser also lost another significant commission after soliciting business from Kaydon Corporation. In or around December 2011, after Mr. Handloser had expended considerable efforts to negotiate a contract with Kaydon, Infosys BPO, a wholly owned subsidiary of Infosys Limited, went against Kaydon's express instructions and signed the client without Mr. Handloser's knowledge within Infosys BPO internal systems. As a result, Mr. Handloser lost a commission. Also, due to significant delivery issues caused be Infosys and Infosys BPO, Mr. Handloser was forced to spend considerable time repairing Infosys's relationship with Kaydon. As a result of the time spent repairing the relationship with Kaydon, Mr. Handloser was unable to pursue new business, which also adversely affected his performance numbers and commission income. Upon information and belief, Infosys exerted significant control over Infosys BPO's actions.

106. In July 2012, Toyota Motor Engineering and Manufacturing North America

("Toyota") informed Infosys they were not interested in Infosys's services, despite over a year of Infosys's Automotive and Aerospace unit pursuing the business. Associate Vice President Rohit Kedia, head of the Automotive and Aerospace unit, asked Mr. Singh to have Mr. Handloser personally help repair the relationship. Mr. Handloser subsequently led the contract negotiations and successfully signed Toyota as a client in August 2012.

107. Starting in October 2012, Infosys management required that Mr. Handloser be shadowed by a colleague named Shailender Jain. On information and belief, Mr. Jain was of South Asian race and Indian national origin. Mr. Jain shadowed Mr. Handloser while he performed due diligence activities onsite with Toyota. These due diligence activities concluded in mid-December 2012.

108. On December 19, 2012, approximately one week after Mr. Handloser secured key business information from Toyota and shared the information with Mr. Jain, Mr. Singh, Mr. Handloser's supervisor, requested to speak with him by telephone. During that call, Mr. Singh and human resources representative Breanna Rhoades informed Mr. Handloser that his employment was terminated immediately. During the phone conference:

- Mr. Singh stated that Infosys reviewed each of its employees and units;

- Mr. Singh stated that based on Infosys's analysis, assessment, current business model and Mr. Handloser's performance during the last business cycle, Infosys decided to end his employment effective that day;

- Mr. Handloser expressed surprise at his termination;

- Ms. Rhoades described pay and benefits issues relating to the job termination, including termination of health benefits the next day and four weeks' separation pay in lieu of notice;

- Mr. Handloser expressed disagreement with the separation pay and benefits decided, in light of his years of service, outstanding commissions he was owed, and other factors;

- Ms. Rhoades stated that the separation package Infosys prepared for Mr. Handloser had been decided by senior leadership, including the CEO and CFO; and

- Mr. Handloser asked Mr. Singh who made the termination decision (discussed during the call), and Mr. Singh said that his understanding was the decision was coming "right from the top."

109. Shortly after Mr. Handloser's termination, he contacted Lisa Kidd, Infosys's Vice President of Human Resources in the United States. When he told her of the circumstances surrounding his termination, she remarked: "They can't do that." She was referring to Infosys management having circumvented policies and procedures (including performance warnings, PIP, *etc.*) that the company requires to occur before a termination.

110. Mr. Jain replaced Mr. Handloser as the sole Infosys point of contact with Toyota.

111. Mr. Handloser is aware of a number of additional non-South Asian employees in the Sales group that experienced similar treatment.

*Additional Evidence of Discriminatory Intent*

112. Additional evidence of Infosys's discrimination has come to light through a lawsuit by one of Infosys's former employees named Jay Palmer. Mr. Palmer was an Infosys employee who is not South Asian. He experienced considerable mistreatment based upon his race and American national origin.

113. While working at a client site in December 2008, Mr. Palmer claims that another Infosys employee wrote "Americans cost $," and "No Americans/Christians" on a whiteboard.

114. Mr. Palmer claims that he received a couple of telephone calls in which the caller asked, "Why are you doing this, you stupid American, we have been good to you." While Mr. Palmer does not know who made these calls, they came after he began to complain about Infosys's misuse of the visa system.

115. On February 28, 2011, while Mr. Palmer was working on a project in Alpharetta,

Georgia, he claims that he found a typewritten note on his keyboard, and a Word document on his computer, both of which stated, "Just leave your [sic] not wanted here hope your journey brings you death stupid american [sic]."

116.    On April 21, 2011, Mr. Palmer claims that he received an e-mail on his personal e-mail account stating, "if you make cause for us to sent [sic] back to india [sic] we will destroy you and your family."

117.    Mr. Palmer claims that he was called a stupid American on one occasion by two Infosys employees.

118.    Mr. Palmer brought these issues to the attention of Infosys, but Infosys did not take significant steps to investigate or prevent future issues.

119.    During Mr. Palmer's lawsuit, another employee also testified that Americans generally were made to feel unwelcome at Infosys.  In late 2012, Anand Swaminathan, Vice President & Global Head – Alliances, stated in regard to the "white guys" who worked under his supervision, a statement to the effect that "Those white guys don't do anything."

120.    In early 2012, an Indian manager at Infosys, Syed Farrukh, stated in reference to American Infosys employees and Americans searching for a location, a comment to the effect that "White guys can't find anything."

## Class Action Allegations

121.    Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive and monetary relief for the systemic pattern and practice of discriminatory employment practices based upon individuals' national origin and/or race.  This action is brought on behalf of the following class of individuals:

> All individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin who applied for a position with Defendants in the United

29

States and were not hired, or were employed by Defendants in the United States and were discharged, or, as compared to South Asian workers in the same or similar positions, received lower pay, lesser positions, denied opportunities, and/or worse performance standards or ratings from August 1, 2009 through the present.

In the alternative, this action is brought on behalf of the following two subclasses of individuals:

    A. <u>Hiring Subclass</u>: All individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin who applied for a position with Defendants in the United States and were not hired from August 1, 2009 through the present.

    B. <u>Employment Subclass</u>: All individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin who were employed by Defendants in the United States between August 1, 2009 and the present and were discharged or, as compared to South Asian workers in the same or similar positions, have received lower pay, lesser positions, denied opportunities, and/or worse performance standards or ratings.

122.    Members of the class (or in the alternative, the two subclasses) are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, the class is readily identifiable from information and records in possession of Defendants.

123.    There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are: (a) whether Defendants have intentionally discriminated against individuals who are not South Asian in making employment decisions; (b) whether Defendants have adopted a policy or practice of employing large numbers of foreign-born workers within the United States via H-1B visas, B-1 visas, L-1 visas, other visas and/or green-card worker recruitment; (c) whether Defendants have improperly misused visa programs, including the H-1B, B-1, and L-1 visa processes, to improperly hire foreign workers, make false statements to unlawfully secure their labor, and/or have them perform work illegally; (d) whether Defendants' policy and/or practice of relying on South Asian visa and green-card workers is

intentionally discriminatory against non-South Asians; (e) whether Defendants' policy and/or practice of relying on South Asian visa and green-card workers have had a disparate impact on non-South Asians; (f) whether the disparate impact of Defendants' policy and practice is justified by business or commercial necessity; (g) whether there were alternative, objective means for recruiting, hiring, and employing workers that would have had a less disparate impact on non-South Asians; (h) whether Defendants have violated Title VII; (i) whether Defendants have violated § 1981; and (j) whether equitable and injunctive relief is warranted for the Class.

124.    Plaintiffs' claims are typical of the Class.   All members of the Class were damaged by the same discriminatory policies and procedures employed by Defendants.  Further, Ms. Koehler's and Ms. Parker's claims are typical of the claims of the members of the Hiring Subclass.   All members of the Hiring Subclass were damaged by the same discriminatory policies and procedures employed by Defendants.  Additionally, Ms. Parker's, Ms. Bolten's and Mr. Handloser's claims are typical of the claims of the members of the Employment Subclass. All members of the Employment Subclass were damaged by the same discriminatory policies and procedures employed by Defendants.

125.    Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class litigation to represent them and the other members of the class.

126.    Plaintiffs and the Class (or in the alternative, the Subclasses) they seek to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of Defendants' actions.

127. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the Class as a whole. The Class members are entitled to declaratory and injunctive relief to end Defendants' systematic, common, uniform, unfair, and discriminatory policies and/or practices.

128. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the Class is whether Defendants have discriminated on the basis of national origin and race in their employment practices. The primary question common to the Hiring Subclass is whether Defendants have discriminated on the basis of national origin and race in their hiring. The primary question common to the Employment Subclass is whether Defendants have discriminated on the basis of national origin and race in their employment practices concerning their work opportunities, performance assessment, compensation practices, promotion practices, and termination practices. These questions are central to the case and predominate over individual issues among the members of the proposed class and subclasses. Defendants have engaged in a common course of discriminatory conduct in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

129.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate Defendants' discrimination.  Certification under this rule is also appropriate to decide whether Defendants have adopted a systemic pattern and practice of national origin and racial discrimination in hiring and employment decisions (including decisions concerning work conditions, promotion, demotion, compensation, and termination).

## COUNT I
### (Disparate Treatment)
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)
### (On Behalf of Plaintiffs and the Class, or in the alternative, the Subclasses)

130.    Plaintiffs re-allege and incorporate Paragraphs 1 through 129 by reference as if fully set forth herein.

131.    This claim is brought by Plaintiffs on behalf of themselves and the Class, or in the alternative, the Subclasses.

132.    Throughout the class liability period, Defendants have engaged in a pattern and practice of discriminating against individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin by:  (a) knowingly and intentionally favoring individuals who are of South Asian race or Indian, Bangladeshi, or Nepalese national origin in "local" hiring, (b) filling a disproportionately large percentage of its work force with individuals of South Asian race or Indian, Bangladeshi, or Nepalese national origin, including South Asian workers brought to the United States on visas even when there are qualified individuals available in the United States, and (c) knowingly and intentionally favoring individuals who are of South Asian race or Indian, Bangladeshi, or Nepalese national origin, including South Asian workers hired "locally" or brought to the United States on visas, and disfavoring individuals not of South Asian national origin and race in decisions concerning positions, promotions, compensation,

performance standards or ratings, and/or termination.

133.    As a direct and proximate result of Defendants' intentional discrimination, Plaintiffs and the members of the Class, or in the alternative, the Subclasses, have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to positions, promotions, compensation, performance standards or ratings, and/or continued employment with Defendants.

134.    Defendants' actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000, *et seq*.

**COUNT II**
**(Disparate Treatment)**
**(Civil Rights Act of 1866, 42 U.S.C. § 1981)**
**(On Behalf of Plaintiffs and the Class, or in the alternative, the Subclasses)**

135.    Plaintiffs re-allege and incorporate Paragraphs 1 through 134 by reference as if fully set forth herein.

136.    This claim is brought by Plaintiffs on behalf of themselves and the Class, or in the alternative, the Subclasses.

137.    Throughout the class liability period, Defendants have engaged in a pattern and practice of discriminating against individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin by:   (a) knowingly and intentionally favoring individuals who are of South Asian race or Indian, Bangladeshi, or Nepalese national origin in "local" hiring, (b) filling a disproportionately large percentage of its work force with individuals of South Asian race or Indian, Bangladeshi, or Nepalese national origin, including South Asian workers brought to the United States on visas even when there are qualified individuals available in the United States, and (c) knowingly and intentionally favoring individuals who are of South Asian race or Indian, Bangladeshi, or Nepalese national origin, including South Asian workers

hired "locally" or brought to the United States on visas, and disfavoring individuals not of South Asian national origin and race in decisions concerning positions, promotions, compensation, performance standards or ratings, and/or termination.

138. As a direct and proximate result of Defendants' intentional discrimination, Plaintiffs and the members of the Class, or in the alternative, the Subclasses, have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to positions, promotions, compensation, performance standards or ratings, and/or continued employment with Defendants.

139. Defendants' actions constitute unlawful discrimination in violation of 42 U.S.C. § 1981.

## COUNT III
### (Disparate Impact)
### (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*)
### (On Behalf of Plaintiffs Koehler, Parker, and the Hiring Subclass)

140. Ms. Koehler and Ms. Parker re-allege and incorporate Paragraphs 1 through 139 by reference as if fully set forth herein.

141. Throughout the class liability period, Defendants have used policies and practices related to hiring described herein, *e.g.*, the reliance upon visa and/or green-card employees, or other individuals of South Asian race or Indian, Bangladeshi, or Nepalese national origin, that have had a disparate impact on the basis of national origin and/or race (discriminating against workers who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin) that are neither job-related for the positions at issue nor consistent with business necessity.

142. The foregoing conduct constitutes unlawful discrimination in violation of 42 U.S.C. § 2000, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for relief as follows:

1. Certification of the case as a class action pursuant to Federal Rule of Civil Procedure 23;

2. Designation of Plaintiffs as representatives of the Class, or in the alternative, Subclasses;

3. Designation of Plaintiffs' counsel as counsel for the Class, or in the alternative, Subclasses;

4. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq.;

5. A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981;

6. A permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

7. Order Defendants to adopt a valid, non-discriminatory method for hiring;

8. Order Defendants to post notices concerning their duty to refrain from discriminating against employees on the basis of national origin or ancestry;

9. Order Defendants to pay Plaintiffs and the Class, or in the alternative, Subclasses, compensatory damages for the harm they suffered as a result of Defendants' violations of Title VII and § 1981;

10. Award Plaintiff and the Class, or in the alternative, Subclasses, prejudgment interest at the prevailing rate on the compensatory damages as a result of Defendants' discriminating against them in violation of Title VII and § 1981;

11. Award Plaintiffs and the Class, or in the alternative, Subclasses, exemplary and punitive damages;

12. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

13. Award Plaintiffs and the Class, or in the alternative, Subclasses, such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated September 9th, 2014.                          /s/Daniel A. Kotchen
                                                    Daniel A. Kotchen
                                                    Michael J. von Klemperer
                                                    KOTCHEN & LOW LLP
                                                    1745 Kalorama Road NW, Suite 101
                                                    Washington, DC 20009
                                                    (202) 471-1995
                                                    (202) 280-1128 (Fax)
                                                    dkotchen@kotchen.com
                                                    mvk@kotchen.com

                                                    Michael F. Brown
                                                    DVG LAW PARTNER LLC
                                                    P.O. Box 645
                                                    Neenah, WI 54957
                                                    920-238-6781
                                                    920-273-6177 (fax)
                                                    mbrown@dvglawpartner.com

                                                    Vonda K. Vandaveer
                                                    V.K. Vandaveer, P.L.L.C.
                                                    P.O. Box 27317
                                                    Washington, DC 20038-7317
                                                    202-340-1215
                                                    202-521-0599 (fax)
                                                    atty@vkvlaw.com

                                                    *Attorneys for Plaintiffs*