IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRENDA KOEHLER,
KELLY PARKER,
LAYLA BOLTON, and
GREGORY HANDLOSER,

Plaintiffs,

v.

INFOSYS TECHNOLOGIES LIMITED INC.,
and INFOSYS PUBLIC SERVICES, INC.,

Defendants.

Case No. 13-cv-885-pp

---

**DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

This is a putative class action, alleging race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981. In the second amended complaint, which is operative, the plaintiffs allege that defendants Infosys Technologies Limited, Inc. (ITL) and/or its wholly-owned subsidiary, Infosys Public Services, Inc. (IPS) intentionally discriminated against them in connection with hiring or employment decisions. Individual plaintiffs Koehler and Parker allege that ITL used employment practices that caused a disparate impact against Caucasians on the basis of their race or national origin.

The defendants moved to dismiss the complaint, including the class allegations, under Fed. R. Civ. Proc. 12(b)(6). (Dkt. No. 20.) For the reasons

discussed below, the court concludes that the complaint adequately pleads claims (a) under Title VII for disparate treatment and disparate impact on the basis of race and national origin, and (b) under §1981 for disparate treatment on the basis of race. The court further concludes that the plaintiffs' class allegations are not implausible, and thus that the court will not dismiss them before permitting any discovery. Accordingly, the court denies the defendants' motion to dismiss, with two exceptions. First, the court dismisses the plaintiffs' claims under §1981 for national origin discrimination, because, as the plaintiffs have conceded, §1981 does not support such a claim. Second, the court dismisses Koehler and Parker's claims against IPS because, as the plaintiffs also have conceded, neither of them were employed by IPS or applied for employment with IPS.

**I.   BACKGROUND**

The four plaintiffs allege that they are Caucasian individuals of American national origin, against whom ITL and/or IPS made adverse hiring or employment decisions on the basis of their race and national origin. They seek to represent a class of similarly situated individuals. The complaint alleges that ITL and IPS are corporations organized and headquartered in India. The corporations have many offices located in the United States that are comprised predominantly – or in some cases, entirely – of employees of the South Asian race and of Indian, Bangladeshi, and Nepalese national origin. (Dkt. No. 19, ¶22.) The complaint contains allegations describing the defendants' discriminatory treatment of each of the plaintiffs, and describing the

defendants' alleged employment practices that cause a disparate impact against Caucasians. A detailed recitation of the allegations is not necessary for the purposes of deciding this motion, but the court will set forth a summary of the material allegations.

The complaint alleges that, around 2011, ITL "began a concerted effort in the U.S. to purge non-South Asian employees in favor of South Asians," and that ITL "has engaged in a systematic pattern and practice of discriminating against non-South Asian employees and in many instances replacing them with South Asian employees." Id., ¶¶6, 96. The complaint alleges that plaintiff Gregory Handloser's employment experiences with ITL reflect its discriminatory intent to purge non-South Asian employees in favor of South Asian employees. The complaint asserts that ITL hired Handloser in 2004 as a sales manager. Id., ¶6. In 2010, Handloser became the sales manager of the Manufacturing Business Unit. Id., ¶100. According to the complaint, as of 2012, that unit "consisted of about 180 employees, approximately 96% of whom were South Asian." Id., ¶101. As alleged in the complaint, in 2011 and 2012, ITL began to set unrealistic goals for Handloser, denied him his bonuses, and fired him soon after he finalized a contract with a major client. Id., ¶6.

The plaintiffs allege that Layla Bolten's experiences with IPS were typical of its discrimination "against non-South Asian individuals in its hiring, compensation, and promotion decisions." Id., ¶77. Bolten alleges that IPS interviewed and hired her in Washington, D.C. Id., ¶82. According to the complaint, Bolten was told that she would be a "Test Lead Analyst," but

3

ultimately IPS hired her as a "'Test Analyst' – a position of considerably lesser pay and responsibility." Id., ¶¶82-83. Bolten claims that she repeatedly requested a promotion to Test Lead, and was told she would receive it. Id., ¶¶86, 99. She alleges, however, that ITL "promoted South Asian workers and brought additional Indian workers . . . to perform work for the testing project in spite of the fact that these workers had no experience as software testers." Id., ¶5.

The plaintiffs also allege that, because of their race and national origin, ITL did not hire Caucasian Americans. Plaintiff Brenda Koehler, who lives in Milwaukee, alleges that she applied and interviewed for a position with ITL to perform IT services. Id., ¶4. Koehler alleges that she "has advanced educational and work experience pertinent to the position Infosys was looking to fill, interviewed with Infosys, and was denied a position in favor of a South Asian worker." Id. Plaintiff Kelly Parker alleges that in 2012, she "was contracted to work under the management of Infosys and was providing IT services to Harley Davidson from Tomahawk WI[.]" Id. Parker alleges that in September 2013, ITL "decided not to hire [her] permanently and terminated the contract under which [she] worked in favor of" a South Asian worker who "Parker herself had trained and who moved to Tomahawk to replace her." Id.

In addition to the plaintiffs' individual experiences, the complaint contains allegations regarding the defendants' purported intent to discriminate on the basis of race. The complaint alleges that two ITL executives, who are South Asian, explicitly encouraged recruiters to focus their efforts on recruiting

4

Indian candidates and dismissed complaints that highly qualified American candidates were being rejected in favor of Indian candidates. Id. ¶¶28-30. The complaint further alleges that an ITL hiring manager stated: "There does exist an element of discrimination. We are advised to hire Indians because they will work off the clock without murmur and they can always be transferred across the nation without hesitation unlike [a] local workforce." Id., ¶3.

The plaintiffs allege that the defendants achieve their discriminatory objectives, at least in part, by their practice of setting annual "visa quotas" to support the growth of their United States offices, hiring South Asian workers in sufficient numbers to meet those quotas, and securing visas for foreign workers to enter and work in the U.S. Id., ¶¶31-35. They allege that ITL sets annual growth targets for its U.S. offices, then budgets for the number (and expense) of additional foreign-worker visas ITL will need to secure in order to bring foreign workers into the U.S. to meet its targets. Id., ¶33. The complaint alleges that this practice results in annual visa quotas of South Asian workers to be hired and "employed within the U.S., irrespective of the fact that qualified workers exist in the U.S. that Infosys could use to support its U.S. business." Id.

In their motion and brief, the defendants argue that the plaintiffs effectively are challenging the defendants' use of the federal visa programs. (Dkt. No. 20, at 3; Dkt. No. 21, at 17-20.) They also argue that the plaintiffs failed to state a cause of action for disparate treatment because "there are no guidelines to determine who is of the 'South Asian race,' and the phrase is not capable of being clearly defined." (Dkt. No. 20, at 3; Dkt. No. 21, at 20-25.)

5

The defendants contend that the plaintiffs' "inability to identify distinct racial and national origin groups is fatal to Plaintiffs' claims," because the plaintiffs cannot show that either defendant took an adverse action because of the plaintiffs' membership in an identifiable group. (Dkt. No. 20, at 3.) They further argue that the court must dismiss the plaintiffs' discrimination claim under §1981 because (1) discrimination on the basis of "national origin" is not actionable under that statute, and (2) the plaintiffs failed to "demonstrate membership in a group commonly regarded as racially distinct." (Dkt. No. 20, at 6; Dkt. No. 21, at 32-33.) Finally, the defendants argue that the plaintiffs' disparate impact claims fail because the plaintiffs "have failed to plead with particularity the source of any alleged disparate impact," and failed to "identify a particular policy or practice" that causes a disparate impact on a member of a protected class. (Dkt. No. 20, at 7; Dkt. No. 21 at 37.)

## II. ANALYSIS

Fed. R. Civ. Proc. 8 sets forth the liberal requirements of notice pleading. To state a claim for relief, the complaint must contain a short and plain statement "of the grounds for the court's jurisdiction, . . . the claim showing that the pleader is entitled to relief, . . . and a demand for the relief sought[.]" Fed. R. Civ. P. 8(a). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

6

liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009). In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404–05 (7th Cir. 2010)). "[T]he proper question to ask is still *could* these things have happened, not *did* they happen." Id. at 827 (internal quotation and citation omitted). The plaintiffs "need not 'show' anything to survive a motion under Rule 12(b)(6)—[they] need only allege." Brown v. Budz, 398 F.3d 904, 914 (7th Cir. 2005).

"Title VII claims are not subject to a heightened pleading standard." Carlson, 758 F.3d at 827. The Seventh Circuit has held that an allegation as simple as "'I was turned down for a job because of my race' is all a complaint has to say" to plead race discrimination in employment. Bennett v. Schmidt, 153 F.3d 516, 518 (1998). Although Bennett predated Twombly and Iqbal, the Seventh Circuit has continued to reaffirm its holding. See, e.g., Tamayo v. Blagojevich, 526 F.3d 1074, 1084 (7th Cir. 2008); see also EEOC v. Concentra Health Servs., Inc., 496 F.3d 773, 781–82 (7th Cir. 2007)). In Concentra, the Seventh Circuit explained, "once a plaintiff alleging illegal discrimination has clarified that it is on the basis of her race, there is no further information that is both easy to provide and of clear critical importance to the claim." Concentra, 496 F.3d at 781-82.

7

A. <u>The Complaint States Plausible Claims for Disparate Treatment on the Basis of Race and National Origin, in Violation of Title VII, and on the Basis of Race, in Violation of §1981.</u>

In Counts I and II of the complaint, the plaintiffs pleaded claims for race and national origin discrimination in violation of Title VII and §1981. Both statutes prohibit discrimination on the basis of race, and Title VII expressly prohibits discrimination on the basis of national origin. Title VII forbids a covered employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . , or national origin. 42 U.S.C. §2000e–2(a)(1). Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" Title VII and § 1981 both encompass "so-called 'reverse discrimination' against white employees." See, e.g., <u>Everett v. Cook County, Ill.</u>, 655 F.3d 723, 729 (7th Cir. 2011) (Title VII); <u>McDonald v. Santa Fe Trail Transp. Co.</u>, 427 U.S. 273, 287, 96 S. Ct. 2574 (1976) (§1981).

Unlike Title VII, §1981 does not expressly prohibit discrimination on the basis of national origin. In <u>St. Francis College v. Al Khazraji</u>, 481 U.S. 604, 613, 107 S. Ct. 2022 (1987), the Supreme Court explained that discrimination based on ancestry or ethnic characteristics is actionable under §1981, while

8

discrimination based on place or nation of origin is not. The Supreme Court stated:

> Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.

Id. (internal citations omitted) As a result, the Seventh Circuit has observed that the Supreme Court "resolved much of" the issue of whether §1981 extended to national origin discrimination "by defining race broadly to include identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Pourghorishi v. Flying J, Inc., 449 F.3d 751, 756 (7th Cir. 2006).

At this stage in the litigation, the court construes the allegations in the complaint in the light most favorable to the plaintiffs; under that construction, the court infers that Count II alleges that the defendants discriminated against the plaintiffs on the basis of their race—meaning their ancestry or ethnic characteristics—not the place or nation of their birth.[1] "Race, nationality, and ethnicity are sometimes correlated, but they are not synonyms. A racial group

---

[1] The defendants contend that the plaintiffs have abandoned their national origin discrimination claim under §1981, and argue that the court should dismiss the claim on that basis. (Dkt. No. 24, at 8-9.) As explained above, to the extent that Count II alleges discrimination on the basis of national origin, the court construes that count to allege discrimination on the basis of the plaintiffs' ancestry or ethnic characteristics, *i.e.*, race discrimination, not the place or nation of the plaintiffs' birth.

as the term is generally used in the United States today is a group having a common ancestry and distinct physical traits. The largest groups are whites, blacks, and East Asians." Abdullahi v. Prada USA Corp., 520 F.3d 710, 712 (7th Cir. 2008). Accordingly, the court considers Counts I and II jointly for purposes of the motion to dismiss.

The defendants argue that the plaintiffs' disparate treatment claims fail because they fail to "identify a distinct racial group" to which the plaintiffs belong that differs from the group the plaintiffs allegedly favor.² (Dkt. No. 21, at 22.) The court concludes that the plaintiffs' allegations are sufficient to state claims that the defendants intentionally discriminated against them because of *the plaintiffs'* race, and the complaint is clear that the plaintiffs regard their race as distinct from the "South Asian race" that the defendants allegedly favor. All of the plaintiffs allege that they are Caucasians of American national origin, and that the defendants discriminated against them because they are not of the South Asian race or Indian, Bangladeshi, or Nepalese national origin. In

---

² The defendants cite Dasgupta v. Univ. of Wis. Bd. of Regents, 121 F.3d 1138, 1139 (7th Cir. 1997) for the proposition that "the people of the Indian subcontinent are Caucasian," like the plaintiffs. (Dkt. No. 21, at 21.) But St. Francis College makes clear that discrimination by one Caucasian group against another is actionable under §1981: "[P]etitioner submits that the section does not encompass claims of discrimination by one Caucasian against another. We are quite sure that the Court of Appeals properly rejected this position." St. Francis College, 481 U.S. at 609-10; see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S. Ct. 998 (1998) (explaining that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group") (internal quotation marks and citation omitted).

10

the context of this case, the plaintiffs are alleging that the Caucasian and South Asian races are distinct, and that the defendants' failure to hire, promote, or retain was due to the fact that the plaintiffs are not of the South Asian race. As in Carlson, the plaintiffs allege that the defendants made adverse employment decisions affecting each of them, and they attribute those adverse employment decisions to race discrimination, "satisfying the standard applied in Swanson, Tamayo, and Concentra." Carlson, 758 F.3d at 827.

Further, as in Carlson, the defendants have "provided additional allegations (which [the court] must accept as true at this stage) that were not needed but bolstered the plausibility of [their] claims." Id. For example, the plaintiffs point to their allegedly positive work evaluations and performance, the South Asian employees who either were hired in place of or replaced the plaintiffs, executives' alleged instructions to hire Indians and not Americans, and a hiring manager's alleged statement confirming that the defendants affirmatively encourage discrimination (and providing an explanation why they did so). (Dkt. No. 19, ¶¶3, 28-30, 64-65, 73, 75, 87, 104, 106.)

Because race discrimination in employment is "a claim upon which relief can be granted," and because the plaintiffs adequately have pleaded plausible claims that they suffered adverse discriminatory employment actions on the basis of their race, the court will not dismiss their claims for race discrimination under Title VII and §1981 under Rule 12(b)(6).

The defendants also argue that Koehler and Parker cannot assert a Title VII claim against IPS because they never applied to work for IPS. (Dkt. No. 21,

at 16.) The plaintiffs acknowledge that Koehler and Parker did not apply to work at IPS, and state that they "did not intend to state a Title VII claim against IPS." (Dkt. No. 22, at 6.) For that reason, the court dismisses Koehler and Parker's claims against IPS, but their claims against ITL survive.

B. Plaintiffs Koehler and Parker State Plausible Claims Against ITL for Disparate Impact on the Basis of Race and National Origin, in Violation of Title VII.

Under Title VII, a plaintiff establishes an unlawful employment practice based on disparate impact by demonstrating that the employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, . . . or national origin," and that the employer "fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. §2000e-2(k)(1)(A)(i). "By enacting the Title VII provision governing disparate-impact claims, Congress allowed claims to be brought against an employer who uses a practice that causes disparate impact, whatever the employer's motives and whether or not he has employed the same practice in the past." 42 U.S.C.A. §2000e–2(k)(1)(A)(i). "In evaluating a disparate-impact claim, courts focus on the *effects* of an employment practice, determining whether they are unlawful irrespective of motivation or intent." Young v. United Parcel Serv., Inc., ___ U.S. ___, 135 S. Ct. 1338, 1345 (2015). "Disparate-impact claims may be based on any employment policy, not just a facially neutral policy." Adams v. City of Indianapolis, 742 F.3d 720, 731 (7th Cir. 2014).

Plaintiffs Koehler and Parker claim that defendants' practices of setting visa quotas for each office, recruiting persons of the South Asian race and Indian, Bangladeshi or Nepalese national origin to fill employment spots, and securing visas for those persons to work in the U.S. caused a disparate impact on the basis of race. (Dkt. No. 19, ¶¶33-35.) They allege further that these practices resulted in a significant disparity in the ratio of South Asian employees to Caucasian employees in each of the defendants' United States offices. According to the complaint, ITL reported to the federal government demographic data from 59 sites located in at least 25 states. Id. ¶22. ITL's self-reported data allegedly shows that 100% of the employees at 21 of its sites are "Asian." Id. For "for 53 of the 59 sites, at least 94.5% of the employees are 'Asian.'" Id. That is so, the plaintiffs allege, despite the "sites' vastly different demographics," the U.S. "population at large," and the demographics of "information technology professionals in the United States." Id., ¶¶22-24. Further, the complaint alleges that ITL falsely certified that it attempted in good faith to recruit U.S. workers before seeking visas for its employees. Id. ¶41.

The defendants respond that plaintiffs Koehler and Parker can assert this claim only against ITL, because neither of them alleges to have sought employment with IPS.[3] The defendants argue that Koehler and Parker failed to

---

[3] At oral argument, the defendants' counsel also argued that neither Koehler nor Parker sought a position that was filled by a visa holder, and thus that they lacked standing to assert a disparate impact claim because they were not actually injured by this alleged practice. Both plaintiffs have alleged, however, that this practice existed and that they were not hired because of it. The

specify the employment practice they challenge, and characterize the plaintiffs' allegations as an attack on ITL's use of the government's visa programs. (Dkt. No. 21, at 30-31.) As a threshold matter, although Title VII does not define the term "employment practice," the court concludes that Koehler and Parker's are sufficient to allege the existence of one. They allege that the defendants use a customary and repeated practice of growing their U.S. offices by setting visa quotas for additional South Asian workers, budgeting for the associated expenses of securing the visas, and filling employment vacancies by assisting persons of the South Asian race to enter this country to work in the defendants' U.S. offices. The court concludes that these allegations constitute a specific and particular employment practice that disparately impacted them because of their race or national origin. Koehler and Parker further allege that the significant disparity in the defendants' racial demographic statistics gives rise to the inference that this practice resulted in discrimination based on race or national origin, and reflects the defendants' preference to recruit and hire persons of South Asian race and of Indian, Bangladeshi, and Nepalese national origin.

Citing <u>Zhang v. Honeywell International, Inc.</u>, Nos. CV–06–1181–PHX–MHM, CV–07–1790–PHX–MHM, 2010 WL 1996594 (D. Ari. May 10, 2010), the defendants next argue that Koehler and Parker cannot invoke Title VII or §1981 to challenge their visa practices. The defendants read <u>Zhang</u> too broadly.

---

defense argument constitutes a factual dispute not subject to resolution on a motion to dismiss for failure to state a claim.

In Zhang, the plaintiff was terminated upon the expiration of her visa, which the court determined was a legitimate non-discriminatory basis for her termination. Nos. CV–06–1181–PHX–MHM, CV–07–1790–PHX–MHM, 2009 WL 3175063, at *5 (D. Ari. Sept. 29, 2009). The court noted that defendant Honeywell would have violated applicable federal laws and regulations by continuing to employ her. Id. In a separate action, the plaintiff alleged that Honeywell had violated the American Competitive and Workforce Improvement Act and the HB1 and L1 Visa Fraud and Abuse Prevention Act. Id. at *2.

The Zhang court did not hold that a plaintiff could not allege facts about an employer's use (or misuse) of the government's visa programs in a Title VII action alleging race discrimination. In dicta, the court noted that the plaintiff may have had other unresolved grievances against Honeywell that were not actionable under Title VII, id. *8; that does not constitute a holding that an employer could not violate Title VII through discriminatory practices that involved employing large numbers of foreign workers holding visas, as the plaintiffs allege in this case.

The court concludes that the complaint sufficiently states a claim for disparate impact against ITL under Title VII on behalf of plaintiffs Koehler and Parker.

C. The Court Determines that the Plaintiffs Have Pleaded Plausible Class Allegations.

Federal Rule of Civil Procedure 23(c) requires a court to determine, "[a]s soon as practicable after the commencement of an action brought as a class action . . . whether it is to be so maintained." The plaintiffs have not filed a

15

motion to certify this case as a class action and, to date, there has been no discovery. Nonetheless, it is not procedurally improper for the defendants to move to dismiss the class allegations at this time. Because the defendants have moved to dismiss the class claims, despite the fact that it is early in the process, they bear the burden of demonstrating that, on the face of the complaint, the plaintiffs have failed to plead plausible class allegations. See, e.g., Ladik v. Wal-Mart Stores, Inc., 291 F.R.D. 263, 269 (W.D. Wis. 2013) ("In the context of a determination under Rule 23, the question is whether plaintiffs' allegations are sufficient to show that it is plausible that plaintiffs will be able to satisfy the Rule 23 requirements after conducting discovery.").

In addition to the discriminatory acts the plaintiffs claim to have suffered individually, they allege that the defendants have used corporate hiring and employment practices that expressly encourage or result in discrimination against persons who are not of the South Asian race or Indian, Bangladeshi, or Nepalese national origin in hiring, retention, and promotion. The plaintiffs' claims relate to two common contentions—they suffered adverse employment actions because of the defendants' allegedly uniform corporate practice of intentionally discriminating against non-South Asians, or they suffered adverse employment actions because of the defendants' use of employment practices that disparately impact non-South Asians. The court finds that the plaintiffs' class allegations are sufficient to demonstrate that they could maintain a class action after discovery. Accordingly, the court denies the defendants' motion to

dismiss the plaintiffs' class allegations. The court will address, at a later date, whether class certification is appropriate.

## III. CONCLUSION

The court concludes that the plaintiffs' complaint adequately states causes of action for disparate treatment and disparate impact on the basis of race and national origin in violation of Title VII, and for disparate treatment on the basis of race in violation of §1981. The court also concludes, however, that the plaintiffs cannot plead claims for disparate treatment under §1981 on the basis of national origin, and that plaintiffs Koehler and Parker cannot plead claims in Counts I or III against IPS because neither worked for IPS nor sought employment with IPS.

Accordingly, the court **DENIES IN PART** the defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, to the extent that the court finds the complaint adequately states claims for disparate treatment on the basis of race under Title VII and §1983 and for disparate impact under Title VII, and **GRANTS IN PART** the defendants' motion regarding the plaintiffs' claims under §1981 for disparate treatment on the basis of national origin and plaintiffs Koehler and Parker's claims against IPS in Counts I and III, and the court dismisses those claims.

**ORDERED** at Milwaukee this 8th day of May, 2015.

_____
**Hon. Pamela Pepper**
**United States District Judge**