# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **BRENDA KOEHLER,**<br>**KELLY PARKER,**<br>**LAYLA BOLTEN &**<br>**GREGORY HANDLOSER**<br><br>　　　　**Plaintiffs,**<br><br>**v.**<br><br>**INFOSYS TECHNOLOGIES LIMITED,**<br>**INC., and INFOSYS PUBLIC SERVICES,**<br>**INC.**<br><br>　　　　**Defendants.** | **Case No. 2:13-cv-885-PP** |

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   BACKGROUND REGARDING INFOSYS ............................................................1

   A.  General Background. ........................................................................... 1

   B.  Infosys's Hiring Process. ..................................................................... 2

   C.  The Harley-Davidson Project. .............................................................. 3

II.  BRENDA KOEHLER ....................................................................................4

   A.  Background Regarding Koehler. ........................................................... 4

   B.  Infosys's Lead VMware/Window Administrator Position For The Harley-Davidson Account. ........................................................................ 4

   C.  Koehler Applies For The Job And Is Rejected Because She Lacks Technical Knowledge And Qualifications. ......................................... 5

   D.  Infosys Hires Another Candidate For A Different Job Requisition And Replaces Him With A Non-South Asian U.S. Citizen. ....................... 9

III. KELLY PARKER ........................................................................................11

   A.  Background Regarding Parker. ........................................................... 11

   B.  Existing Helpdesk Structure When Infosys Secured The Harley-Davidson Account. ...... 13

   C.  Technology Lead Kapil Kulkarni Begins Working On The Harley-Davidson Account.. 13

   D.  Parker Learns That Her Intern Position Will Not Continue Into 2013, And She Is Not Chosen For An Infosys Position. .................................... 15

   E.  Infosys Hires 21 Non-Asian Senior Systems Engineers For The Harley-Davidson Account In 2012. ............................................................ 17

   F.  Parker Is Hired By Contracting Company SoftHQ. ............................. 18

   G.  Infosys Hires Two Caucasian Americans for Systems Engineer Positions In Tomahawk. .................................................................. 19

   H.  Infosys's Contract With SoftHQ For Desktop Support Ends, And, Accordingly, Parker's Assignment Ends. ............................................. 24

   I.   Kulkarni Moves From His Offshore Harley-Davidson Role To Wisconsin ................ 24

   J.   Parker Files An Administrative Charge Of Discrimination ............................ 26

i

IV. LAYLA BOLTEN ......................................................................................27

    A.  Bolten Applies To Be A Test Analyst And Is Hired As A Test Analyst. ........................ 27

    B.  After An Initial Delay In Available Work, Bolten Is Assigned To Geeta Kulkarni's Testing Team. ........................................................................................ 29

    C.  Bolten Moves To Another Testing Team. ...................................................... 31

    D.  Bolten Is Assigned To A New Testing Team, Is Asked To Move Work Locations, And Quits On The Spot. ................................................................................. 32

    E.  Other Test Leads On The D.C. Health Exchange Project Worked For Infosys Substantially Longer Than Bolten. ................................................................ 34

V.  GREGORY HANDLOSER ...................................................................35

    A.  Background Regarding Gregory Handloser. .................................................... 35

    B.  Handloser Receives The Worst Possible Performance Appraisal. ................................. 36

    C.  Handloser's Employment Is Terminated. ...................................................... 40

US.108225407.04

# I.     BACKGROUND REGARDING INFOSYS

## A.    General Background.

1.     Infosys provides consulting, systems integration, and business IT services in more than thirty countries. Declaration of Megan Groves ("Groves Decl."), attached to Defs.' Mot. for Summ. J. as **Exhibit A**, ¶ 3.

2.     Infosys has approximately 198,000 employees worldwide and is headquartered in Bengaluru (f/k/a Bangalore), India. Infosys employs approximately 21,000 people in the United States. Groves Decl. ¶ 3.

3.     Employees outside of India are primarily engaged in sales or revenue-generating work, such as providing consulting services to Infosys's clients. Groves Decl.¶ 3.

4.     Infosys maintains policies strictly prohibiting discrimination based on race, color, creed, gender, religion, marital status, age, national origin or ancestry, sexual orientation, and any other protected status. Groves Decl. ¶ 5; Groves Decl. Ex. 1.

5.     Infosys categorizes positions by "Job Level," which reflects a position's place in Infosys's overall structure. Depending on the position, it could be classified anywhere from Job Level 2 (the lowest level) to Job Level 9 (with "title-holders" in positions of JL7-A and higher). Declaration of Patty Cramer ("Cramer Decl."), attached to Defs.' Mot. for Summ. J. as **Exhibit B**, ¶ 4.

6.     Infosys positions are organized by "career stream." One career stream is called Project Management, and the Project Management Stream (along with others) includes roles that work on client accounts. Within the Project Management Stream, there are a variety of roles. The lowest level role is called a Systems Engineer, which is classified as Job Level 3 for compensation and placement purposes. The next highest role is called a Technology Analyst,

which is classified as Job Level 4.  The next higher after that is Technology Lead, which is classified as Job Level 5. Groves Decl. ¶ 9; *see also* Groves Decl. Ex. 2.

>    **B.**    **Infosys's Hiring Process.**

7.    The external hiring process at Infosys begins with the creation of an approved job opening, which Infosys refers to as a "requisition."  Declaration of Nandita Kumar ("Kumar Decl."), attached to Defs.' Mot. for Summ. J. as **Exhibit C, ¶** 4.

8.    The requisition is posted on Infosys's web site, as well as distributed to other internet sites (e.g., Monster.com) through a job aggregator.  Kumar Decl. ¶ 5.

9.    To be considered for the open position, a candidate must submit an application on Infosys's applicant portal.  Kumar Decl. ¶ 6.

10.    During the relevant time period (2012 – 2013), after the applicant submitted a resume, Infosys would conduct a resume review.  During the resume review, Infosys's technical consultants reviewed each applicant's resume to determine whether the applicant appeared to potentially possess the technical expertise required for a particular position.  Kumar Decl. ¶ 9.

11.    An applicant who passed the resume-review phase was then scheduled for either a telephonic interview or an in-person meeting at a job fair, depending on logistics such as where the position and the applicant were located.  To the extent a telephonic interview was scheduled, it would be used to further assess the applicant's technical skills.  Kumar Decl. ¶¶ 10-11.

12.    During the telephone interview, technical interviewers did not ask a specific set of questions; rather, interviewers asked applicants targeted questions based on the competencies required for the specific position and the skills listed on the applicant's resume, generally progressing from probing basic to more advanced skills.  The recruiting process sometimes involved a second telephonic interview where a second set of technical interviewers assessed the applicant's skill set.  Kumar Decl. ¶¶ 10-11.

US.108225407.04

13.     Infosys's employees responsible for interviewing applicants are required to complete a training course entitled "Hiring Skills & Restrictions."  As part of that training, interviewers learn to review candidates' qualifications and interview applicants in an effective and legally acceptable manner.  For example, Infosys prohibits employees from asking applicants questions related to protected characteristics such as birthplace, national origin, or citizenship.  Kumar Decl. ¶ 13.

14.     In approximately May 2013, Infosys managed the hiring process using an applicant tracking system in SAP.  At that time, Infosys transitioned to using an applicant tracking system in Kenexa.  Kumar Decl. ¶ 8.

**C.      The Harley-Davidson Project.**

15.     In 2012, Infosys and Harley-Davidson entered into a five-year contract for IT services, which includes application management, infrastructure support, and hosting services.  Declaration of Gridher Thoranagallu ("G. Thoranagallu Decl."), attached to Defs.' Mot. for Summ. J. as **Exhibit D**, ¶ 3; 2nd. Am. Compl. ¶ 48.

16.     Infosys understood that one of Harley-Davidson's core objectives in hiring Infosys was to increase the skill level and expertise of its IT operations.  Thoranagallu Decl. ¶ 5.

17.     As part the project, Infosys hired a number of people to work at various Harley-Davidson sites.  Groves Decl. ¶ 7.

18.     In 2012, Infosys hired 61 employees at all locations for the Harley-Davidson project, 45 of whom (or 73.8 percent) were non-Asian candidates. Report of Bernard R. Siskin, Ph.D. ("Siskin Report"), attached to Defs.' Mot. for Summ. J. as **Exhibit E**, ¶ 11.

19.     Concentrating on the Milwaukee area, in 2012, Infosys hired 54 people for Harley-Davidson, 77.8 percent of whom were non-Asian. Siskin Report ¶ 11.

US.108225407.04

20.     In 2013, Infosys's hiring for the Harley-Davidson project continued to be predominantly non-Asian: 18 of 32 hires were identified as non-Asian. Siskin Report ¶ 12.

## II.     BRENDA KOEHLER

### A.     Background Regarding Koehler.

21.     Brenda Koehler is a Caucasian woman of American national origin who lives in Milwaukee, Wisconsin.  Deposition of Brenda Koehler, May 9, 2016 ("Koehler Dep."), attached to Defs.' Mot. for Summ. J. as **Exhibit F**, 180:23-181:1; Compl. ¶ 8.

22.     Koehler did not want to leave the Milwaukee area at the time she applied to Infosys because she had children.  Koehler Dep. 121:14-21.

### B.     Infosys's Lead VMware/Window Administrator Position For The Harley-Davidson Account.

23.     One position Infosys wanted to fill for the Harley-Davidson account was a Lead VMware/Windows Administrator.  *See* Koehler Dep. 75:19-76:8; Koehler Dep. Ex. 4; *see also* Declaration of Amol Vyawahare ("Vyawahare Decl."), attached to Defs.' Mot. for Summ. J. as **Exhibit G**, ¶¶ 5-7.

24.     Candidates requiring visa sponsorship were ineligible for the Lead VMware/Windows Administrator position.  Koehler Dep. 75:19-76:8; Koehler Dep. Ex. 4 at 2.

25.     The Lead VMware/Windows Administrator position was a highly skilled position requiring several years of relevant experience and a sophisticated set of IT skills.  Koehler Dep. 75:19-76:18; Koehler Dep. Ex. 4; Vyawahare Decl. ¶ 7.

26.     Among other things, the Lead VMware/Windows Administrator's job duties and responsibilities involved architecture and design of the Windows operating environment, including setting up new servers, increasing disk space on servers, working with the storage team, and installing and cloning servers.  The position was also responsible for VMware

4

software.  Vyawahare Decl. ¶ 8; Deposition of Megan Groves, July 28, 2016 ("Groves Dep."),

attached to Defs.' Mot. for Summ. J. as **Exhibit H**, 33:23-36:3; Koehler Dep. 75:19-76:8;

Koehler Dep. Ex. 4.

27.     VMware provides a virtualized set of hardware to the guest's operating system

(rather than the hardware components being locally installed on the machine).  VMware is

primarily used as a means of connecting a virtual environment to a single server, thereby freeing

up space, reducing costs, and increasing the efficiency of an organization's IT environment.

Vyawahare Decl. ¶ 10.

28.     Other job duties and responsibilities of the position included supporting Active

Directory, which is a part of the Windows architecture and is a database-driven program that

operates on multiple servers, controls user logins within an organization, and creates a consistent

and stable operating environment for users.  Vyawahare Decl. ¶ 8.

29.     Finally, the Lead VMware/Windows Administrator was also responsible for

supporting Microsoft DNS, which is a part of the Windows architecture and is a hierarchical

naming system that associates various information with specific domain name; for example,

translating a .com web address to the numerical IP address associated with that particular domain

name.  Vyawahare Decl. ¶ 9.

    **C.**     **Koehler Applies For The Job And Is Rejected Because She Lacks Technical Knowledge And Qualifications.**

30.     In April 2012, Koehler applied for the Lead VMware/Windows Administrator

position.  Koehler Dep. 25:6-12, 54:9-16; Vyawahare Decl. ¶ 4.  The position was posted as a

Job Level 6 Technology Architect role.  Siskin Report ¶ 7.

31.     Koehler had never been a lead VMware/Windows administrator before.  Koehler

Dep. 64:5-7.

32.     Thereafter, Infosys invited Koehler to participate in a first-round telephonic technical interview.  Koehler Dep. 75:9-15, 81:6-13; Vyawahare Decl. ¶ 4.  About an hour before the interview, Koehler received an email changing the phone number she was to use for the interview.  Koehler Dep. 83:1-3.

33.     On April 24, 2012, Lead Consultants Amol Vyawahare and Nitin Hujare telephonically interviewed Koehler for the Lead VMware/Windows Administrator position; the interview lasted about 30 minutes.  Koehler Dep. 81:18-25, 87:8-11; Groves Dep. 30:16-23; Vyawahare Decl. ¶ 4.

34.     During the interview, Koehler was asked questions that addressed Microsoft Active Directory, group policies, and matters like how to set up users.  Koehler Dep. 90:16-19.  Koehler was surprised to receive questions about her skills in these areas.  Koehler Dep. 90:11-23.

35.     Koehler concedes that Active Directory was not a big part of the jobs she performed between June 2010 and her Infosys interview and that she was "a little rusty" on Active Directory.  Koehler Dep. 232:12-233:17.  She also concedes that one of the Infosys interviewers remarked on her lack of recent Active Directory experience.  Koehler Dep. 138:14-21, 140:11-141:14; Koehler Dep. Ex 16; Vyawahare Decl. ¶ 11.  Despite this, Koehler believed she was a "perfect fit for" the job and had "95 percent of the skill set for the job."  Koehler Dep. 59:18-25, 142:8-11.

36.     Based on Koehler's work history and inability to answer certain technical questions, Vyawahare concluded during the interview that Koehler lacked sufficient Active Directory experience to satisfy the duties of a Lead VMware/Windows Administrator.  Both interviewers also determined that Koehler lacked fundamental technical skills related to

6

VMware/Windows. Unlike what would be expected of a qualified applicant, she could not answer a range of technical questions about DNS and Active Directory or even basic questions about server logins and domain names. Vyawahare Decl. ¶ 11; Groves Dep. 32:20-34:7, 38:2-7; Groves Dep. Ex. 4.[1]

37.     Koehler's application was rejected because she lacked both average and advanced technical skills needed for the Lead VMware/Windows Administrator job and was therefore not qualified. Vyawahare Decl. ¶ 14.

38.     The interviewers did not know Koehler's race or national origin when they rejected her application. Vyawahare Decl. ¶ 15.

39.     Infosys did not hire any of the 113 people who applied for the Lead VMware/Windows Administrator role, including approximately 40 of whom had South Asian-sounding sur-names. Groves Dep. 172:13-19; Siskin Report ¶ 7; Siskin Report Ex. 1.

40.     Infosys' records reveal that the following people applied for the Lead VMware/Windows Administrator Level 6 Technical Architect position:

---

[1]     The candidate name "Brandon Bazan" on page two of Koehler's evaluation template is a typographical error. Groves Dep. 51:24-52:21.

US.108225407.04

Applicants to Requisition #57477877

| Name | Application Date | Name | Application Date |
| --- | --- | --- | --- |
| Ahmed, Salman | 12/24/11 | Emad, Nojan | 3/30/12 |
| Alansari, Thaer | 1/26/12 | Evans, Gary | 4/3/12 |
| Alcazar, Raul | 3/29/12 | Fernandez, Tomas | 3/28/12 |
| Ali, Syed Arshad | 1/14/12 | Fried, Robert | 4/19/12 |
| Almueti, Philip Christopher | 4/3/12 | Gabriel, Fredrik | 4/14/12 |
| Ardehali, Michael | 4/23/12 | Ganesan, Manikandan Venmani | 1/5/12 |
| Ashiru, Taorid Adedeji | 3/20/12 | Garrido, Sergio | 3/29/12 |
| Bailey, John Edward | 4/23/12 | Ghodekar, Pradeep B | 12/20/11 |
| Becker, Roger A | 4/6/12 | Golembo, William | 3/28/12 |
| Beyah, Malik | 4/19/12 | Guity, Reza | 3/28/12 |
| Bogart, Jack | 3/27/12 | Gurley, Oscar J | 3/31/12 |
| Brown, Charles William | 4/6/12 | Guzman, Alejandro | 4/21/12 |
| Cabral, Mbaxi | 4/3/12 | Haneef, Asim | 1/14/12 |
| Campos, Victor M | 4/3/12 | Haque, Ahmed Ul | 1/6/12 |
| Carste, Thomas H | 3/31/12 | Hernandez, Nendy | 3/28/12 |
| Cheng, Mark | 4/10/12 | Horton, Douglas A | 4/20/12 |
| Choi, Tae Young | 3/28/12 | John, Joji | 1/26/12 |
| Chopra, Sandeep | 1/10/12 | Kadari, Shyam | 4/5/12 |
| Chowdhury, Jewel | 4/13/12 | Karth, Jerry G | 4/24/12 |
| Christian, Daniel | 3/29/12 | Khan, Yaser | 3/28/12 |
| Clarke, Jason | 1/26/12 | Khandalkar, Virat | 3/29/12 |
| Colin, Brad | 1/5/12 | Khatha, Sam | 3/30/12 |
| Craig Ramdhanny, Richard Anthony | 4/19/12 | Koehler, Brenda | 4/19/12 |
| D, James Merdan | 4/20/12 | Koziol, Edward J | 4/20/12 |
| Datta, Robin | 2/24/12 | Kwan, Jason | 2/8/12 |
| Dewangan, Sanjeev | 3/30/12 | Lamparth, Christian | 4/3/12 |
| Digiacomo, Ralph E | 4/19/12 | Larkin, Alexander | 5/1/12 |
| Dooley, Blaine P | 4/12/12 | Lassotovitch, Edward | 3/28/12 |
| During, Charles | 3/28/12 | Laubstein, Stuart | 1/14/12 |
| Dziak, James | 4/11/12 | Lewis, Kevin | 3/13/12 |

Applicants to Requisition #57477877

| Name | Application Date | Name | Application Date |
| --- | --- | --- | --- |
| Li, Albert | 2/8/12 | Scott Bazan, Brandon | 4/17/12 |
| Li, Frank | 12/20/11 | Sethi, Deepika | 2/14/12 |

| | | | |
|---|---|---|---|
| Lobos, Irene Virginia | 3/28/12 | Siddiqui, Laeeq | 1/17/12 |
| Luckett, Clifton K | 4/19/12 | Simko, John Charles | 3/28/12 |
| Ma, Henry | 1/11/12 | Skolnick, Kenneth P | 4/20/12 |
| Mandiola, Carlos G | 4/5/12 | Skurnick, Richard | 3/28/12 |
| Mason, Mark | 4/19/12 | Sky, Daniel J | 4/6/12 |
| Masood, Shahid | 1/26/12 | Smith Sr, Phillip | 3/27/12 |
| Mattis, Darryl | 3/29/12 | Surpris, Jonathan | 4/19/12 |
| Melendez, Seth | 3/28/12 | Szervo, Jay M | 4/3/12 |
| Mells, Bradley N | 4/5/12 | Talbert Jr, Paul E | 4/16/12 |
| Mitchell, Jamie | 1/31/12 | Thallapalli, Sateesh | 12/8/11 |
| Nguyen, Loc | 4/24/12 | Thoutireddy, Shashank | 1/5/12 |
| Pan, Yi | 4/4/12 | Tran, Jimmy T | 3/29/12 |
| Parssian, Emry | 12/24/11 | Umamaheswaran, Deepa | 3/29/12 |
| Patel, Harish | 12/20/11 | Vannostran, David | 4/12/12 |
| Peterson, Reggie | 4/6/12 | Ware, Richard A | 4/13/12 |
| Phillips, Kareem | 3/31/12 | Wiedenhoeft, Mark D | 4/19/12 |
| Praude, Raimonds | 2/8/12 | Williams, Cedric | 4/19/12 |
| Qureshi, Adeel | 2/7/12 | Witbro, Scott A | 4/19/12 |
| Ralli, Deepak | 12/12/11 | Xing, Xing | 2/8/12 |
| Razzaq, Jawad A | 1/13/12 | Xu, Joe | 12/24/11 |
| Robbins, Craig | 3/28/12 | Zuikov, Paul | 3/30/12 |
| Rodriguez, Eliezer | 3/29/12 | | |
| Sabala, Charles S | 3/27/12 | | |
| Sabharanjak, Ravindra | 4/14/12 | | |
| Sakroo, Nishant | 3/28/12 | | |
| Sarte Sr, Bruce A | 3/29/12 | | |
| Saxena, Gaurav | 1/5/12 | | |
| Schwartzberg, David K | 3/28/12 | | |

Siskin Report ¶ 7; Siskin Report Ex. 1.

> **D.** **Infosys Hires Another Candidate For A Different Job Requisition And Replaces Him With A Non-South Asian U.S. Citizen.**

41. On May 23, 2012, Infosys posted another opening for a job similar to the position

Koehler had applied for, but under a different requisition and with a different job description.

Groves Dep. 74:18-76:2; Groves Dep. Ex. 7; Siskin Report ¶ 9.

42. Koehler did not apply for and accordingly was not considered for the similar

Milwaukee-area job. Groves Dep. 75:20-76:18; Siskin Report ¶ 8; *accord* Koehler Dep. 54:9-16,

55:16-21, 79:19-21.  Koehler did not apply for any other job with Infosys.  Koehler Dep. 55:16-19.

43.     In July 2012, Infosys hired Fazlul Halim as a Job Level 4 Technology Analyst for the open position.  Siskin Report ¶ 9.  Halim is originally from Bangladesh and is a U.S. citizen.  Deposition of Fazlul Halim, September 1, 2016 ("Halim Dep."), attached to Defs.' Mot. for Summ. J. as **Exhibit I**, 6:14-22.

44.     Halim had a Bachelor's degree in computer systems engineering and a master's degree in computer science.  Halim Dep. 35:8-13, 36:25-37:5.  He had a strong skillset related to both Windows and VMware.  Vyawahare Decl. ¶ 16.  The two positions that Halim held immediately prior to his Infosys employment were a Senior Systems/VMware Administrator for Haniford Brothers and Senior VMware Engineer for Liberty Mutual.  Halim Dep. 40:15-41:9.  While at Liberty Mutual, Halim was in charge both of VMware and Active Directory, and the position was about 70 percent similar to the Infosys VMware position.  Halim Dep. 43:18-23, 47:15-25.  However, the Liberty Mutual job was more challenging.  Halim Dep. 43:18-44:17.

45.     Vyawahare approved Halim's hiring because he concluded that Halim had the necessary technical skills for the position.  On the interview profiler, Halim was rated as "A" (or "good") for VMware, high availability, and network storage and rated "B" (or "fair") for Windows.  Vyawahare Decl. ¶ 17-18; Vyawahare Decl. Ex. 3.

46.     Halim began working for Infosys in August 2012 but resigned shortly thereafter for another job.  Halim Dep. 8:18-21, 29:19-30:8, 48:6-9; Groves Dep. 86:21-87:6.

47.     Vyawahare did not know Halim's race or national origin at the time he interviewed him and neither Halim's race nor his national origin were factors in the determination that he had the necessary technical skills for the position.  Vyawahare Decl. ¶ 18.

10

48.     When Halim left, Infosys replaced him with Mike Recknagel, who Infosys identified for the job around September 20, 2012.  Recknagel is a Caucasian U.S. citizen and is not of South Asian race or national origin.  Groves Decl. ¶ 8.  Recknagel was hired as a Job Level 5 Technology Lead.  Siskin Report ¶ 10.

### III.     KELLY PARKER

#### A.     Background Regarding Parker.

49.     From 2009 to 2012, Parker (Caucasian, American national origin) attended Nicolet Community College to pursue her two-year's associate's degree, which she earned in 2012.  Deposition of Kelly Parker, May 24, 2016 ("Parker Dep."), attached to Defs.' Mot. for Summ. J as **Exhibit J**, 35:14-25, 115:15-22; 2nd Am. Compl. ¶ 9. Studying to be an "Information Technology Support Specialist," Parker attended classes such as Networking 1 and 2, Intro to Programming, Maintenance and Troubleshooting, and Help Desk Fundamentals, among others.  Parker Dep. 116:6-120:3; Parker Dep. Ex. 4.

50.     Up until 2010, Parker had not held an IT job.  While in school, she held jobs testing biological warfare suits (which was not IT-related) and bartended on the weekends. Parker Dep. 36:10-25, 37:1-4.

51.     Parker's first IT-related position began at the end of 2010 when she began working at Packaging Corporation of America as an "IT grunt" in a co-op/intern position.  Parker Dep. 36:10-37:4, 38:21-39:4, 40:18-20, 41:1-12.

52.     As an "IT Grunt," Parker's responsibilities included cabling management and cleaning keyboards and monitors.  She also deployed computers, monitors, and printers, which meant she carried "a lot of stuff from one end to the other."  Parker Dep. 42:13-24.

US.108225407.04

53.     When Parker's internship at Packaging Corporation of America ended in February 2012, she learned from one of her community college classes that Harley-Davidson was seeking an IT intern.  Parker Dep. 43:13-19, 44:9-12.

54.     Parker submitted an application to the front desk at Harley-Davidson, and an Enterforce representative later contacted her.  Parker Dep. 45:4-7, 45:13-46:2.

55.     Enterforce is a staffing company that Harley-Davidson used for its temporary IT staffing needs.  Groves Decl. ¶ 12.

56.     Enterforce hired Parker as an IT Co-Op in February 2012, which is equivalent to an intern position.  Parker Dep. 34:3-19, 46:15-18.  As an IT Co-Op, Parker performed IT helpdesk Level 1 duties, which included answering phones and assisting callers with hardware, software, and printer questions.  For example, Parker might assist with a call regarding a paper jam, a software error message, preparing a Microsoft Word document, or rebooting phones by turning them off and back on.  Parker Dep. 14:10-25, 48:4-25-49:9.

57.     As an intern, Parker did not perform any coding or scripting, and she did not conduct testing beyond helpdesk troubleshooting.  Parker does not know what "implement relevant go live activities" means, not does she know of GoTo Meeting or Wavelink.  She did not work with ITIL framework.  Parker Dep. 241:19-242:24, 244:15-245:3, 245:12-246:2, 246:24-247:8.

58.     Parker worked at Harley-Davidson's Tomahawk, Wisconsin location.  Parker Dep. 30:5-21.  Due to Parker's divorce decree, she could not have worked in another location because her children were in school in the Minocqua, Lakeland School District, and moving would have forced her to give up her children's placement with her.  Parker Dep. 172:4-173:13.

59.     Parker considered contractor Charles Henrichs to be her supervisor.  Parker Dep. 30:22-25.  While Henrichs considered himself a site principal who oversaw a team, Henrichs did not evaluate Parker, did not sign her "pay things," and he would not necessarily call the relationship supervisory.  Deposition of Charles Henrichs, September 21, 2016 ("Henrichs Dep."), attached to Defs.' Mot. for Summ. J as **Exhibit K**, 14:9-22.  Parker and Henrichs did not usually work the same shift, so he didn't observe her work.  Henrichs Dep. 54:15-22.

### B.     Existing Helpdesk Structure When Infosys Secured The Harley-Davidson Account.

60.     Parker was still working as an intern performing helpdesk duties when Infosys assumed responsibility for Harley-Davidson's IT functions.  Thoranagallu Decl. ¶ 6.

61.     In Infosys's position structure, the role of helpdesk support equates to the position of Systems Engineer, which is in the Project Management career stream (or function).  There are two levels of Systems Engineers:  System Engineer and the higher level position of Senior Systems Engineer.  The next position in that career stream, requiring an even higher level of technical skill, is Technology Analyst.  Thoranagallu Decl. ¶ 7; Henrichs Dep. 59:16-23.

### C.     Technology Analyst Kapil Kulkarni Begins Working On The Harley-Davidson Account.

62.     When Infosys first entered into a contract with Harley-Davidson in April 2012, a number of Infosys employees began working on the project from India.  Thoranagallu Decl. ¶ 4. Among those were Kapil Kulkarni, who was then a Technology Analyst.  Deposition of Kapil Kulkarni, September 8, 2016 ("Kulkarni Dep."), attached to Defs.' Mot. for Summ. J. as **Exhibit L**, 30:21-31:4.

63.     By way of background, Kapil Kulkarni joined Infosys on September 15, 2008 after completing his Bachelor's degree in Electrical Engineering from Sardar Patel College of Engineering.  Kulkarni Dep. 11:10-16, 12:7-19.

64.     Immediately after joining Infosys, Kulkarni received seven-to-eight months of training on various technologies.  Kulkarni Dep. 12:20-12:25.

65.     After completing his training in 2009, Kulkarni's first assignment was in Pune, India, for Infosys's Bloomberg account.  Kulkarni worked with Bloomberg to develop applications that would segregate legal cases depending on a type of law.  Kulkarni Dep. 12:20-13:8, 14:10-17.

66.     After working on the Bloomberg account for two-to-three months, Kulkarni began preparing for an upcoming project with Microsoft.  Kulkarni Dep. 14:10-25.  Once Kulkarni began working on the Microsoft account in 2009, he was responsible for maintaining, supporting, and enhancing 25 applications.  Kulkarni Dep. 19:24-20:7.

67.     While working on the Microsoft account, Kulkarni was first a Systems Engineer, and then, on April 1, 2011, he was promoted to a Senior Systems Engineer.  Kulkarni Dep. 20:20-21:7.  On October 1, 2011, Kulkarni was again promoted, this time to Technology Analyst.  Kulkarni Dep. 53:2-6.

68.     Kulkarni worked on the Microsoft account until January 31, 2012, and then began working on the Harley-Davidson account.  Kulkarni Dep. 25:11-23.

69.     When Kulkarni began on the Harley-Davidson account, a "knowledge transfer" occurred.  Kulkarni and others spent months learning about the Harley-Davidson computer applications from current Harley-Davidson employees.  Kulkarni Dep. 102:8-103:19.

70.     Thereafter, Kulkarni provided application and desktop support for the project from India. Kulkarni Dep. 31:11-25. This included printer administration, VMware administration, and supporting approximately 25 customized applications designed for Tomahawk.  Kulkarni Dep. 100:17-101:8.  Fourteen to 15 of the applications were designed and

customized by Harley-Davidson, so those outside of Harley-Davidson could not use them. Kulkarni Dep. 101:15-102:3.

> **D.**   **Parker Learns That Her Intern Position Will Not Continue Into 2013, And She Is Not Chosen For An Infosys Position.**

71.     In the summer of 2012, Parker learned that Infosys would be taking over the IT staffing responsibilities at Harley-Davidson.  Parker Dep. 98:24-99:4.  As a part of the change, by October 2012, Parker learned that her intern position would conclude at the end of 2012. Parker Dep. 52:20-53:5; 57:11-25, 143:11-16.

72.     In or about October 2012,[2] Parker learned that she would have the opportunity to interview for a position with Infosys.  Parker Dep. 143:11-16.

73.     Infosys employees Karthi Mohan and Muthukumaar Narayanamurthy interviewed Parker for a Systems Engineer role, which was the position that required the least prior IT experience.  Groves Decl. ¶¶ 10-11.  This technical interview was the first step of the interview process, and it was designed to assess a candidate's technical skills.  Kumar Decl. ¶ 10.  In searching for qualified Systems Engineers in the anticipated IT structure, Infosys evaluated candidates for their ability to provide both helpdesk and desktop support.  Thoranagallu Decl. ¶ 8.

74.     According to an example job requisition for a Systems Engineer position, a Systems Engineer would "Perform validation activities (Functional, Integration, System, User experience) based on the plans, identification and validation of defects found (including UAT), creation and reviewing of artifacts (Test Scripts, Documentation, Automation, Setups) in order to ensure a quality deliverable." Siskin Report ¶ 17, n.8; Siskin Report Ex. 5.  When asked about

---

[2]      Parker recalls this interview occurring in October 2012.  According to Infosys's records, it actually occurred in September 2012.  However, for purposes of summary judgment, Infosys will refer to the interview as occurring in October 2012.

US.108225407.04

these qualifications during her deposition, Parker asked for the description to be put in "normal jargon" and explained that she does not use words like "artifacts" and "validation activities." Parker Dep. 240:2-15. Parker did not know the meaning of "UAT" and could only speculate that it might mean "user account something." Parker Dep. 241:10-18. She did not "test scripts" or perform "automation." Parker Dep. 241:19-242:1. When asked about the described duties of "Do Impact Analysis, create Design Specifications as per the high level design, create Unit Test Plans in order to develop/validate/maintain the application as per the requirements," Parker testified that "impact analyses" and "create design specifications" were at a higher level than what she was performing. Parker Dep. 242:3-7, 244:19-245:3. Parker did not perform any coding or scripting. Parker Dep. 242:16-21, 244:15-18.

75.     Parker does not recall many details of the interview, but she recalls that Mohan and Narayanamurthy asked her about an accomplishment that had made her proud. She responded that she was most proud of returning to college as a 40-something year old after a divorce while raising her three children. The interviewers asked a few more questions, and then the interview ended. It was "very short" and lasted approximately 10 minutes. Parker Dep. 150:5-23, 292:24-293:8, 294:2-6, 295:20-296:1. She testified that the interview was a "really embarrassing moment" in part because she recalls her colleagues' interviews lasting 30 minutes or more. Parker Dep. 293:1-8, 294:2-6, 295:20-296:16

76.     Mohan and Narayanamurthy concluded Parker was "technically not competent for the role requirements" and rated her desk top technical skills as "Poor." Groves Dep. 46:25-47:4, 94:17-24, 99:4-24, 103:21-104:4; Groves Dep. Ex. 10; Groves Decl. ¶¶ 10-11; Groves Decl. Ex. 3. Narayanamurthy reported that Parker was rejected as a candidate "on technical grounds." Groves Decl. ¶ 11; Groves Decl. Ex. 4.

77.     Mohan's and Narayanamurthy's assessment was consistent with the assessment of the project manager for the Harley-Davidson account, who observed that Parker could not be left alone to independently and consistently provide Level 1 and Level 2 helpdesk support.  Parker performed the helpdesk functions at a low level, consistent with her intern status.  Groves Dep. 104:15-105:5; Thoranagallu Decl. ¶ 9.

78.     As of November 2, 2012, Parker knew that there were no open positions for her and that she had not been given an offer to join Infosys.  She emailed a staffing agency to inquire about positions.  Parker wrote: "My current contract will end on Dec 31, 2012.  At this time, there are no open permanent positions for me."  Parker Dep. 133:7-137:1,139:16-140:24, 162:10-16; Parker Dep. Ex. 5 at 10819 (last page of exhibit), 7.

79.     Although Infosys had decided not to hire Parker because she was unqualified for a Systems Engineer role, it chose to continue Parker's contract assignment while determining the details of what would be needed in the desktop roles. However, it was clear Infosys and Harley-Davidson required more infrastructure and application support in the role.  Groves Dep. 114:19-115:19, 116:6-14, 117:21-24.

**E.      Infosys Hires 21 Non-Asian Senior Systems Engineers For The Harley-Davidson Account In 2012.**

80.     In 2012, Infosys hired 21 Senior Systems Engineers for the Harley-Davidson Account.  Siskin Report ¶ 16.

81.     None of these 21 Senior Systems Engineers self-identified their race as Asian. Siskin Report ¶ 16.

82.     Infosys did not hire any Systems Engineers in Tomahawk in 2012.  Siskin Report ¶ 16.

US.108225407.04

83.    Further information about the individuals hired as Senior Systems Engineers in 2012 is provided in the chart below:

| Name | Race | Hire Date | Assignment City | State |
|------|------|-----------|-----------------|-------|
| Baskin, J | Two or more | 11/1/12 | Milwaukee | WI |
| Blanchard, J | Hispanic | 9/21/12 | Milwaukee | WI |
| Brennan, M | White | 9/21/12 | Milwaukee | WI |
| Danczyk, J | White | 9/21/12 | Milwaukee | WI |
| Dickson, R | White | 9/21/12 | Milwaukee | WI |
| Dielen, M | White | 9/21/12 | Milwaukee | WI |
| Ehrenberg, J | White | 11/1/12 | Milwaukee | WI |
| Garcia, F | Hispanic | 9/21/12 | Milwaukee | WI |
| Hudalla, P | White | 9/21/12 | Milwaukee | WI |
| Joseph Lucht, R | White | 11/1/12 | Milwaukee | WI |
| Kobus, J | White | 9/21/12 | Milwaukee | WI |
| Krawczak, J | White | 9/21/12 | Milwaukee | WI |
| Lee Leighton, W | White | 11/1/12 | Milwaukee | WI |
| Liederbach, M | White | 10/9/12 | Milwaukee | WI |
| Orput, T | White | 11/19/12 | Carson City | NV |
| Prestia, D | White | 10/1/12 | Phoenix | AZ |
| Rozmenoski, B | White | 11/26/12 | Milwaukee | WI |
| Runkle, C | White | 11/1/12 | Milwaukee | WI |
| Scola, J | White | 11/12/12 | Kansas City | MO |
| Thomas, J | Ntv. Amer. | 11/1/12 | Milwaukee | WI |
| Thome, B | White | 11/1/12 | Milwaukee | WI |

Siskin Report ¶ 16.

### F.    **Parker Is Hired By Contracting Company SoftHQ.**

84.    Because Infosys did not have an established contract with Enterforce as a staffing company, Enterforce was not an Infosys empaneled vendor. Per Infosys practice at the time, Infosys did not want to add additional temporary staffing agency relationships (i.e., another empaneled vendor), so Infosys could not continue working with Enterforce. Groves Dep. 141:12-142:7; Groves Decl. ¶ 13.

US.108225407.04

85.     SoftHQ is an IT staffing company with whom Infosys has worked with for a number of years, and SoftHQ took over servicing Infosys's temporary staffing needs on the Harley-Davidson project.  Groves Dep. 136:19-23; Groves Decl. ¶ 14.

86.     Accordingly, two individuals from SoftHQ visited Harley-Davidson to meet with Parker.  Parker Dep. 179:5-180:21.  On June 1, 2013, Parker accepted SoftHQ's written offer of employment, which explicitly stated her "employment with SoftHQ [ ] will end as soon as the Desktop Support Specialist role with Infosys at Harley-Davidson in Tomahawk, WI ends with our client."  Parker Dep. 199:20-200:19; Parker Dep. Ex. 8 at Koehler 0001861 (30th page of exhibit).

87.     Parker was never an Infosys employee.  Groves Dep. 118:8-11.

**G.     Infosys Hires Two Caucasian Americans for Systems Engineer Positions In Tomahawk.**

88.     On May 21, 2013, Infosys posted a requisition for a Systems Engineer position (Job Level 3) for the Tomahawk, Wisconsin location.  Siskin Report ¶ 18.

89.     According to the requisition, the Systems Engineer would "contribute to the implementation of the Software Development lifecycle activities from development and testing to implementation and support activities as per project plan."  The Systems Engineer would also "develop code, create artifacts like test specifications, perform testing and implement relevant go live activities."  A Bachelor's degree was a preferred qualification, as well as at least one year experience in desktop support skills and software development life cycle; knowledge of desktop management tools like Tivoli End Point Manager, Tivoli Asset Manager, GoTo Meeting, and Wavelink; knowledge of ITIL framework; and knowledge of administering OS image management activities.  Siskin Report ¶ 18, n.8; Siskin Report Ex. 3.

US.108225407.04

90.     The Systems Engineer requisition specifically stated, in bold print, that

"**Applicants for employment in the U.S. must possess work authorization which does not require sponsorship by the employer for a visa (H1b or otherwise).**"  Siskin Report ¶ 18, n.8; Siskin Report Ex. 3.

91.     Five candidates applied for the Systems Engineer position in Tomahawk.  One candidate, Charles Henrichs, was Caucasian American. Three candidates self-reported their races as Asian, and one candidate self-reported as African American.  Siskin Report ¶ 18.

92.     Infosys hired Charles Henrichs, the Caucasian American, for the position.  Siskin Report ¶ 18.

93.     Information regarding the applicants for the position is provided in the chart below:

| Name | Race | Hire Date | Authorized to Work in the US? | Disposition |
|------|------|-----------|-------------------------------|-------------|
| Henrichs, C | White | 6/28/13 | Yes | Joined |
| Hari, S R | Asian | | Yes | Reject Candidate |
| Gadson, R | African American | | Yes | Candidate Withdrawal |
| Magadi Devaraju, M | Asian | | Yes | Failed Site Questions |
| Kumar, P S | Asian | | No | Failed Site Questions |

Siskin Report ¶ 19.

94.     On July 24, 2013, Infosys posted a second requisition for a Systems Engineer position.  For this requisition, Infosys sought Systems Engineers for placement in Milwaukee, WI; Tomahawk, WI; and Carson City, NV.  Siskin Report ¶ 20.

95.     According to the requisition, the Systems Engineer would "contribute to the implementation of the Software Development lifecycle activities from development and testing to implementation and support activities as per project plan."  The Systems Engineer would also

"develop code, create artifacts like test specifications, perform testing and implement relevant go live activities." Siskin Report ¶ Siskin Report ¶ 18, n.8; Siskin Report Ex. 4. A Bachelor's degree was a preferred qualification, as well as at least one year experience in Level 1/Level 2 system administration support and software development life cycle; knowledge of desktop management tools like Tivoli End Point Manager, Tivoli Asset Manager, GoTo Meeting, and Wavelink; knowledge of ITIL framework; and knowledge of administering OS image management activities. Siskin Report ¶ 20; Siskin Report Ex. 4.

96.     The Systems Engineer requisition specifically stated, in bold print, that

"**Applicants for employment in the U.S. must possess work authorization which does not require sponsorship by the employer for a visa (H1b or otherwise).**" Siskin Report ¶ 20; Siskin Report Ex. 4.

97.     Fourteen candidates applied for the Systems Engineer requisition. Three candidates who applied were not authorized to work in the U.S., including one candidate who reported his race as Asian; all three were rejected. Siskin Report ¶ 20.

98.     Infosys hired nine of the candidates who applied for this requisition. Of the nine, seven self-reported their race as Caucasian, one self-reported his race as African American, and one candidate, named Steven Scherbel, chose not to self-report his race as a candidate. However, Mr. Scherbel is listed as Asian in the Human Resource employee data. Siskin Report ¶ 21.

99.     Only one candidate, Gerald Duellman was hired for the Harley-Davidson location in Tomahawk. Duellman self-reported his race as Caucasian. Siskin Report ¶ 21.

100.    Information regarding the applicants is provided in the chart below.

| Name | Race | Hire Date | Authorized to Work in the US? | Disposition | Assignment City | State |
|---|---|---|---|---|---|---|
| Anderson, W | White | 8/19/13 | Yes | Joined | Carson City | NV |
| Barnes, M | African American | 9/9/13 | Yes | Joined | Milwaukee | WI |
| Barwick, D | White | 9/23/13 | Yes | Joined | Milwaukee | WI |
| Duellman, G | White | 8/12/13 | Yes | Joined | Tomahawk | WI |
| Gritt, W | White | 8/19/13 | Yes | Joined | Milwaukee | WI |
| Nelson, E | White | 8/12/13 | Yes | Joined | Milwaukee | WI |
| Pansch, D | White | 9/23/13 | Yes | Joined | Milwaukee | WI |
| Scherbel, S | | 9/3/13 | Yes | Joined | Milwaukee | WI |
| Szczech, M | White | 9/16/13 | Yes | Joined | Milwaukee | WI |
| Clark, D | White | | Yes | Reject Candidate | | |
| Lorenz, S | White | | Yes | Reject Candidate | | |
| G, Thangamani | Ntv. Amer. | | No | Failed Site Questions | | |
| Mahali, S | Asian | | No | Failed Site Questions | | |
| Roman Casabianca, J | White | | No | Failed Site Questions | | |

Siskin Report ¶ 22.

101.     Including Henrichs and Duellman, Infosys hired 16 Systems Engineers and Senior Systems Engineers for the Harley-Davidson account in 2013.  Only one (Scherbel) is identified as Asian.  Siskin Report ¶ 23.

102.     Information regarding each of the Systems Engineers hired in 2013 is provided in the chart below.

US.108225407.04

| Name | Race | Hire Date | Assignment City | State |
|---|---|---|---|---|
| Anderson, W | White | 8/19/13 | Carson City | NV |
| Barnes, M | African American | 9/9/13 | Milwaukee | WI |
| Barwick, D | White | 9/23/13 | Milwaukee | WI |
| Black, J | White | 6/24/13 | Plano | TX |
| Blain, T | White | 6/24/13 | Milwaukee | WI |
| Duellman, G | White | 8/12/13 | Tomahawk | WI |
| Gadson, R | African American | 6/24/13 | Milwaukee | WI |
| Gritt, W | White | 8/19/13 | Milwaukee | WI |
| Henrichs, C | White | 6/28/13 | Tomahawk | WI |
| Matthies, K[1] | White | 6/24/13 | Milwaukee | WI |
| Nelson, E | White | 8/12/13 | Milwaukee | WI |
| Pansch, D | White | 9/23/13 | Milwaukee | WI |
| Rockel, D | White | 6/28/13 | Milwaukee | WI |
| Scherbel, S | Asian | 9/3/13 | Milwaukee | WI |
| Szczech, M | White | 9/16/13 | Milwaukee | WI |
| Zananiri, S | White | 10/21/13 | Milwaukee | WI |

[1] The Human Resource data does not list a race for Matthies, but he self-identified as white when he applied.

Siskin Report ¶ 24.

103.    Parker did not apply for either of the Systems Engineer positions open in

Tomahawk.  Parker Dep. 171:22-172:3; 172:15-20; *see generally* Siskin Report ¶¶ 19, 22.

104.    In total, in 2012 and 2013, Infosys hired 37 Systems Engineer and Senior Systems

Engineer positions, and only one of the successful applicants was Asian.  However, multiple

Asian candidates were in the applicant pools in 2013.  Siskin Report ¶ 26.[3]

105.    A summary of the applicant pools for the 2013 Systems Engineer positions

appears below:

[3]    The SAP applicant tracking database does not have reliable race information on applicants, so only data from Kenexa was analyzed for this purpose.  Siskin Report ¶ 26.

US.108225407.04

| Requisition | Applicants | | | Hires | | | |
|---|---|---|---|---|---|---|---|
| Number | Asian | Non-Asian | Unknown | Total | Asian | Non-Asian | Unknown |
| 1013BR | 4 | 4 | 0 | 2 | 0 | 2 | 0 |
| 1173BR | 1 | 3 | 1 | 1 | 0 | 1 | 0 |
| 1283BR | 3 | 5 | 0 | 1 | 0 | 1 | 0 |
| 1652BR | 2 | 12 | 0 | 9 | 1 | 8 | 0 |
| 1965BR | 3 | 1 | 0 | 1 | 0 | 1 | 0 |
| 930BR | 0 | 2 | 0 | 1 | 0 | 1 | 0 |
| 943BR | 3 | 2 | 0 | 1 | 0 | 1 | 0 |

Siskin Report ¶ 26.

### H. Infosys's Contract With SoftHQ For Desktop Support Ends, And, Accordingly, Parker's Assignment Ends.

106. As part of Infosys's contract with SoftHQ, task orders were required for any work SoftHQ employees would perform. Groves Dep. 140:5-141:6.

107. The Task Order memorializing Parker's assignment explicitly stated that the contract between Infosys and SoftHQ would end effective September 15, 2013. Groves Decl. ¶ 15; Groves Decl. Ex. 6.

108. In 2013, Infosys informed SoftHQ that it had no further need for temporary services in the Tomahawk facilities. Declaration of Kranti Ponnam ("Ponnam Decl."), attached to Defs.' Mot. for Summ. J. as **Exhibit M**, ¶ 6. Accordingly, SoftHQ informed Parker on or around August 2013 that because SoftHQ's work for Infosys in Tomahawk would be ending on September 15, 2013, her employment would end per the terms of her contract with SoftHQ. Ponnam Decl. ¶ 7. *See also* Parker Dep. 210:8-211:9.

109. Parker never applied for an Infosys position in 2013 and did not look at Infosys's website for available positions. Parker Dep. 171:22-172:20.

### I. Kulkarni Moves From His Offshore Harley-Davidson Role To Wisconsin.

110. Several months after the Harley-Davidson project started, Kapil Kulkarni transferred to the Tomahawk location. In his role at the Tomahawk location, he was responsible

24

for providing some helpdesk support but also for providing application support. His skills in application support were critical because the other Infosys employees at the Tomahawk facility did not have the ability to provide this support. Thoranagallu Decl. ¶ 10.

111.     When Kulkarni transferred to Tomahawk, there were three total Infosys employees at the location: Kulkarni, Henrichs, and Duellman. Kulkarni Dep. 87:18-88:5. The role that Kulkarni filled was not the same as the Systems Engineer role that Henrichs and Duellman held. It was at a higher level and required a greater level of technical skill and application experience than the Systems Engineers had. Thoranagallu Decl. ¶ 11.

112.     Kulkarni was performing the same job in Tomahawk as he had performed in India. Kulkarni Dep. 81:6-12. However, when he arrived in Tomahawk, he worked with a Harley-Davidson employee for a knowledge transfer related to a few applications, particularly application customization. Kulkarni Dep. 102:17-19, 103:4-8, 105:2-14. Kulkarni received these additional responsibilities because Kulkarni had knowledge of application technologies such as Java and .NET, along with database technologies such as Microsoft SQL. Kulkarni Dep. 103:9-19.

113.     Parker claims that, before she left in September 2013, she showed Kulkarni what she did and showed him all of her documentation. Parker Dep. 79:1-19. During the time Parker spent with Kulkarni, she did not know what Kulkarni's job or duties would be. Parker Dep. 88:9-18. Parker has no knowledge of what Kulkarni did after she left Harley-Davidson. Parker Dep. 297:15-20.

114.     When Kulkarni began working in Tomahawk, he worked with Henrichs and Duellman. Kulkarni Dep. 87:19-88:5. Kulkarni did not perform the same job as Henrichs or Duellman. Kulkarni Dep. 91:23-25, 100:10-14. Henrichs performed only desktop support,

while Kulkarni provided both application and desktop support, which included printer server administration, VMware administration, and application packaging, enhancement, development, and support.  Kulkarni Dep. 91:23-92:9.

115.    Henrichs did not provide applications support in his position supporting Harley-Davison.  Henrichs Dep. 64:1-3.  He does not consider himself, Duellman, or Parker qualified to perform applications support.  Henrichs Dep. 66:20-67:8.

116.    Kulkarni's position in Tomahawk required SQL programming and coding for applications.  Kulkarni Dep. 111:9-21.

117.    Sixty percent of Kulkarni's Tomahawk position involved applications support, 25 percent was desktop support, and 15 percent was printer and VMware administration.  Kulkarni Dep. 113:22-114:4.

**J.      Parker Files An Administrative Charge Of Discrimination.**

118.    Parker filed an administrative Charge of Discrimination on August 29, 2013.  The only employment practice she challenged was that Infosys has "a company-wide employment policy and practice of hiring, retaining, and promoting employees of South Asian race and Indian, Bangladeshi, or Nepalese national origin (including workers with H-1B visas, B-1 visas, L-1 visas, and local hires, *e.g.* non-visa dependent individuals) over non-South Asian employees…).  Parker Dep. 289:7-291:22; Parker Dep. Ex. 21 at 825.

119.    Her charge also states that, "Infosys's policies, procedures and actions described above (including, for instance, the hiring of visa-dependent and/or green card holding foreign-born workers) have had a disparate impact on individuals of non-South Asian employees [sic]…."  Parker Dep. 289:7-291:22; Parker Dep. Ex. 21 at 827.

US.108225407.04

# IV.   LAYLA BOLTEN

## A.   Bolten Applies To Be A Test Analyst And Is Hired As A Test Analyst.

120.    In late 2012 and after not working for approximately two-to-three months, Plaintiff Layla Bolten sought a position in testing with a variety of companies.  Deposition of Layla Bolten, May 17, 2016 ("Bolten Dep."), attached to Defs.' Mot. for Summ. J. as **Exhibit N**, 49:8-19, 70:9-19, 71:18-25, 80:18-20; Bolten Dep. Ex. 6.

121.    Bolten posted her resume to a job search website, and on November 19, 2012, a person recruiting on behalf of Infosys contacted her via email asking to arrange a time to discuss "testing opportunities" Infosys had available in the Washington, D.C. metropolitan area.  Bolten Dep. 48:5-18; Bolten Dep. Ex. 2.

122.    Bolten agreed to talk with the recruiter, and the recruiter arranged a technical interview with Infosys.  Bolten Dep. 51:17-25, 53:22-24; Bolten Dep. Ex. 3.

123.    The recruiter explained that the position for which Bolten was applying and being interviewed was Tester (or Test Analyst), a Job Level 4 position.  Bolten Dep. 51:17-52:18; Bolten Dep. Ex. 3.

124.    Bolten understood that she was applying, interviewing, and being considered for a Test Analyst position.  Bolten Dep. 50:20-51:3, 52:16-24, 53:20-54:14, 69:5-70:5, 73:9-14.

125.    After the technical interview, Bolten was invited to participate in a second interview.  Bolten Dep. 54:15-25, 55:4-12; Bolten Dep. Ex. 4.

126.    The second interview lasted approximately two hours and consisted of a general overview of the company provided to all of the approximately 30 interviewees (including Bolten), followed by individual two-person interviews with managers.  Bolten Dep. 55:4-56:3, 56:12-18, 57:14-15, 58:12-16, 60:6-9; Bolten Dep. Ex. 4.

127.     On December 21, 2012, Bolten received an email from an Infosys representative, asking her to submit a formal application for the Test Analyst position for which she had interviewed.  Bolten Dep. 67:15-20, 68:6-13, 69:5-8, 69: 18-25; Bolten Dep. Ex. 5.

128.     Bolten submitted the application for the Test Analyst position, and Infosys offered her a position as a Test Analyst on January 10, 2013.  Bolten accepted.  Bolten Dep. 73:9-14, 74:19-75:4, 78:6-19, 80:15-17, 81:4-9; Bolten Dep. Exs. 10, 11 at 1.

129.     Bolten understood that her written offer letter superseded any prior representations or promises made to her.  Bolten Dep. 81:4-9, 85:3-18; Bolten Dep. Ex. 11 at 2.

130.     On January 14, 2013, Bolten began working for Infosys as a Test Analyst on the Washington, D.C. Health Exchange Project ("D.C. Health Exchange Project").  Bolten Dep. 56:4-11, 90:22-91:23, 95:4-14, 206:11-25; Bolten Dep. Exs. 13, 18; Groves Dep. 164:20-165:3.

131.     Bolten received, read, and signed Infosys's policies prohibiting unlawful harassment and providing employees avenues to report alleged harassment or ask questions about harassment.  Bolten Dep. 201:9-16, 202:19-204:5, 205:25-206:7; Bolten Dep. Exs. 15, 16.

132.     Sometime during Bolten's first month of employment, Jayanta Ghosh called to introduce himself and ask about her background.[4]  After Bolten told Ghosh about her background, he said there was a "possibility" that she could be a Test Lead with two junior testers reporting to her.  Bolten Dep. 78:20-79:12, 259:21-260:15.  Bolten did not know when this promotion might occur.  Bolten Dep. 208:10-24.  Ghosh is the only person who Bolten spoke to about being a Test Lead.  Bolten Dep. 259:13-261:8.

133.     Bolten understood that Ghosh "eventually" wanted her to become a Test Lead, so she "had a plan" that she would work hard so that Ghosh would "eventually" see that she could

---

[4]     During her deposition, Bolten initially believed this conversation occurred before she interviewed for the Test Analyst position, but she later corrected herself as to timing.  Bolten Dep. 50:20-51:3, 259:21-260:15.

do the job and then "eventually, [Bolten would] get the promotion he spoke with [her] about."
Bolten Dep. 96:11-97:10.

   **B.     After An Initial Delay In Available Work, Bolten Is Assigned To Geeta Kulkarni's Testing Team.**

   134.    Initially, Bolten and others did not receive their laptops to begin work, so she and others were sent to training and asked to review background information about the project. During this time, Bolten worked from home, and she continued to do so until sometime after February 12, 2013.  Bolten Dep. 210:25-212:5.

   135.    As a Test Analyst, she was an individual contributor on the team, which was overseen by a Test Lead.  Groves Dep. 156:22-157:3.  When Bolten first began reporting to work onsite, her assigned Test Lead was Geeta Kulkarni.  Bolten Dep. 95:4-11.  The team led by Geeta Kulkarni worked specifically on Medicare and Medicaid issues.  Bolten Dep. 160:12-15.

   136.    Geeta Kulkarni's testing team included two other Test Analysts in addition to Bolten: Petal Wong, a Chinese man, and an Indian man whose name Bolten cannot recall. Bolten Dep. 95:7-25, 96:1-10; Groves Dep. 159:4-8.

   137.    As Test Analysts, Bolten, Wong, and the other coworker were responsible for writing test cases and test scenarios to evaluate the database system.  Bolten Dep. 51:14-21, 94:18-21, 97:11-20; Bolten Dep. Ex. 3; *see also* Groves Dep. 155:8-17.

   138.    During the approximately two-month period Bolten reported to Geeta Kulkarni, Geeta Kulkarni made two comments about Bolten being an American.  First, Bolten once heard Geeta Kulkarni say something to the effect that "stupid Americans" are lucky that they can take sick days after Bolten took a sick day.  Bolten Dep. 103:3-12, 266:6-24.  Second, during a group meeting at which several test analysts were sharing their experiences, Geeta Kulkarni did not let Bolten talk about her background and said that Bolten was here for "American experience."

Bolten Dep. 103:22-104:11. Geeta Kulkarni did not make any other comments that Bolten felt were derogatory. Bolten Dep. 110:14-17.

139. The only other comment mentioning nationality that Bolten recalls occurred after the Boston Marathon terrorist bombing. Bolten arrived at work and one coworker said to her that he had learned from the news that the terrorist was from Russia and that Bolten was Russian, too, while pointing a finger at her. Bolten Dep. 115:21-118:24. Bolten is, in fact, Russian. Bolten Dep. 64:9-10. Bolten thought this was "silly," did not say anything in response, and did not report the comment to anyone. Bolten Dep. 118:8-14, 202:9-15.

140. Bolten claims she did not know what was going on with her testing project because Geeta Kulkarni did not always speak English. Bolten told Geeta Kulkarni once that she had to use English because Bolten did not understand what she was saying. Bolten Dep. 108:24-109:25.

141. Bolten thought that Geeta Kulkarni "didn't like" her because Bolten believed that when she heard Geeta Kulkarni and the Indian tester converse "in their language" that they were laughing at her and making jokes. But Bolten did not know what they were actually saying. Bolten Dep. 101:14-102:23.

142. However, this did not impact Bolten's performance, which she described as "great." Bolten Dep. 102:19-20, 127:10-130:5, 173:22-24

143. On April 1, 2013, Bolten emailed Jayanta Ghosh and Test Manager Ajeet Mohanty to inform them of her performance testing experience and wrote "Please see my resume just in case if you want to use my skills for the DCASPerformance testing." Bolten Dep. 140:21-141:21, 221:1-24; Bolten Dep. Ex. 25. Bolten considered the lack of response to her email as

30

harassment because she believed her manager was supposed to reply to every single e-mail, and a lack of reply means that the person "hate[s] your guts."  Bolten Dep. 185:16-186:6.

144.    Bolten was not chosen for the performance testing team, and she considered that "discrimination."  Bolten Dep. 141:23-25.  She does not remember the names of those who were selected for the team.  Bolten Dep. 142:5-6.

145.    Bolten does not know whether she would have received any increase in pay had she been chosen for the performance testing team. Bolten Dep. 144:16-19.

146.    In approximately May 2013, Bolten spoke with a manager, John Santuchi, to complain about her coworkers' use of Hindi in the workplace.  She told him that "we live here in U.S., in America, this is a Obama health application, and everybody has to speak English."  She also told Santuchi that when "we discuss a project, I have to understand what's going on."  Bolten Dep. 89:12-25, 93:6-94:4.  Bolten only talked to Santuchi about the issue of others speaking Hindi.  Bolten Dep. 205:2-6.

147.    Santuchi responded that the use of Hindi was wrong and that he would speak to a supervisor.  Bolten asked him to keep her name "incognito" because she worried "the harassment" would get worse.  Santuchi told Bolten he would do so.  Bolten Dep. 94:5-16.

148.    At some point after Bolten spoke with Santuchi, Ajeet Mohanty asked Bolten to report to work at 8:30 a.m. Bolten Dep. 134:10-20.  Bolten was not the only employee who reported to work at 8:30 a.m.  Bolten Dep. 135:9-14.

**C.    Bolten Moves To Another Testing Team.**

149.    In or about May 2013, Bolten was moved to another testing team because Geeta Kulkarni believed that Bolten was uncomfortable from a technical aspect with the type of work Geeta Kulkarni's team performed.  Groves Dep. 159:18-161:10.  Bolten does not know why she was moved to a different testing team, and she did not ask.  Bolten Dep. 100:19-101:7.

US.108225407.04

150.     During her next assignment, Bolten's Test Lead was Shanmuganthan Selvanathan, and the team focused on a different aspect of the D.C. Health Exchange Project. Bolten Dep. 99:17-25, 160:16-24; Groves Dep. 159:4-15.

151.     Bolten did not complain to anyone about any issues she had on the second team. Bolten Dep. 159:18-21.  Other than the one conversation she had with Santuchi, Bolten did not report any other conduct she thought was harassing.  Bolten Dep. 202:12-15.

152.     On May 29, 2013, Bolten emailed other Test Leads to ask whether they needed her assistance.  Bolten Dep. 224:14-225:4; Bolten Dep. Ex. 27.  She received work from them. Bolten Dep. 151:16-152:13.

153.     After Bolten performed work for other test leads, Ajeet Mohanty called her into his office to question why she had eight hours per day charged on her time sheet.  Once Bolten explained that she had worked for other Test Leads to write test cases, he told her "it's good that, Layla you're being so proactive."  Bolten Dep. 130:6-10, 131:2-132:24.

154.     On June 3, 2013, Bolten emailed Mohanty expressing interest in working with the Selenium Automation Testing tool.  Bolten Dep. 225:24-226:14; Bolten Dep. Ex. 28.  Because Bolten did not receive a reply, she considered that "discrimination."  Bolten Dep. 152:18-153:19. Bolten does not know how many people indicated their interest in working with the Selenium Automation Testing tool.  Bolten Dep. 153:9-12.  Bolten does not know whether anyone was chosen to work with the Selenium Automation Testing tool before her resignation seven days later.  Bolten Dep. 186:22-187:3.

**D.     Bolten Is Assigned To A New Testing Team, Is Asked To Move Work Locations, And Quits On The Spot.**

155.     Sometime during the week of June 3, 2013, Bolten was reassigned to a new group.  Bolten Dep. 161:22-162:1.

156.     On June 10, 2013, Bolten was asked to move to a new work station. When she began setting up her belongings at the new station, another Test Analyst informed her that the station was the Test Analyst's station and that Bolten's location would be at another station in the corner.  Bolten Dep. 162:11-163:20.

157.     Being asked to move work locations like this "was just too much" for Bolten. Bolten said, "you know what? I'm not moving anywhere, I'm not doing anything."  She then immediately wrote her resignation letter and left.  Bolten Dep. 163:1-20.

158.     When asked why she was resigning her position, Bolten told Infosys that she was "leaving because I don't like the commute, because I wanted to leave as soon as possible." Bolten Dep. 228:11-16.

159.     Bolten's job was in Washington D.C., which required Bolten to commute up to 90 minutes each way.  Bolten Dep. 76:8-77:4, 212:24-213:10; Bolten Dep. Ex. 9.

160.     Bolten "didn't like the commute" to the Washington, D.C. location and had been corresponding with recruiters about jobs closer to her home as early as March 29, 2013 "because of the commute."  Bolten Dep. 213:12-13, 214:1-19, 215:24-217:1; Bolten Dep. Exs. 22, 23.

161.     Bolten had previously quit another job because she wanted to work from home and "didn't want to drive any more."  Bolten Dep. 40:15-41:1.

162.     No one ever told Bolten there were any concerns with the quality of her work or that her job was in jeopardy.  Bolten Dep. 173:22-24, 140:1-3.  Because Bolten had only been employed for approximately five months, she did not receive a formal performance review during her employment.  Groves Dep. 170:8-12.

US.108225407.04

## E. Other Test Leads On The D.C. Health Exchange Project Worked For Infosys Substantially Longer Than Bolten.

163.    A promotion at Infosys involves a change in job levels. Typically, an individual must have worked in the same position for approximately two years before obtaining a promotion. Cramer Decl. ¶ 4.

164.    During the entire tenure of Bolten's employment, no employees were promoted from the position of Test Analyst (Job Level 4) to Test Lead (Job Level 5) at the D.C. Health Exchange Project. Siskin Report ¶ 34.

165.    Bolten believes two employees were wrongfully promoted to Test Lead instead of her: Sirisha Pallekonda and Raghavendran Ramalingam. Bolten Dep. 122:21-126:2. Neither was promoted during Bolten's employment. Siskin Report ¶ 35.

166.    Sirisha Pallekonda, who obtained a Master's degree in June 1999, was hired by Infosys in March 2006. Pallekonda was assigned to the U.S. in May of 2008, and by the time Bolten was hired as a Test Analyst, Pallekonda had been a Technical Test Lead for more than three years. Siskin Report ¶ 35.

167.    Raghavendran Ramalingam joined Infosys in April 2010 as a Technology Analyst. On January 1, 2013, he became a Technical Test Lead, and on February 2, 2013, he was assigned the D.C. Health Exchange Project. Siskin Report ¶ 35.

168.    Bolten never applied for Test Lead; she was not provided a specific date for the alleged promotion to occur; and she never talked with anyone about being promoted to the Test Lead position after the initial conversation with the manager she claims "promised" her the position. Bolten Dep. 70:3-5, 207:25-209:2.

US.108225407.04

## V.    GREGORY HANDLOSER

### A.    Background Regarding Gregory Handloser.

169.    In August 2004, Gregory Handloser (Caucasian, American national origin) began his employment with Infosys as a Sales Manager in its Automotive Industry Unit.  2nd Am. Compl. & Answer ¶¶ 11, 100; Deposition of Gregory Handloser, May 13, 2016 ("Handloser Dep."), attached to Defs.' Mot. for Summ. J. as **Exhibit O**, 41:2-16, 73:9-22; Handloser Dep. Ex. 1.

170.    From around 2006 until the end of his employment, Handloser worked nearly equal time from his home in Florida and at various Infosys offices.  Handloser Dep. 60:6-61:4; 62:24-63:7; 2nd Am. Compl. & Answer ¶ 102.

171.    As a Sales Manager, Handloser was responsible for acquiring new clients (also called new "logos").  Handloser would begin the sales process and then pass the account to an engagement manager.  Handloser Dep. 41:10-42:21.

172.    In Infosys parlance, Handloser was a "hunter" who was responsible for securing the new "logos."  Engagement managers were "farmers" who, after a "hunter" acquired a new "logo," would "farm the account" for additional work.  Handloser Dep. 54:23-55:15.

173.    In approximately 2009, Handloser transitioned to a Sales Manager position within the Manufacturing Business Unit for Resources, the job he held until his termination.  2nd Am. Compl. & Answer ¶ 100; Handloser Dep. 47:13-48:20; 176:20-177:6.

174.    Beginning no later than 2009, Handloser reported directly to Group Engagement Manager Rohit Kedia.  In approximately mid-2011, Handloser began reporting to Sudip Singh, who then headed new sales for Manufacturing for North and South America (and is currently the Global Head of Engineering Services). Handloser Dep. 18:13-19:14, 44:12-13, 47:8-9, 70:16-18,

170:15-171:1; Deposition of Sudip Singh, July 22, 2016 ("Singh Dep."), attached to Defs.' Mot.

for Summ. J. as **Exhibit P**, 6:9-13, 60:25-61:7, 107:23-108:4; Handloser Dep. Ex. 20.

**B.      <u>Handloser Receives The Worst Possible Performance Appraisal.</u>**

175.    At Infosys, performance appraisals are conducted every six months.  Singh Dep.

86:9-11.  The performance appraisal cycle is aligned with Infosys's fiscal year, which runs from

April 1 to March 31 each year.  Singh Dep. 86:12-22.  Accordingly, the first six-month

performance appraisal cycle begins on April 1 and ends on September 30, while the second six-

month cycle begins on October 1 and ends on March 31.  Singh Dep. 86:12-22.

176.    Human Resources sets the "key performance indicators" for all sales managers to

ensure consistency across the organization.  Singh Dep. 92:18-94:7.  For example, a key

performance indicator for sales managers could be the number of new accounts opened during

the performance appraisal cycle.  Singh Dep. 94:8-17.

177.    At the beginning of each performance appraisal cycle, the sales manager and his

supervisor discuss the key performance indicators for the upcoming cycle and appropriate targets

for each key performance indicator.  Singh Dep. 88:21-89:23.  The targets might differ among

sales managers:  for example, employee X might need to open three new accounts in the

performance appraisal cycle, while employee Y needs to open four new accounts.  Singh Dep.

94:18-95:2.

178.    A sales manager might have four or five different key performance indicators, and

each are given a percentage weighting.  The percentage weight across all key performance

indicators totals 100 percent.  For each key performance indicator, supervisors are given a very

narrow band for the assigned weight; for example, for a key performance indicator of new

account openings, a supervisor might have discretion to assign a weight between 30 and 35

percent.  Singh Dep. 94:2-96:18.

179. During the appraisal process at the end of the performance appraisal cycle, both the sales manager and supervisor enter his understanding of the sales managers' performance to goal. Singh Dep. 110:10-111:15. For example, if a sales manager had a target of achieving one new sales campaign and did so during the performance cycle the sales manager would enter "one." The sales manager would have achieved 100 percent of that target, and a rating would be automatically generated for that key performance indicator. Ratings range from one to five, with five being the best. Achieving 100 percent of the target would equal a three rating (meets expectations) for that target. Singh Dep. 111:10-22.

180. Once the automatically-generated ratings are complete, the system generates a Performance Index ("PI") score. The PI score is on a scale of one-to-five, with five being the best score. All sales managers' PI scores are then collected by the performance appraisal system. Singh Dep. 131:4-133:2; Cramer Decl. ¶ 7.

181. The system then generates a sales manager's CRR score based on a bell curve of all sales managers' PI scores. Singh Dep. 132:13-133:2. CRR stands for Consolidated Relative Rating. Cramer Decl. ¶ 7. The purpose of the CRR score is to assess the relative performance of an individual against the universe of similar job profiles across Infosys. Singh Dep. 97:23-98:4. The highest available CRR score is a one plus (also referred to as a 1E). Singh Dep. 104:24-105:5. The lowest score is a four. Singh Dep. 105:6-7. A CRR score of three reflects not meeting expectations. Singh Dep. 140:4-15. A CRR score of four is considered as "really right at the bottom of the rung." Singh Dep. 159:2-5. Handloser described receiving a four as "you should be in another job or in another company." Handloser Dep. 20:15-24. Officially, a four reflects that the employee did not meet expectations, and this score generally is reserved for

those whose performance placed them at the bottom 15 percent of their peer group. Cramer Decl. ¶ 7.

182.    Singh completed Handloser's performance appraisal for the April 1, 2012, to September 30, 2012 cycle.   Singh Dep. 140:23-142:7; Singh Dep. Ex. 5.

183.    The first key performance indicator was Gross Margin on 18-Month Revenue, and Handloser's target was 30 percent. Singh Dep. 142:8-16; Singh Dep. Ex. 5. Handloser met this target. Singh Dep. 142:17-18. Both Handloser's self-appraisal and Singh's appraisal resulted in a rating of three. Singh Dep. Ex. 5 at INFOSYS0024062. This key performance indicator was weighted at 20 percent. Singh Dep. Ex. 5 at INFOSYS0024062.

184.    The second key performance indicator was "Mentoring 2 in Box" with a target of one, and Handloser met that target. Singh Dep. 142:19-143:6; Singh Dep. Ex. 5 at INFOSYS0024062. Handloser gave himself a rating of three in his self-appraisal, and Singh gave him a slightly higher rating of four. Singh Dep. Ex. 5 at INFOSYS0024062. This key performance indicator was weighted at five percent. Singh Dep. Ex. 5 at INFOSYS0024062.

185.    The third key performance indicator was New Revenue: 18-Month, and Handloser's target was $2 million. Singh Dep. 143:11-18; Singh Dep. Ex. 5 at INFOSYS0024062. Handloser did not meet that target and instead achieved $1.6 million. Singh Dep. 143:19-23; Singh Dep. Ex. 5 at INFOSYS0024062. Both Handloser's self-appraisal and Singh's appraisal reflected a score of two. Singh Dep. Ex. 5 at INFOSYS0024062. This key performance indicator was weighted at 30 percent. Singh Dep. Ex. 5 at INFOSYS0024062.

186.    The fourth key performance indicator was "NAO," meaning New Accounts Opened. Singh Dep. 143:24-144:2. Handloser's target was two new accounts. Singh Dep. 144:3-4. In Handloser's self-appraisal, he recorded that he had opened one new account. Singh

38

Dep. 144:5-6; Singh Dep. Ex. 5 at INFOSYS0024063. But Singh determined that Handloser had not opened any new accounts. Singh Dep. 144:7-8; Singh Dep. Ex. 5 at INFOSYS0024063. Handloser had claimed credit for a new contract with Toyota Americas, but Singh did not consider this a new account opening because the criteria for a new account opening includes billing the new client $50,000 in the given performance appraisal cycle. Singh Dep. 144:9-17. Infosys had not billed Toyota Americas anything that would meet this $50,000 threshold during the performance appraisal cycle, so it did not count. Singh Dep. 144:18-21. Handloser's rating for this key performance indicator was a one. However, even if Singh had counted Toyota Americas as a new account opening, Handloser still would have achieved only 50 percent of his target of two new account openings, which would still result in a one rating. Singh Dep. 144:22-145:9; Singh Dep. Ex. 5 at INFOSYS0024063. The New Accounts Opened key performance indicator was weighted the heaviest at 35 percent. Singh Dep. Ex. 5 at INFOSYS0024063.

187.    The fifth key performance indictor was Campaign Selling Pipeline. Singh Dep. 150:5-10; Singh Dep. Ex. 5 at INFOSYS0024063. Handloser's target was one, and in his self-appraisal, he recorded that he had achieved three, which generated a rating of five. Singh Dep. Ex. 5 at INFOSYS0024063. However, Singh's appraisal reflected that Handloser achieved only one, resulting in a rating of three. Singh Dep. Ex. 5 at INFOSYS0024063.

188.    The evaluation reflected that Handloser's new account revenues were "stuck" and he had failed to initiate any new campaigns. Singh Dep. 147:8-15; Handloser Dep. Ex. 20 at INFOSYS0024062-63.

189.    After Handloser's overall appraisal score of 2.05 was placed on the bell curve, Handloser's CRR was a 4 for this final performance appraisal cycle. Handloser Dep. 170:15-171:6; Handloser Dep. Ex. 20 at INFOSYS0024063; Singh Dep. 132:13-133:2.

190.     Handloser does not know of anyone else who received a CRR score of 4 during the appraisal period that ended in September 2012.  Handloser Dep. 170:15-171:6; Handloser Dep. 220:20-24.

191.     Handloser does not know of anyone who received a CRR score of 4 whose employment was not terminated in 2012 or 2013.  Handloser Dep. 220:25-221:2.

**C.      Handloser's Employment Is Terminated.**

192.     In Fall 2012, Infosys conducted a reduction in force ("RIF") that led to the termination of employees.  Cramer Decl. ¶ 6.

193.     The RIF in the U.S. targeted those who received a Consolidated Relative Rating or "CRR" score of 4 in the most recent performance appraisal cycle.  Cramer Decl. ¶ 7.

194.     Infosys terminated Handloser's employment on December 19, 2012 pursuant to this RIF.  Handloser Dep. 11:3-6, 12:16-21; Singh Dep. 150:23-152:24; Compl. And Answer ¶ 108; Cramer Decl. ¶ 8.

195.      Within the United States, there were 50 employees terminated as part of this RIF. Twenty-nine of these terminated employees were Asian.  Cramer Decl. ¶ 9; Cramer Decl. Ex. A; Siskin Report ¶¶ 29, 30.

196.     During the meeting to discuss his termination and a subsequent call he made to Human Resources, Handloser did not allege that his termination was discriminatory or the result of previous discrimination.  Handloser Dep. 212:18-216:22.

197.     After Handloser's employment was terminated, he drafted but did not send a letter to Infosys's CEO.  Handloser Dep. 196:11-19; Handloser Dep. Ex. 22.

198.     Handloser did not mention discrimination in this letter.  Handloser Dep. 196:11-19; Handloser Dep. Ex. 22.

40

199.     In this draft letter, Handloser wrote that "Infosys Manufacturing Leadership terminated my employment to remove the need to pay me commissions for current logos plus the new client Toyota that was in the final stages of closing with verbal commitment they will close the business with me."  Handloser Dep. 196:11-19; Handloser Dep. Ex. 22, at Koehler0007839.

200.     Handloser alleges that "[i]n  or around 2011, Infosys began a concerted effort in the U.S. to purge non-South Asian employees in favor of South Asians, including in the sales force and other areas that had comparatively large numbers of non-South Asian employees." 2nd Am. Compl. ¶ 6.

201.     Employee data shows that both the number and percent of non-Asians hired was higher in 2011 and 2012 than in previous years.  Siskin Report ¶ 31.  Infosys hired 339 non-Asian employees resident in the U.S. in 2011, and 382 in 2012.  This resulted in the shift of the demographics of Infosys's total U.S. workforce to include proportionately more non-Asian employees.  This is not consistent with a "purge" of non-Asian employees from Infosys's U.S. workforce.  Siskin Report ¶ 31.

US.108225407.04

Date: September 23, 2016                           Respectfully submitted,

FAEGRE BAKER DANIELS LLP


/s/ Ellen E. Boshkoff
Ellen E. Boshkoff
Rozlyn M. Fulgoni-Britton
FAEGRE BAKER DANIELS LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
(317) 237-0300
(317) 237-1000 (fax)
ellen.boshkoff@FaegreBD.com
rozlyn.fulgoni-britton@FaegreBD.com

George A. Stohner
Gregory P. Abrams
Lindsey M. Hogan
FAEGRE BAKER DANIELS LLP
311 S. Wacker Drive, Suite 4400
Chicago, IL 60606
(312) 212-6500
(312) 212-6501 (fax)
george.stohner@faegreBD.com
gregory.abrams@FaegreBD.com
lindsey.hogan@FaegreBD.com

Dulaney Lucetta Pope
FAEGRE BAKER DANIELS LLP
202 S Michigan Street, Suite 1400
South Bend, IN 46601
574-234-4149
574-239-1900 (fax)
lucetta.pope@FaegreBD.com

Attorneys for Defendants, Infosys Technologies
Limited, Inc. and Infosys Public Services, Inc.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney certifies that a true and correct copy of the foregoing

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS' MOTION**

**FOR SUMMARY JUDGMENT** was served on all counsel of record by electronic service

through the Clerk of the Court's CM/ECF filing system on September 23, 2016.

Daniel A Kotchen
dkotchen@kotchen.com

Michael F Brown
mbrown@dvglawpartner.com

Michael J von Klemperer
mvonklemperer@kotchen.com

**Notice has been delivered by other means to:**

Vonda K. Vandaveer
VK Vandaveer PLLC
PO Box 27317
Washington, DC 20038-7317
atty@vkvlaw.com

/s/ Ellen E. Boshkoff

US.108225407.04