| | |
|---|---|
| **BRENDA KOEHLER,**<br>**KELLY PARKER,**<br>**LAYLA BOLTEN &**<br>**GREGORY HANDLOSER**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**INFOSYS TECHNOLOGIES LIMITED,**<br>**INC., and INFOSYS PUBLIC SERVICES,**<br>**INC.**<br><br>        **Defendants.** | **Case No. 2:13-cv-885-PP** |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................. 1

SUMMARY JUDGMENT STANDARD ................................................................. 6

ARGUMENT ........................................................................................................... 6

I.  Each Plaintiff's Disparate Treatment Claim Fails As A Matter of Law. .................................. 6

    A.  Brenda Koehler. ........................................................................................ 8

        1.  Summary Of Claims. .......................................................................... 8

        2.  Koehler Cannot Establish A *Prima Facie* Case Of Reverse Discrimination............... 8

            a.  No Background Circumstances Suggest An Inclination To Discriminate............. 9

            b.  Koehler Cannot Meet Her Burden To Show She Was Qualified For The Lead VMware/Windows Administrator Position. ........................................................ 10

            c.  Koehler's Lack Of Qualifications Was The Legitimate, Nondiscriminatory Reason She Was Not Hired, And No Evidence Suggests That Reason Is Pretextual. ........................................................ 12

    B.  Kelly Parker. ........................................................................................... 14

        1.  Summary Of Claims. ........................................................................ 14

        2.  Parker's 2012 Failure To Hire Claim Fails For Multiple Reasons. ............................ 15

            a.  Parker's Title VII Claim Based on Infosys's Decision Not to Hire Her in 2012 Is Time-Barred. ........................................................ 15

            b.  Parker's 2012 Failure to Hire Claim Fails Under a *McDonnell Douglas* Analysis ........................................................ 17

                i.  No Evidence Suggests Infosys Had Any Reason or Inclination to Discriminate Against Caucasian Americans on the Harley-Davidson Project..................... 17

                ii.  Parker Was Not Qualified For The Systems Engineer Position. .................... 18

                iii.  Parker Cannot Identify any South Asian Employee Hired by Infosys as a Systems Engineer in 2012.............................. 19

            c.  Parker's Lack of Qualifications Was the Legitimate, Nondiscriminatory Reason She Was Not Hired, and She Has No Evidence of Pretext................................. 19

US.108296829.02

3. Infosys Did Not Discharge Parker; Parker's Contract With SoftHQ Expired............ 20

4. Parker Cannot Base A Claim On Kapil Kulkarni's Assignment To Tomahawk........ 22

C. Layla Bolten..................................................................................................... 23

1. Summary Of Claims. ..................................................................................... 23

2. Bolten's Own Testimony Defeats Her Failure to Hire Claim...................................... 24

3. Infosys Is Entitled To Summary Judgment On Bolten's Promotion Claim................ 25

a. Bolten Cannot Establish a Prima Facie Case of Reverse Discrimination............. 25

i. Bolten Lacks Any Suspicious Background Circumstances. .......................... 25

ii. Bolten Cannot Identify Any Better-Treated Comparator Outside of Her Protected Class................................................................................. 26

b. Bolten Was Not Employed Long Enough To Be Promoted To Test Lead, And She Cannot Prove Pretext. ...................................................................... 27

4. Bolten's Allegations Do Not Add up to Unlawful Harassment.................................. 27

5. Bolten Was Not Constructively Discharged. ............................................................. 30

D. Greg Handloser. ................................................................................................. 31

1. Summary Of Claims. ..................................................................................... 31

2. Handloser's Discriminatory Termination Claim Fails Because He Cannot Support His Prima Facie Burden in the Context of a Performance-Based RIF. ............................. 31

3. Handloser's Discriminatory Termination Claim Fails Because He Cannot Dispute That Infosys Discharged Him As Part of a Legitimate and Non-discriminatory RIF. 33

II. Infosys Is Entitled To Summary Judgment On Plaintiffs' Pattern-And-Practice Claim. ........35

A. Legal Framework. ............................................................................................... 35

B. Plaintiffs Cannot Carry Their Burden Of Proving That Discrimination Is Infosys's Standard Operating Procedure. .......................................................................... 36

III. Plaintiffs Koehler's And Parker's Disparate Impact Claims Fail As A Matter Of Law..........38

A. Koehler Lacks Standing To Assert Her Disparate Impact Claim. ..................................... 39

1. Koehler Applied For A Job Closed To Visa Candidates. ........................................... 40

US.108296829.02

    2.  Koehler Was Unqualified For The Position She Sought. ............................................. 40

B.  Kelly Parker's Disparate Impact Claims Fail For Multiple Reasons............................... 41

    1.  The Specific Employment Practices That Parker Seems To Challenge Are Beyond
        The Scope Of Her Administrative Charge............................................................... 41

    2.  Parker Does Not Have Standing To Bring A Disparate Impact Claim Based on
        Infosys's Failure to Hire Her in 2012 or 2013. ........................................................ 43

    3.  Parker's Disparate Impact Claims Are Conceptually Flawed. ................................. 44

        a.  Parker's Failure-to-Hire Claim Does Not Involve Hiring. ................................. 44

        b.  Infosys Visa Practices Have The Same Impact All Job Applicants. .................... 46

        c.  Title VII Does Not Require Infosys To Treat Job Applicants The Same As
            Employees............................................................................................................. 47

        d.  If Accepted, Parker's Unsupported "Disparate Impact" Theory Would Subject
            Every Employer Who Participates In Visa Programs To A Title VII Lawsuit. ... 48

    4.  Parker Has No Statistical Evidence Of A Disparate Impact....................................... 49

CONCLUSION........................................................................................................................49

US.108296829.02

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adler v. Evanston NW Healthcare Corp.*,
No. 07C4203, 2008 WL 5272455 (N.D. Ill. 2008) ................................................................29

*Adreani v. First Colonial Bankshares Corp*,
154 F.3d 395 (7th Cir. 1998) ...................................................................................................34

*Algarin v. Loretto Hosp.*,
No. 10 C 02996, 2012 WL 710177 (N.D. Ill. Mar. 5, 2012) ..................................................28

*Anderson v. Baxter Healthcare Corp.*,
13 F.3d 1120 (7th Cir. 1994) ..................................................................................................11

*Antonetti v. Abbott Labs.*,
563 F.3d 587 (7th Cir. 2009) ............................................................................................27, 35

*Bell v. Envtl. Prot. Agency*,
232 F.3d 546 (7th Cir. 2000) ...................................................................................................36

*Bennett v. Roberts*,
295 F.3d 687 (7th Cir. 2002) ...................................................................................................36

*Carpenter v. Bd. of Regents of the Univ. of Wis. Sys.*,
728 F.2d 911 (7th Cir. 1984) .............................................................................................40, 41

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................................................................6

*Chaib v. Indiana*,
744 F.3d 974 (7th Cir. 2014) ............................................................................................28, 30

*Coates v. Johnson & Johnson*,
756 F.2d 524 (7th Cir. 1985) ...........................................................................................35, 36

*Cooney v. Casady*,
652 F.Supp.2d 948 (N.D. Ill.2009) .........................................................................................10

*Cooper v. Fed. Rserve Bank of Richmond*,
467 U.S. 867 (1984)..................................................................................................................38

*Cruse v. Chicago Park Dist.*,
95 F.3d 1154 (7th Cir. 1996) (per curiam) ..............................................................................16

*Darbha v. Capgemini America Inc.*,
492 Fed. Appx. 644 (7th Cir. 2012) ........................................................................................30

iv

*Denisi v. Dominick's Finer Foods, Inc.*,
99 F.3d 860 (7th Cir. 1996) ...................................................................11

*Doe v. First Nat'l Bank of Chicago*,
865 F.2d 864 (7th Cir. 1989) ..................................................................47

*Durkin v. City of Chicago*,
341 F.3d 606 (7th Cir.2003) ...................................................................29

*East Texas Motor Freight System Inc. v. Rodriguez*,
431 U.S. 395 (1977) ..................................................................................38

*Farrell v. Butler University*,
421 F.3d 609 (7th Cir. 2005) ...........................................................40, 43

*Ferrill v. City of Milwaukee*,
295 F. Supp. 2d 920 (E.D. Wis. 2003) ................................................16

*Gammage v. Fed. Reserve Bank of Chi.*,
No. 03 C 9209, 2005 WL 43259 (N.D. Ill. Jan. 6, 2005) .......................37

*Garza v. Wautoma Area Sch. Dist.*,
984 F. Supp. 2d 932 (E.D. Wis. 2013) ..................................................7

*Gen'l Tele. Of SW v. Falcon*,
457 U.S. 147 (1982) ..................................................................................38

*Gilty v. Vill. of Oak Park*,
919 F.2d 1247 (7th Cir. 1990) .........................................................39, 41

*Good v. Univ. of Chi. Med. Ctr.*,
673 F.3d 670 (7th Cir. 2005) ...............................................10, 18, 26

*Gore v. Ind. Univ.*,
416 F.3d 590 (7th Cir. 2005) .........................................................10, 26

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ..........................................................................11, 45

*Hague v. Thompson Distribution Co.*,
436 F.3d 816 (7th Cir. 2006) ..........................................................27, 37

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ....................................................................................27

*Helzing v. Loyola University of Chicago*,
No. 02 C 9408, 2004 WL 1881780 (N.D. Ill. Aug. 16, 2004) ................14

v

*Hentosh v. Herman M. Finch Univ. of Health Sci.*,
167 F.3d 1170 (7th Cir. 1999) ...............................................................15

*Herzog v. Graphic Packaging Int'l, Inc.*,
742 F.3d 802 (7th Cir. 2014) ...................................................................6

*Hildebrandt v. Ill. Dept. of Natural Res.*,
347 F.3d 1014 (7th Cir. 2003) ...............................................................35

*Hoosier v. Greenwood Hospitality Mgmt. LLC*,
32 F. Supp. 3d 966 (N.D. Ill. 2014) .......................................................30

*Hudson v. Chicago Transit Auth.*,
375 F.3d 552 (7th Cir. 2004) ...................................................12, 20, 21

*Int'l Bd. Of Teamsters v. United States*,
431 U.S. 324 (1977) ...............................................................................35

*Jackson v. E.J. Brach Corp.*,
176 F.3d 971 (7th Cir. 1999) ..................................................................32

*Johal v. Little Lady Foods, Inc.*,
434 F.3d 943 (7th Cir. 2006) ..................................................................32

*Johnson-Carter v. B.D.O. Seidman, LLP*,
169 F. Supp. 2d 924 (N.D. Ill. 2001) .....................................................34

*Jones v. City of Springfield*,
554 F.3d 669 (7th Cir. 2009) ..................................................................46

*Jones v. Advocate N. Side Health Network*,
No. 13 C 6432, 2016 WL 3568724 (N.D. Ill. June 29, 2016)................34

*King v. Gen. Elec. Co.*,
960 F.2d 617 (7th Cir. 1992) ............................................................35, 36

*Krchnavy v. Limagrain Genetics Corp.*,
294 F.3d 871 (7th Cir. 2002) ..................................................................34

*Lewis v. Casey*,
518 U.S. 343 (1996)................................................................................40

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................40

*Matthews v. Waukesha County*,
759 F.3d 821 (7th Cir. 2014) ....................................................................1

vi

US.108296829.02

*McQueen v. City of Chicago*,
    803 F. Supp. 2d 892 (N.D. Ill. 2011)..................................................43

*Melendez v. Ill. Bell Tel. Co.*,
    79 F.3d 661 (7th Cir. 1996) ..........................................................41

*Millbrook v. IBP, Inc.*,
    280 F.3d 1169 (7th Cir. 2002) ...........................................12, 20, 27

*Mills v. Health Serv. Corp.*,
    171 F.3d 450 (7th Cir. 1999) .......................7, 9, 17, 19, 25, 33

*Mitchell v. Jefferson County Bd. of Educ.*,
    936 F.2d 539 (11th Cir. 1991) .......................................................48

*Montgomery v. Am. Airlines, Inc.*,
    626 F.3d 382 (7th Cir. 2010) ...................................................7, 29

*Neal v. Sandia Nat'l Labs.*,
    157 F. App'x 67 (10th Cir. 2005) .................................................47

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)..........................................................................27

*O'Neal v. Shinseki*,
    No. 13 C 653, 2015 WL 1396375 (N.D. Ill. Mar. 24, 2015)................23

*O'Regan v. Arbitration Forums, Inc.*,
    246 F.3d 975 (7th Cir. 2001) ........................................................47

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).......................................................................41

*Peele v. Country Mut. Ins. Co.*,
    288 F.3d 319 (7th Cir. 2002) ........................................................12

*Penn. State Police v. Suders*,
    542 U.S. 129 (2004).......................................................................30

*Phelan v. City of Chicago*,
    347 F.3d 679 (7th Cir. 2003) ..........................................................7

*Pruitt v. Captain D's LLC*,
    CV 3:15-cv-00013-RLY-MPB, 2016 WL 2989060 (S.D. Ind. May 24, 2016) ......................46

*Ransom v. CSC Consulting, Inc.*,
    217 F.3d 467 (7th Cir. 2000) ........................................................35

US.108296829.02

*Reeves v. Fed. Reserve Bank of Chi.*,
  No. 00 C 5048, 2003 WL 21361735 (N.D. Ill. June 12, 2003)........................................37, 38

*Ritter v. Hill 'N Dale Farm, Inc.*,
  231 F.3d 1039 (7th Cir. 2000) ...................................................................................21

*Springer v. Durflinger*,
  518 F.3d 479 (7th Cir. 2008) ....................................................................................14

*Stockwell v. City of Harvey*,
  597 F.3d 895 (7th Cir. 2010) ....................................................................................25

*Thompson v. Mem'l Hosp. of Carbondale*,
  625 F.3d 394 (7th Cir. 2010) ....................................................................................30

*Torry v. Northrop Grumman Corp.*,
  No. 98 C 7288, 2003 WL 22595280 (N.D. Ill. Nov. 7, 2003), <u>aff'd,</u> 399 F.3d 876 (7th
  Cir. 2005) ...............................................................................................................23

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs Local 150*,
  433 F.3d 1024 (7th Cir. 2006) ....................................................................................6

*Tsombanidis v. W. Haven Fire Dep't*,
  352 F.3d 565 (2d Cir. 2003), *superseded on other grounds*....................................48

*Turner v. Shinseki*,
  824 F. Supp. 2d 99 (D.D.C. 2011) ............................................................................28

*U.S. v. Valenzuela-Bernal*,
  458 U.S. 858 (1982) ................................................................................................49

*Victor v. Village of Hoffman Estates*,
  2016 WL 232420 (N.D. Ill. Jan. 20, 2016) ................................................................20

*Vitug v. Multistate Tax Comm'n*,
  88 F.3d 506 (7th Cir. 1996) ......................................................................................45

*Wallace v. SMC Pneumatics, Inc.*,
  103 F.3d 1394 (7th Cir. 1997) ..................................................................................28

*Wards Cove Packing Co., Inc. v. Atonio*,
  490 U.S. 642 (1989), *superseded on other grounds* ...........................................48, 49

*Welch v. Eli Lilly & Co.*,
  585 F.App'x 911 (7th Cir. 2014)...........................................................................39, 40

*Wells v. Unisource Worldwide, Inc.*,
  289 F.3d 1001 (7th Cir. 2002)...................................................................................13

US.108296829.02

*Wilson v. Cook Cty.*,
    742 F.3d 775 (7th Cir. 2014) ........................................................................45

**FEDERAL STATUTES**

42 U.S.C. § 2000e-5(e) ................................................................................15

42 U.S.C. § 2000e–1 (c)(2) ..........................................................................46

ADEA ..........................................................................................................34

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ............................. passim

**RULES**

Fed. R. Civ. P. 56(a) ....................................................................................6

**REGULATIONS**

20 C.F.R. 655.737 .......................................................................................39

20 C.F.R. 655.738 .......................................................................................39

20 C.F.R. 655.739 .......................................................................................39

41 C.F.R. 60-2.11. ........................................................................................2

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. Article III, § 2 .......................................................................39, 40

US.108296829.02

# INTRODUCTION

Infosys is entitled to summary judgment on all Title VII and Section 1981 claims against it. Though pleaded as a putative class action, this reverse discrimination case combines the independent complaints of four different plaintiffs–one Infosys job applicant, one former intern/contractor, one former Infosys employee, and a former employee of an Infosys subsidiary– from four different locations whose differing claims (ranging from failure to hire to hostile work environment to discriminatory discharge) are connected by a single premise: that an Indian company's "adverse" treatment of them could be explained *only* by a centralized practice of reverse discrimination. That premise does not fit the evidence. In contrast to the provocative stories in the complaint, the undisputed facts do not support even a *prima facie* inference of discrimination, let alone show a "standard operating practice"[1] of discriminatory conduct.

Begin with Brenda Koehler, a Caucasian American who claims Infosys rejected her application for a Milwaukee-based IT position based on her non-South Asian national origin and race. According to her complaint, the "highly experienced" Koehler applied for a position as "Lead VMware/Windows Administrator" with Infosys for its Harley-Davidson project, her telephone interview unexpectedly covered the subjects of "DNS" and "Active Directory" software, and Infosys inexplicably rejected her while hiring a South Asian applicant two months later.

These allegations founder on a single fact: Koehler's technical experience did *not* qualify her for a position requiring knowledge of Microsoft DNS and Active Directory software that she admittedly lacked. Indeed, Infosys rejected 112 other candidates, including approximately 40 with Asian-sounding names, for the same position. The South Asian job applicant who Koehler

---

[1] To prevail on a claim that Infosys engages in a pattern and practice of discrimination, Plaintiffs must prove that it is Infosys's "standard operating procedure" to discriminate. *See Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014).

1

complains about was hired for a *different* job requisition through a *different* applicant pool and at a *different* job level–for a job Koehler did not even seek. And notwithstanding general claims that Infosys employees in the United States are overwhelmingly "South Asian," fully 73 percent of the employees that Infosys hired to work at Harley-Davidson in 2012 were non-Asian instead.[2]

The complaint also treats Infosys's treatment of Kelly Parker, a Caucasian American who worked on its Harley-Davidson project through a temporary employment agency, as all but inexplicable. Parker complains that while she performed well for Harley-Davidson in a temporary help desk position at its Tomahawk location, Infosys rejected her application for a permanent "Systems Engineer" position when it became the company's IT service provider in 2012 and that Infosys "terminated" Parker's employment (through another staffing company) in August 2013 to the shock of co-workers – all while requiring her to train the South Asian worker (Kapil Kulkarni) who took over her job.

Here, too, the evidence tells a different story altogether. As a help desk "intern," Parker was unable to provide "higher level" help desk support and did not pass an initial screening for an entry-level Systems Engineer position in 2012. Moreover, contrary to her failure-to-hire allegations, Infosys had no job openings at the Tomahawk plant in 2012, and Parker did not even apply for either of the Tomahawk Systems Engineer positions offered in 2013. More damning still, Infosys hired only one Asian for the 39 Systems Engineers in Harley-Davidson locations for all of 2012 and 2013. And regardless of whether long-term Infosys employee Kulkarni absorbed

---

[2]     Pursuant to OFCCP requirements, Infosys tracks certain demographics, including whether its employees are Asian/Pacific Islanders. *See, e.g.* 41 C.F.R. § 60-2.11 (explaining that employers are required to indicate "the total number of male and female incumbents in each of the following groups: Blacks, Hispanics, Asians/Pacific Islanders, and American Indians/Alaskan Natives"). Thus, Infosys does not have data that isolates "South Asian" individuals, and using the category of Asian/Pacific Islanders as a proxy will overstate this number.

any help desk duties previously performed by Parker, he had qualifications (including an engineering Bachelor's degree) far superior to Parker's Associate's degree, and occupied a technical role *above* the Systems Engineer role that Parker aspired to fill.

The unmistakable gap between allegations and evidence continues with Layla Bolten. According to the complaint, Infosys subsidiary Infosys Public Services (IPS) interviewed and promised the job of "Test Lead" to this Caucasian worker of Russian origin, then employed her as a mere "Test Analyst" on its DC Health Benefit Exchange project instead. The complaint also alleges that IPS never promoted Bolten to Test Lead, while giving less experienced South Asian workers promotions. And Bolten complains she was harassed through frequent taunts and rude remarks by co-workers, leaving her no choice but to resign after working for only five months on the project.

By Bolten's own admissions, however, this story is false. Bolten concededly applied for, knew she was applying for, and received the Test Analyst (not Test Lead) position. Bolten admits that no manager ever promised her a promotion to Test Lead–indeed, no one was promoted to Test Lead during Bolten's employment. And the South Asian employees whom Bolten deems less qualified were promoted after serving far longer as Test Analysts and *before* Bolten was even hired. Nor does Bolten's testimony support any claim of harassment: she can only recall a single comment relating to her national origin (calling it "silly"), cannot link her allegedly less favorable work schedule to national origin or race, and admittedly told IPS she resigned because of the three-hour (round trip) commute.

The gap between Gregory Handloser's allegations–Plaintiffs' final "example" of systemic discrimination–and undisputed evidence is more striking still. A Caucasian American, Handloser complains that Infosys ended his employment as a Florida-based Sales Manager as

3

part of a systematic "purge" of non-South Asian employees from its workforce. Infosys "purged" Handloser, according to the complaint, by giving him an inexplicably low performance rating in 2012, then discharging him without notice and in violation of its own policies on progressive discipline.

None of this survives the undisputed record. Handloser received the lowest possible performance evaluation of "4"–the equivalent (in his own words) of "you should be in another job or in another company"–based on pre-determined, objective standards and consistent with his own self-appraisal. Indeed, this sales manager, whose primary job was to open new accounts, went six months without opening any. And Handloser lost his job not through progressive discipline, but as part of a company-wide reduction-in-force affecting 50 employees in the United States–including 29 Asians–who had received the same rating. Nor is there evidence that Infosys used an ordinary RIF to shrink the non-Asian workforce; to the contrary, Infosys's hiring of non-Asian employees *increased* during this time period and the percentage of non-Asians in its workforce dramatically rose as well.

Not one of these individual claims, in sum, holds up to undisputed evidence. Indeed, what Plaintiffs present as their chief support for sweeping claims of company-wide reverse discrimination does not even satisfy their *prima facie* burden in any individual case. And their remaining evidence–statistics on the racial composition of Infosys's United States workforce–is as unhelpful as their allegations. The complaint is replete with general statistics on local demographics and Infosys facilities. But demographic comparisons cannot explain hiring decisions that favored Caucasian Americans over South Asians (as with Parker and Koehler); they cannot establish a non-existent racial "purge" in 2011 and 2012 (as claimed by Handloser);

4

and they cannot explain why Bolten was given the very job she applied for or why she quit after only five months.

Nor, finally, do the claims of these individual plaintiffs raise any other issue for trial. Beyond allegations of intentional discrimination, Koehler and Parker purport to challenge Infosys "visa practices" (*i.e.,* staffing projects with employees on temporary visas) as disparately impacting non-South Asian applicants for Infosys jobs.[3]  But once again, Plaintiffs' grand theories have no basis in undisputed facts.  Neither Koehler nor Parker were injured by the practices they purport to challenge.  Thus neither even has standing to bring a Title VII disparate impact claim.

Even putting this constitutional infirmity aside, Plaintiffs' disparate impact claims fail on multiple levels.  There is no evidence to support a theory that Infosys favored visa-holding applicants to other applicants when filling open positions; and to the extent Plaintiffs fault Infosys for not creating *more* jobs, the law imposes no obligation on Infosys to do so.  Even were Infosys somehow required under Title VII or Section 1981 to create new jobs, its decision to use existing employees to staff projects impacts all potential applicants in the U.S. equally, regardless of race, national origin, or any other status.  And not just conceptually flawed, Plaintiffs' disparate impact claims fail on the evidence: a *prima facie* showing requires concrete statistical evidence that Infosys's practice falls more harshly on a particular protected class; yet no such statistics exist.

---

[3]    They purport to bring this disparate impact claim on behalf of a "hiring subclass" composed of "All individuals who are not of South Asian race or Indian, Bangladeshi, or Nepalese national origin who applied for a position with Defendants in the United States and were not hired from August 1, 2009 through the present."  2nd Am. Compl. ¶ 121.

US.108296829.02

The undisputed evidence, in sum, fails to show any reverse discrimination by Infosys against Koehler, Parker, Bolten, or Handloser.  In their rush to depict a class-wide "forest" of centralized discrimination, Plaintiffs have neglected to identify even one "tree."

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A court appropriately grants summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Although the evidence and all reasonable inferences drawn therefrom are viewed most favorably to the nonmoving party, Plaintiffs must go outside the pleadings to present "significant probative evidence" to support their claims, and "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs Local 150*, 433 F.3d 1024, 1029, 1038 (7th Cir. 2006) (quotation omitted); *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014).

## ARGUMENT

### I.    Each Plaintiff's Disparate Treatment Claim Fails As A Matter of Law.

Though the disparate treatment claims of each individual plaintiff vary, they share a common theme:  each Plaintiff alleges that he or she was the subject of "reverse discrimination"– discrimination against the "majority"–by Infosys.  Applicant Brenda Koehler alleges that she was not hired due to her protected status.  Intern/Contractor Kelly Parker alleges, incongruently, that she was not hired and/or was fired for discriminatory reasons.  Former Test Analyst Layla

Bolten alleges that she was not hired or not promoted to a Test Lead position due to her race and national origin and that she was harassed and constructively discharged from employment. And finally, former Infosys Sales Manager Greg Handloser alleges that he was discharged due to his race and national origin in an Infosys attempt to "purge" non-Asian employees.

Because reverse discrimination is uncommon, the Seventh Circuit has altered the *prima facie* showing under *McDonnell Douglas* to require proof, in addition to the usual elements, of background circumstances demonstrating that the employer has reason or inclination to discriminate invidiously against people of (in this case) non-South Asian race or national origin, or something "fishy" about the facts "at hand." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003).[4] This proof ensures that reverse discrimination plaintiffs do not "have to show less to prove *their prima facie* burden than minorities (who have historically suffered the type of discrimination Title VII sought to prevent)." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454-56 (7th Cir. 1999).

Applying this heightened standard, each Plaintiff's individual disparate treatment claim fails as a matter of law for multiple, independent reasons. Among other reasons, Koehler was not hired for a Lead VMware position because she was not qualified for it; Parker was never an Infosys employee, was not qualified to become one, and did not apply for any open positions in 2013; Bolten did not apply for a Test Lead position and was not eligible for promotion due to her short tenure; and Handloser was discharged due to his poor performance and as part of a uniform reduction-in-force.

---

[4]     The elements of the claims and methods of proof are "essentially identical" under Title VII and Section 1981. *See Garza v. Wautoma Area Sch. Dist.*, 984 F. Supp. 2d 932, 939 (E.D. Wis. 2013), citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) (both Title VII and Section 1981 "require a plaintiff to prove the same elements to make out a *prima facie* case," and "the claims rise or fall together").

7

Accordingly, for the reasons stated further below, the Court should enter summary judgment on each Plaintiff's individual disparate treatment claims.

## A. Brenda Koehler.

### 1. Summary Of Claims.

Plaintiff Brenda Koehler (Caucasian, American national origin) applied for a Lead VMware/Windows Administrator position with Infosys in April 2012. Defs.' Statement of Facts ("SOF") ¶ 30. During the interview, she was unable to answer questions about technical applications correctly, and the interviewers determined that she lacked sufficient experience to satisfy the role. SOF ¶ 36. Infosys did not hire any of the 113 people who applied for the Lead VMware/Windows Administrator role, including approximately 40 with South Asian-sounding surnames. SOF ¶ 39.

Koehler's disparate treatment failure-to-hire claim fails as a matter of law. First, Koehler cannot establish a *prima facie* case of reverse discrimination because she cannot show the requisite "background circumstances" supporting her claim, nor can she show that she was qualified for the position sought. Further, even if Koehler could establish a *prima facie* case, there is no evidence of pretext.

### 2. Koehler Cannot Establish A *Prima Facie* Case Of Reverse Discrimination.

After months of discovery, Koehler can identify no evidence that her non-South Asian race or national origin affected Infosys's decision not to hire her for the Lead VMware/Windows Administrator position at Harley-Davidson's Wisconsin facility. As noted above, to prevail in a reverse discrimination case, Koehler must establish background circumstances demonstrating that the employer has reason or inclination to discriminate invidiously against people of (in this case) non-South Asian race or national origin, or that there is something "fishy" about the facts

US.108296829.02

"at hand."  Here, Koehler must also establish:  (1) that she applied and was qualified for an open job; (2) that she was rejected; and (3) that the employer filled the job with an individual of South Asian race or national origin or left the position vacant.  *Mills*, 171 F.3d at 454-56.  Not only does Koehler lack any evidence of reverse discrimination, but she cannot support at least two elements of this modified burden.

**a.**     **No Background Circumstances Suggest An Inclination To Discriminate.**

First, Koehler cannot identify background circumstances suggesting Infosys has or had any inclination or reason to discriminate against non-South Asians.  Standing alone, that Infosys is an India-based company, or that Infosys staffs projects with existing employees from Infosys's headquarters in India, does not demonstrate any discriminatory intent.  Indeed, any employer could be expected to use existing employees–rather than hiring new ones–to staff projects to the extent feasible.  And when one considers that much of Infosys's U.S. workforce consists of long-term Indian employees working here on a temporary basis on valid visas, much of Plaintiffs' dramatic evidence evaporates entirely.

Nor could any inference of discrimination survive the relevant statistics for the Harley-Davidson project.  Koehler presumes discrimination from the fact that she was not hired to be a Lead VMware Administrator despite her opinion that she was "perfect" for the job.  SOF ¶ 35.  But the hiring statistics support a different presumption. In 2012, Infosys hired 61 employees at all locations for the Harley-Davidson project, 45 of whom (or 73.8 percent) were non-Asian candidates.  SOF ¶ 18.  And, concentrating on Koehler's Milwaukee location, Infosys hired 54 people for Harley-Davidson, 77.8 percent of whom were non-Asian.  SOF ¶ 19.  This is not the stuff that suspicious circumstances are made of.

9

Neither can Koehler's reverse discrimination theory be squared with the requisition (job opening) itself, applicant data, or requisition history. The position Koehler sought was limited to individuals who were already legally authorized to work in the United States–a restriction favoring United States citizens. SOF ¶ 24. And of the 113 persons who applied for the job, Infosys rejected all, including approximately 40 applicants with Asian-sounding names. SOF ¶ 39. Had Infosys intended to hire an Asian candidate for the position, it would have had ample options in the applicant pool. That Infosys rejected all of them shows that Infosys was not focused on race or national origin but on qualifications instead.

The undisputed record, in short, does not permit any inference of an anti-American or anti-Caucasian bias. And unable to meet her *prima facie* burden, Koehler is not entitled to bring her discriminatory hiring claim to trial. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 678-79 (7th Cir. 2005) (affirming summary judgment for employer where plaintiff was replaced by another white worker and offered no facts in the summary judgment record that demonstrated employer had an anti-white bias or a history of discrimination against white people); *Gore v. Ind. Univ.*, 416 F.3d 590, 593 (7th Cir. 2005) (affirming summary judgment for defendant where plaintiff did not meet added background circumstances burden); s*ee generally Cooney v. Casady*, 652 F. Supp. 2d 948, 958 (N.D. Ill.2009) ("Let there be no mistake: plaintiff's conspiracy allegations have a distinctly paranoid *gestalt*, and it is unlikely that her claims have merit.").

> **b.** **Koehler Cannot Meet Her Burden To Show She Was Qualified For The Lead VMware/Windows Administrator Position.**

Koehler's claim also fails because she cannot satisfy the second element of her *prima facie* case: the evidence is undisputed that Koehler was unqualified for the Lead VMware/Windows Administrator position. Indeed, Koehler lacked even basic qualifications for this highly technical job. The Lead VMware/Windows Administrator position undisputedly

10

requires facility with: 1) Active Directory, a database-driven program that controls user logins; 2) Microsoft DNS, a hierarchical system that associates information with domain names; and 3) VMware, a means of connecting a virtual environment to a single server. SOF ¶¶ 26-29. In contrast, Koehler concededly lacked recent experience in Active Directory, proved unable to answer a range of technical questions about Active Directory and DNS during her interview, and failed to demonstrate even basic knowledge about server logins and domain names. SOF ¶¶ 35-36. Unsurprisingly, Infosys did not hire Koehler because she lacked not only the advanced technical skills, but even the basic skills required for the position. SOF ¶ 37.

Nor does the record contain any evidence to the contrary. Koehler will presumably rely on her own testimony that she had "about 95% of the skill set" for the position. SOF ¶ 35. But Koehler's self-appraisal cannot defeat summary judgment. *See generally Denisi v. Dominick's Finer Foods, Inc*., 99 F.3d 860, 865 (7th Cir. 1996) (holding that plaintiff's personal opinion that his performance was satisfactory did not constitute evidence to defeat summary judgment); *see also Anderson v. Baxter Healthcare Corp*., 13 F.3d 1120, 1125 (7th Cir. 1994) (holding that where an employer asserts poor performance, employee must do more than simply disagree; affidavits from co-workers attesting to plaintiff's satisfactory performance will not create a genuine issue of fact). And not just insufficient, Koehler's testimony amounts to an admission: by her own measure, Koehler *lacked* qualifications that Infosys sought. Nor does it matter that Koehler had others. "Mostly qualified" is an oxymoron: an applicant either does or does not possess all of the skills required by an employer for purposes of *McDonnell Douglas* burden-shifting. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430-31 (1971) (finding the employer had no obligation (under Title VII or otherwise) to hire someone who only had a percentage of the job qualifications). Indeed, Infosys rejected 112 other applicants for Lead

11

VMware/Windows Administrator because it was *not* interested in hiring almost-qualified candidates.  *See* SOF ¶ 39.

That Koehler admittedly lacked qualifications necessary for the position she sought alone defeats her reverse discrimination claim.  "If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry."  *Peele v. Country Mut. Ins. Co*., 288 F.3d 319, 327 (7th Cir. 2002).

### c. Koehler's Lack Of Qualifications Was The Legitimate, Nondiscriminatory Reason She Was Not Hired, And No Evidence Suggests That Reason Is Pretextual.

Infosys is also entitled to summary judgment because Koehler cannot show that its legitimate reason for not hiring her–that she was unqualified for the Lead VMware/Windows Administrator job–is pretext for race or national origin discrimination.  At this stage of the inquiry, the question is not whether Infosys properly evaluated competing applicants but only whether its reason for not hiring Koehler was truthful.  *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (explaining that pretext means a dishonest explanation, a lie or a phony reason rather than an oddity or an error, or deceit used to cover one's tracks.).  After months of discovery, there is simply no evidence that Infosys has lied.  *See generally Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 561 (7th Cir. 2004) (explaining that articulation of a legitimate reason shifts the burden to the plaintiff to identify evidence suggesting: "1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible.").

Indeed, Koehler's primary attack on Infosys's decision-making does not even relate to the position at issue.  Koehler questions the hiring of Fazlul Halim, an *American citizen* from Bangladesh.  SOF ¶ 43.  But Halim was hired through a *different* job requisition with a *different* applicant pool and at a *different* job level–and for a job that Koehler did not even seek.  SOF ¶¶

12

41-43.  Indeed, Halim was hired as a Job Level 4 Technology Analyst, not in the Job Level 6 Technology Architect role for which Koehler applied.[5]  *Compare* SOF ¶ 30 *with* SOF ¶ 43.  To credit this argument, moreover, one would have to conclude Infosys interviewed Koehler with no intention of hiring her, and then rejected her along with 112 other applicants *including approximately* 40 *with South Asian surnames*; that it closed its requisition for the for Lead VMware/Windows Administrator position without hiring anyone; and that it later opened a new job requisition with a different description – all as part of an elaborate ruse to hire an applicant of South Asian race or national origin.  *See* SOF ¶¶ 39, 41.  This is the stuff of legal thrillers, not lawsuits. *See generally Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) ("We have typically been wary of allegations based on nothing but an attempt to come up with a conspiracy theory and in particular where there is not a scintilla of evidence [to support it].") And raises no issue for trial.

Even had Koehler and Halim applied for the very same position, his superior qualifications would allow no inference of pretext.  Immediately before working for Infosys, Halim was a Senior VMware Engineer in charge of VMware, and he also supported Active Directory.  SOF ¶ 44.  Halim estimated that his prior position had 70 percent overlap with the Infosys position and that the Infosys position was, in fact, less challenging than his previous position.  SOF ¶ 44.  So as opposed to Koehler's limited skillset (she had never been in charge of VMware before) and her admission that she was "rusty" on Active Directory, Halim had directly comparable recent experience in a more challenging setting.[6]  SOF ¶¶ 31, 35, 44.  Further

---

[5]    Infosys categorizes positions by "Job Level."  Depending on the position, it could be classified anywhere from Job Level 2 (the lowest level) to Job Level 9 (with "title-holders" in positions of JL7-A and higher). SOF ¶ 5.

[6]    Consistently, Infosys's interviewer determined that Halim had a strong skillset related both to Windows and VMware, rating them as "B" (fair) and "A" (good) respectively.  SOF ¶ 45.

13

US.108296829.02

Case 2:13-cv-00885-PP-DEJ   Filed 09/23/16   Page 23 of 61   Document 80

rebutting any inference of discrimination, Infosys not only hired Mike Recknagel (a Caucasian American) when Halim resigned, but it hired Recknagel at a higher job level. SOF ¶ 48.

As her final "evidence" of pretext, Koehler complains that Infosys changed how she and her interviewers would reach each other on short notice and asked her interview questions she did not expect. SOF ¶¶ 33-34. But so what? No evidence suggests Infosys spared South Asian candidates the same questions or circumstances; nor could these minor complaints otherwise suggest Infosys's reasons for rejecting Koehler (or any of the other 112 unsuccessful applicants) are phony. *See, e.g., Helzing v. Loyola Univ. of Chicago*, No. 02 C 9408, 2004 WL 1881780, at *9 (N.D. Ill. Aug. 16, 2004) (rejecting argument in reverse discrimination case that interview process was "bizarre" and "strange" because courts cannot dictate how employers conduct interviews or select hiring criteria).

As the Seventh Circuit has made clear, "summary judgment is the put up or shut up moment in the lawsuit." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (noting a plaintiff's "hunch about the defendant's motives" is insufficient to survive summary judgment). Here, Koehler has no evidence that Infosys's reason for not hiring her is dishonest. For this additional reason, the Court must grant summary judgment to Infosys on her reverse discrimination failure to hire claim.

**B.      Kelly Parker.**

**1.      Summary Of Claims.**

Plaintiff Kelly Parker (Caucasian, American national origin) was an intern assigned to Harley-Davidson's Tomahawk, Wisconsin facility at the time Infosys began providing IT services to Harley-Davidson. SOF ¶¶ 49, 60. Around October 2012, Infosys screened Parker for a Systems Engineer position, but determined her not technically qualified for the role. SOF ¶¶ 72, 76. During the same time period, Infosys hired 18 *Senior* Systems Engineers for its

Harley-Davidson Account in Milwaukee, none of whom were South Asian. SOF ¶¶ 80-81, 83.

Though Parker continued to work as an intern assigned to Infosys's Harley-Davidson Account through two temporary staffing companies, her Harley-Davison assignment ended in 2013 when Infosys ended its contract with the temporary staffing company that employed her. SOF ¶¶ 79, 86, 108. That same year, Infosys hired two Systems Engineers in Tomahawk for the Harley-Davidson account–both Caucasian. SOF ¶¶ 91, 99.

Parker seems to contend that Infosys discriminated based on her race and national origin by not hiring her in 2012 and by not hiring and/or terminating her in 2013 when her temporary staffing assignment ended. Parker's disparate treatment claims fail for a variety of reasons, including her failure to timely assert some of them; her lack of qualifications for the position she sought; and her inability to identify any South Asian employee who was hired as a Systems Engineer. Accordingly, Infosys is entitled to judgment as a matter of law.

### 2. Parker's 2012 Failure To Hire Claim Fails For Multiple Reasons.

Parker alleges that Infosys discriminated when it rejected her for a Systems Engineer position in 2012. Not only is this claim time-barred, but Parker cannot support even a *prima facie* case of disparate treatment under the *McDonnell Douglas* method of proof.

#### a. Parker's Title VII Claim Based on Infosys's Decision Not to Hire Her in 2012 Is Time-Barred.

Parker's 2012 failure to hire claim fails not just on its merits, but (insofar as she brings this claim under Title VII) because it is time-barred: Parker failed to file her administrative discrimination charge within 300 days after learning of the employment action she challenges. *See* 42 U.S.C. § 2000e-5(e); *Hentosh v. Herman M. Finch Univ. of Health Sci.*, 167 F.3d 1170, 1174 (7th Cir. 1999).

15

While working as an intern assigned to Harley-Davidson in the summer of 2012, Parker learned that Infosys would be taking over the IT staffing responsibilities at Harley-Davidson. SOF ¶ 71. As part of that change, Parker knew that Harley-Davidson was outsourcing its entire IT Department and that she would have to interview for an Infosys position. SOF ¶¶ 71-72. In or about October 2012, two Infosys employees screened Parker for a Systems Engineer role and determined that she was "technically not competent for the role requirements." SOF ¶¶ 73, 76. Parker immediately knew that her interview, which lasted only ten minutes in comparison to colleague interviews lasting a half hour or more, had gone poorly. SOF ¶ 75. Calling the interview a "really embarrassing moment," Parker understood Infosys would not offer her a full time position. SOF ¶ 75, 78. On November 2, 2012, she observed in a contemporaneous email: "My current contract will end on Dec 31, 2012. At this time, there are no open permanent positions for me." SOF ¶ 78. And this understanding was confirmed by Parker's immediate search for a new job. SOF ¶ 78.

Under settled law, a "plaintiff's action accrues when he discovers that he has been injured…." *Cruse v. Chicago Park Dist*., 95 F.3d 1154, at *1 (7th Cir. 1996) (per curiam); *see also Ferrill v. City of Milwaukee,* 295 F. Supp. 2d 920, 923-24 (E.D. Wis. 2003) ("[W]hen the adverse employment action (i.e. the injury) was the termination of employment, the action accrues when the plaintiff was advised of the termination…"). Because Parker was indisputably aware of the employment action she challenges by November 2, 2012, she had 300 days or until August 29, 2013 to file her administrative charge of discrimination. By filing her charge on November 22, 2013–*months* after the 300-day statute of limitations had run–Parker forfeited her right to assert this claim under Title VII.[7] *Id.*, SOF ¶ 118.

---

[7] To the extent Parker asserts a disparate impact claim based on the 2012 failure-to-hire, that claim is likewise untimely.

US.108296829.02

b.    **Parker's 2012 Failure to Hire Claim Fails Under a *McDonnell Douglas* Analysis**.

In addition to being time-barred, Parker's 2012 failure to hire claim fails because she cannot meet her *prima facie* burden under *McDonnell Dougla*s: she can present no "background circumstances" suggesting reverse discrimination; she cannot show she was qualified for the Systems Engineer position; and she cannot identify a similarly situated South Asian candidate who was hired into a position she sought or that the position remained vacant. *See Mills*, 171 F.3d 450, 454-56. Further, she cannot prove that Infosys's legitimate, nondiscriminatory reasons for not hiring her–her lack of qualifications–is pretextual. *See id.*

i.    **No Evidence Suggests Infosys Had Any Reason or Inclination to Discriminate Against Caucasian Americans on the Harley-Davidson Project.**

At the outset, Parker's reverse discrimination claims fail because she has no evidence that Infosys had any reason or inclination to discriminate against Caucasians or Americans. Indeed, the overall demographics of Infosys's hiring for the Harley‑Davidson project rebut any inference of discrimination. As noted, during 2012, 73.8 percent of the individuals hired for the project were non‑Asian; in 2013, the pattern continued with 18 of 32 hires identified as non‑Asian. SOF ¶¶ 18, 20. More relevant here, Infosys hired *no* South Asians in 2012 for the Infosys role closest to helpdesk support (Systems Engineer). SOF ¶¶ 80-81. Indeed, of the 37 Systems Engineer and Senior Systems Engineer positions filed in 2012‑13, only one went to an Asian applicant[8] – despite multiple Asian candidates in the applicant pools.[9] SOF ¶¶ 101, 104. These background

---

[8]    Infosys hired 21 Senior Systems Engineers in 2012 (none in Tomahawk); all of them were non-Asian. SOF ¶¶ 80-81. Infosys hired 16 Systems Engineers in various locations in 2013, only one of which was identified as Asian. SOF ¶ 101.

[9]    The applicant pools can only be studied for the period beginning May 2013 when Infosys began using Kenexa as its applicant tracking system. The prior applicant tracking system did not capture race data. SOF 104, n.3.

US.108296829.02

circumstances do not suggest discrimination, but negate it–entitling Infosys to summary judgment against Parker. *Good*, 673 F.3d at 678-79 (affirming summary judgment where plaintiff offered no evidence of employer anti-white bias or historical discrimination).

### ii. Parker Was Not Qualified For The Systems Engineer Position.

Parker's discrimination claim also fails because she was indisputably unqualified for the Systems Engineer position. Though Parker assumed Infosys interviewed her for the "same position" she performed as a student intern with Enterforce, Infosys sought Desktop Systems Engineers with far greater expertise and experience. Indeed, one of Infosys's objectives in taking over Harley-Davidson's IT functions was to improve the quality of IT services. SOF ¶ 16. Consistently, Infosys looked for Systems Engineer candidates who had the ability to provide both helpdesk and desktop support. SOF ¶ 73.

In contrast, Parker's technical skills fell far short of the minimum requirements for Desktop Systems Engineers. A job requisition for the position states that a Systems Engineer would "Perform validation activities (Functional, Integration, System, User experience) based on the plans, identification and validation of defects found (including UAT), creation and reviewing of artifacts (Test Scripts, Documentation, Automation, Setups) in order to ensure a quality deliverable." SOF ¶ 74. But when asked about these qualifications during her deposition, Parker asked for the description to be put in "normal jargon" and explained that she does not use words like "artifacts" and "validation activities"; Parker did not know the meaning of "UAT" and could only speculate that it might mean "user account something"; she did not know "test scripts" or perform "automation"; and she concededly could not perform higher level tasks like "impact analyses" and "creat[ing] design specifications," or any coding or scripting. SOF ¶ 74.

18

Likewise, the project manager for the Harley-Davidson account observed that, as an intern, Parker could not provide even the lower level helpdesk functions without supervision. SOF ¶ 77.

In short, Parker's experience and skillset fell far short of the minimum requirements for a Systems Engineer position, which is reflected in the Profiler completed as part of her interview. The Infosys interviewers concluded that she was "technically not competent for the role requirements" and rated her desktop technical skills as "Poor." SOF ¶ 76. For this reason alone, Parker's failure-to-hire claim fails as a matter of law.

### iii. Parker Cannot Identify any South Asian Employee Hired by Infosys as a Systems Engineer in 2012.

Parker cannot meet her *prima facie* burden for yet another reason: she cannot identify any person of South Asian race or national origin who was hired as a Systems Engineer for the Harley-Davidson project in 2012. *Mills*, 171 F.3d at 454-56 (explaining burden to show similarly situated person outside protected class was hired or the position was left vacant). Though Parker testified she would not work outside the Tomahawk area, SOF ¶ 58, Infosys did not create any Systems Engineer position for the Tomahawk facility in 2012. SOF ¶ 82. And it filled all Senior Systems Engineers positions hired in Milwaukee for the Harley-Davidson project with non-Asians. SOF ¶¶ 80-81. For this reason too, Parker's claim fails as a matter of law.

### c. Parker's Lack of Qualifications Was the Legitimate, Nondiscriminatory Reason She Was Not Hired, and She Has No Evidence of Pretext.

Even if Parker could establish a *prima facie* case (and she cannot), her claim still fails because Infosys has a legitimate, nondiscriminatory reason for not hiring her in 2012: she lacked the necessary skills for any open Systems Engineer position. *See generally Hudson,* 375 F.3d at 561 (explaining articulation of legitimate reason shifts burden to plaintiff to identify evidence

that a discriminatory reason more likely motivated the employer or the employer's reason is not credible.).

Here, Infosys has explained that it rejected Parker as a candidate for the Systems Engineer position on technical grounds. SOF ¶ 76. And as discussed, Parker conceded this very lack of qualifications in her deposition. Indeed, nearly four years after her admittedly "really embarrassing" interview for the position, Parker *still* does not recognize many of its basic qualifications. Statement of Facts ¶¶ 74-75. This evidence is fatal. No reasonable juror could conclude Infosys's explanation for not hiring Parker is pretextual–entitling Infosys to judgment as a matter of law. *See Millbrook*, 280 F.3d at 1175 (explaining plaintiff's burden to identify evidence an employer's stated reason is dishonest); *see also Victor v. Vill. of Hoffman Estates*, No. 13 C 00921, 2016 WL 232420, at *12 (N.D. Ill. Jan. 20, 2016) (noting that to win an argument that "disparate qualifications" are "evidence of pretext, [a plaintiff's] credentials have to be so superior that no reasonable person could have impartially chosen the other candidate over the plaintiff.").

### 3.  Infosys Did Not Discharge Parker; Parker's Contract With SoftHQ Expired.

Infosys is entitled to summary judgment on Parker's discriminatory discharge claim because it did not discharge her. Parker characterizes the end of her assignment in September 2013 as a "termination." *See, e.g.,* 2nd Am. Compl. ¶ 73-74. But Infosys made no such decision; rather, it merely allowed its contract with Parker's employer, the staffing agency SoftHQ, to expire at its predetermined end. SOF ¶ 107. Indeed, SoftHQ informed Parker in August that her assignment with Harley-Davidson would end on September 15, 2013. SOF ¶ 108. And Infosys afterwards staffed all positions at the Tomahawk facility with its own

employees.[10]  SOF ¶¶ 108, 111.  Nor could Parker re-characterize her "termination" claim as a

"discriminatory" failure to hire.  As a threshold matter, Parker neither applied for, nor was

considered for the two Tomahawk Desktop Systems Engineer positions opened in 2013.  *See*

SOF ¶¶ 93, 100, 103.  In fact, she failed even to look at Infosys's website to identify open

positions.  SOF ¶ 109.  This defeats her *prima facie* case.  *See, e.g., Ritter v. Hill 'N Dale Farm,*

*Inc.*, 231 F.3d 1039, 1045 (7th Cir. 2000) (holding that "[h]aving not applied for the position,

[plaintiff] cannot demonstrate a *prima facie* case of discrimination due to [defendant]'s failure to

hire him as a mechanic).

Indeed, that Parker is complaining that race and national origin affected her employment

at Infosys is remarkable on its face.  Infosys posted two Desktop Systems Engineer positions in

Tomahawk in 2013 and filled *both* with Caucasian Americans (one of whom, Charles Henrichs,

who Parker's considered her superior).  SOF ¶¶ 92, 99.  And Infosys hired eight other Systems

Engineers on these requisitions, and all but one were non-Asian.  SOF ¶ 98.  What's more,

Infosys restricted both of the open Systems Engineer positions in Tomahawk to applicants

without any need employer sponsorship for a visa, rejecting three candidates who did not meet

this criteria.  SOF ¶¶ 90, 96, 97.  Any notion that Infosys rejected Parker because she was a

Caucasian American only to hire Caucasian Americans instead defies both logic and common

sense.

---

[10]     Even if considered a discharge, this expiration of the staffing contract with Infosys supplies a legitimate
reason for the end of Parker's employment and she can identify no evidence to impugn it.  *See, e.g,*
*Hudson*, 375 F.3d at 561 (explaining a plaintiff's burden to show pretext once the employer supplies a
legitimate reason for its decision).

### 4. Parker Cannot Base A Claim On Kapil Kulkarni's Assignment To Tomahawk.

Finally, Parker alleges that Infosys "decided not to hire Ms. Parker permanently and terminated [her] contract . . . in favor of Kapil Kulkarni, a South Asian [Infosys employee]." 2nd Am. Compl., ¶ 4. Putting aside that this combines a failure-to-hire claim with a termination claim (both of which fail for the reasons stated above), Kulkarni's assignment is not evidence of discrimination for several reasons.

First, Kulkarni performed a different job: he was a Job Level 4 Technology Analyst (and had been for more than a year)—working one job level *above* the Systems Engineer position Parker was unqualified for (and filled by Parker's former superior). SOF ¶¶ 5, 66, 92. And it is undisputed that Kulkarni performed different duties than Parker. *See* SOF ¶¶ 114. Parker provided only helpdesk support, while Kulkarni devoted a substantial percentage of his time to application support that Parker had no ability to provide. SOF ¶¶ 56-57, 117.

Second, even if the positions had been identical, Parker could stake no claim to Kulkarni's position. Whereas Parker was a temporary contractor, Kulkarni was an existing employee who had provided application support to Harley‑Davidson from India for more than a year. SOF ¶¶ 68-70. Whereas Parker was an intern with a two‑year associate degree, Kulkarni had a four‑year Engineering Degree. SOF ¶¶ 49, 63. And whereas Parker had limited IT experience working as an intern, Kulkarni had years of IT work experience, and specific training and expertise in the proprietary software programs used by Harley‑Davidson. *See* SOF ¶¶ 49-52, 56-57, 64-70.

Finally, it is undisputed that Kulkarni and Parker had different relationships with Infosys – Kulkarni as an existing long‑term employee and Parker as a temporary contractor. *See* SOF ¶¶ 56, 63, 86-87. As such, the two were not "similarly situated" for purposes of Title VII and

22

Section 1981. *See Torry v. Northrop Grumman Corp.*, No. 98 C 7288, 2003 WL 22595280, at *6 (N.D. Ill. Nov. 7, 2003), *aff'd*, 399 F.3d 876 (7th Cir. 2005) (temporary and permanent workers not similarly situated because company treated the two types of workers differently); *O'Neal v. Shinseki*, No. 13 C 653, 2015 WL 1396375, at *8 (N.D. Ill. Mar. 24, 2015) (finding a temporary employee was not similarly situated to a permanent employee because terminating the employment of each was procedurally different). Thus, even if Parker could show that Infosys "favored" Kulkarni over her, no inference of discrimination could arise from Infosys drawing a distinction between a long‑term existing employee and a short‑term contractor filling a staffing need on a temporary basis.

That Infosys used an existing (and more highly skilled) employee to perform a small portion of what had previously been Parker's duties as an intern – while at the same time discharging far more advanced responsibilities – is a business decision, not evidence of discrimination. However described, Parker's disparate treatment claims fail as a matter of law.

    **C.**     **Layla Bolten.**

        **1.**     **Summary Of Claims.**

Plaintiff Layla Bolten (Caucasian, Russian national origin) is a former Test Analyst for Infosys Public Services. SOF ¶¶ 128, 139. Bolten applied, interviewed, and received an offer for a Test Analyst position. SOF ¶ 124. After working as a Test Analyst for five months, Bolten quit, citing a three‑hour daily commute. SOF ¶¶ 157-158. Now Bolten alleges she interviewed for the higher‑level Test Lead position, was later promised and wrongfully denied a promotion to that position, and suffered racial and national‑origin based "harassment" so severe that she was forced to resign.

Bolten's individual disparate treatment claims under Title VII (2nd Am. Compl., Count 1) and Section 1981 (2nd Am. Compl., Count II) fail as a matter of law. First, Bolten admittedly

US.108296829.02

never applied for a Test Lead position. Second, Infosys did not promote any Test Analyst to Test Lead during Bolten's five months of employment, and her South Asian "comparators" worked for years before advancing to Test Lead. And third, Bolten's testimony about isolated comments by co-workers does not describe an actionable hostile work environment, let alone support a claim for constructive discharge.

### 2. Bolten's Own Testimony Defeats Her Failure to Hire Claim.

When Bolten filed her Second Amended Complaint two years ago, she had a story to tell. She alleged that she had "initially conducted a telephone interview for a Test Lead position with Infosys in Washington, DC, working on the DC Health Benefit Exchange." 2nd Am. Compl. ¶ 80. And she alleged that during a second interview, her interviewer promised that "she would be a 'Test Lead Analyst.'" 2nd Am. Compl. ¶ 82. But in 2016, when she had the chance to tell this story under oath to support these bare allegations with admissible evidence–she did not.

Instead, she testified that she knew she was applying for the Test Analyst position, not a Test Lead position. SOF ¶ 124. She knew she interviewed for a Test Analyst position. SOF ¶ 124. She knew she had been offered a Test Analyst position. SOF ¶ 128. And, in contrast to her "bait and switch" allegations, she admits that she willingly accepted the Test Analyst position. SOF ¶ 128.

All of this contradicts Bolten's claim that she was promised – but then denied – a position as Test Lead. Indeed, the most Bolten said about this during her deposition was that before her interview, someone asked her if she would *consider* working as a Test Lead. SOF ¶ 132, n.4. But Bolten corrected herself later, explaining that her future manager, Jayanta Ghosh, talked to her about the possibility of a promotion to Test Lead *after* she received her Test Analyst job offer and that Ghosh was the *only* person who talked to her about being a Test Lead. SOF ¶132. Contrary to the Complaint allegations, she knew she was never "promised" a promotion; she

US.108296829.02

testified about how she planned to work hard so that she could "eventually" get the promotion Ghosh mentioned. SOF ¶ 133.

In sum, *none* of Bolten's allegations that the Court found sufficient to survive a motion to dismiss are supported by admissible evidence. Any claim based on an alleged failure to hire to the Test Lead position fails as a matter of law.

### 3. Infosys Is Entitled To Summary Judgment On Bolten's Promotion Claim.

#### a. Bolten Cannot Establish a Prima Facie Case of Reverse Discrimination.

Nor can Bolten prevail on a failure-to-promote claim. To make out a prima facie case of reverse discrimination in a failure-to-promote case under the *McDonnell Douglas* burden-shifting methodology, Bolten must prove: (1) background circumstances exist that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or Americans or that there is something fishy about the facts at hand; (2) she was qualified for the position; (3) she was rejected; and (4) Infosys gave the job to someone outside her protected class who was similarly or less qualified than she. *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010); *Mills*, 171 F.3d at 454-56. Bolten fails at every step to carry her initial burden.

##### i. Bolten Lacks Any Suspicious Background Circumstances.

To begin, Bolten has no evidence that Infosys had reason or inclination to discriminate invidiously against Caucasians or Americans, and the circumstances of Bolten's alleged lack of promotion are not suspicious. It is undisputed that Bolten applied for a Test Analyst job; she interviewed for a Test Analyst job; and she accepted Infosys's offer to be a Test Analyst. SOF ¶¶ 124, 128. According to Bolten, after she accepted the position, Jayanta Ghosh said there was

25

a possibility that she could become a Test Lead at some point in the future. SOF ¶ 132. But Bolten did not know when such a speculative promotion might take place and knew nothing at all about the prospect. SOF ¶ 132. There is nothing fishy or suspicious about these circumstances that would allow Bolten to overcome the added burden of a reverse-discrimination case, and Bolten fails to clear her very first hurdle. *See Good*, 673 F.3d at 678-79 (affirming summary judgment for employer where plaintiff offered no facts in the summary judgment record that demonstrated employer had an anti-white bias or a history of discrimination against white people); *Gore*, 416 F.3d at 593 (affirming summary judgment for defendant where plaintiff did not meet added background circumstances burden).

### ii. Bolten Cannot Identify Any Better-Treated Comparator Outside of Her Protected Class.

Second, Bolten has no evidence that Infosys promoted someone outside her protected class who was similarly or less qualified than she. Indeed, a review of Infosys's employment data reveals that during Bolten's short employment with Infosys, no employees assigned to the D.C. Health Exchange Project were promoted from Level 4 Test Analyst to Level 5 Test Lead. SOF ¶ 164. Lacking such a comparator, Bolten's claim fails outright.

Nor do the two "comparators" Bolten identifies change this analysis. Indeed, both were already Test Leads when Bolten was hired. SOF ¶¶ 166-167. One had been a Test Lead for more than three years before Bolten's hire, and the other waited nearly three years for his promotion to Test Lead from an analyst. SOF ¶¶ 166-167. Bolten thus lacks evidence that Infosys treated any equally or less qualified comparator better. And her claim fails for this reason alone. *See, e.g., Antonetti v. Abbott Labs.*, 563 F.3d 587, 591-92 (7th Cir. 2009) (affirming summary judgment when plaintiffs could not identify a favorably-treated similarly situated employee).

US.108296829.02

### b. Bolten Was Not Employed Long Enough To Be Promoted To Test Lead, And She Cannot Prove Pretext.

To survive summary judgment, Bolten must also identify evidence that Infosys's reasons for not promoting her to Test Lead–*i.e.*, that she only worked for five months as a Test Analyst– are pretextual. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006); *Millbrook*, 280 F.3d at 1175. But for all the reasons set out above, Bolten cannot. Infosys did not employ Bolten long enough to give her a performance evaluation – much less a promotion – and no one was promoted on the project during the relevant time period. SOF ¶Entirely without evidence, Bolten's discriminatory promotion claim does not entitle her to a trial. *Millbrook*, 280 F.3d at 1175 (explaining plaintiff's burden to show pretext).

### 4. Bolten's Allegations Do Not Add up to Unlawful Harassment.

Bolten's remaining allegations are equally futile. Bolten claims that she was "harassed" by co-workers and certain managers based on her race and national origin. But Title VII does not set forth a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Rather, a hostile work environment becomes actionable only when a "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted). Thus to avoid summary judgment, a plaintiff must provide evidence that: (1) the work environment was subjectively and objectively offensive; (2) a protected characteristic was the cause of the harassment; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *See Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014). In contrast, Bolten alleges only sporadic and minor annoyances and conduct unrelated to her race or national origin.

US.108296829.02

Consider Bolten's complaint that Geeta Kulkarni and another Indian man spoke Hindi in her presence. Bolten contends they were discussing work matters or belittling her. SOF ¶¶ 140-141. But this is speculation (by a non-Hindi speaker), not evidence. Nor does any evidence suggest they spoke what is presumably a shared first language based on Bolten's national origin or race. *See generally Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1398 (7th Cir. 1997) ("The failure to translate from Japanese into English at meetings at which Wallace was present is subject to too many alternative explanations to discrimination . . . to be considered any better than makeweight evidence of discrimination."). The mere speaking of a foreign language also fails to communicate any obvious discriminatory intimidation, ridicule, and insult, much less rise to the level of an actionable work environment. *See, e.g.*, *Turner v. Shinseki*, 824 F. Supp. 2d 99, 124 (D.D.C. 2011) (explaining that "[w]hile [her] coworkers speaking in another language may have caused the plaintiff to feel ostracized, that impact alone was not enough to create a hostile work environment").

Second, Bolten alleges that her supervisor Geeta Kulkarni once said something like, "Stupid Americans are lucky they get sick days." SOF ¶ 138. Even if true, this isolated comment, which merely suggests Americans do not appreciate routine benefits other workers may lack, falls well short of harassment. *See, e.g., Algarin v. Loretto Hosp.*, No. 10 C 02996, 2012 WL 710177, at *11 (N.D. Ill. Mar. 5, 2012) (comments including that "Hispanics are the worst" were too isolated and insufficiently severe to support hostile-work-environment claim). But neither does it implicate Bolten's national origin. Though she is a citizen of the United States, Bolten's national origin is Russian. SOF ¶139. The alleged remark has no bearing on Bolten's discrimination claim. *Adler v. Evanston Nw. Healthcare Corp.*, No. 07 C 4203, 2008 WL 5272455, at *4 (N.D. Ill. Dec 16, 2008) ("To the extent that [others] made disparaging

comments about Americans, those comments did not implicate [plaintiff's] national origin" because plaintiff "was born in Ukraine").

Third, Bolten claims that a co-worker once remarked that the terrorist responsible for the Boston Marathon bombing was Russian while pointing at Bolten. SOF ¶139. This sole comment relating to Bolten's Russian origin could not possibly rise to the level of an actionable hostile work environment; nor was Bolten, who described the comment as "silly," subjectively offended by it. SOF ¶ 139. And because Bolten never reported this comment despite Infosys's anti-harassment policies, SOF ¶¶ 131, 139, it could not support liability even if somehow "harassing." *See Durkin v. City of Chicago*, 341 F.3d 606, 612–13 (7th Cir. 2003) ("An employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists, but the victim fails to utilize it."); *see also Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010) ("An aggrieved employee must at least report–clearly and directly–nonobvious policy violations troubling him so that supervisors may intervene.").

Fourth, Bolten complains that her supervisors harassed her by insisting that she report to work at 8:30 a.m., by moving her between testing teams, and by changing her work station. *See* SOF ¶¶ 148-149, 156. But no evidence connects these garden-variety supervisory decisions (by different managers) to her national origin or race. Nor do they communicate any hostility or ridicule toward Caucasians or people of non-South Asian origin. *See, e.g. Darbha v. Capgemini America Inc.*, 492 F. App'x 644, 647 (7th Cir. 2012) (holding that plaintiff offered no evidence to connect his negative performance reviews and PIP to his race, national origin, or age); *Hoosier v. Greenwood Hospitality Mgmt. LLC*, 32 F. Supp. 3d 966, 978-79 (N.D. Ill. 2014) (finding that a manager singling out plaintiff during a staff meeting, confronting her at her desk in a demeaning manner, and talking down to her like she was uneducated were not enough to rise

29

to a level so severe and pervasive to constitute a hostile work environment, and plaintiff had no evidence to support that that the conduct was related to plaintiff's race or age). A grab bag of minor employment decisions not actionable of themselves and unsupported by any evidence of a discriminatory motive does not become actionable merely because a plaintiff labels them "harassment."

Like her other claims, Bolten's hostile work environment claim is entirely unsupported. The record entitles Infosys to judgment as a matter of law.

### 5. Bolten Was Not Constructively Discharged.

To the extent Bolten is asserting a constructive discharge claim, it fails for the same reason her harassment claim fails. "A plaintiff proceeding under this theory must demonstrate a work environment that is even more egregious than that needed for a hostile work environment such that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401-02 (7th Cir. 2010) (citation and internal quotation marks omitted). Bolten's failure to show conduct remotely equivalent to a hostile work environment, much less to prove harassment above and beyond it, warrants summary judgment on any claim of constructive discharge. *See Penn. State Police v. Suders*, 542 U.S. 129, 133-34 (2004). *See also Chaib*, 744 F.3d at 986.

Bolten's claim also founders on her own admissions. Bolten told Infosys she was leaving because she did not like the commute. SOF ¶ 158. She reaffirmed that statement in her deposition and supported it with additional testimony that: 1) she quit a different job for the same reason; and 2) she was in touch with recruiters as early as March 29, 2016 "because of the commute." Statement of Facts ¶¶ 160-161. No reasonable juror could find that Bolten quit for any other reason, barring further litigation of her constructive-discharge claim.

30

### D. Greg Handloser.

#### 1. Summary Of Claims.

Plaintiff Gregory Handloser (Caucasian, American national origin) is a former Sales Manager for Infosys. After Handloser received the lowest possible performance evaluation during a six-month cycle (a rating of "4"), Infosys terminated his employment as part of a company-wide reduction-in-force ("RIF"). SOF ¶¶ 189, 192-194. The same RIF impacted 49 other employees, of which 29 were Asian, all of whom had also earned a "4." SOF ¶¶ 193, 195. Handloser not only takes issue with his termination, but alleges that it was part of an Infosys effort to "purge" non-South Asian employees. 2nd Am. Compl. ¶ 6.

Handloser's individual, disparate treatment claims under Title VII (2nd Am. Compl. Count I), and Section 1981 (2nd Am. Compl. Count II) fail as a matter of law. Handloser cannot establish a *prima facie* case that Infosys terminated him based on his national origin or race, nor can he dispute Infosys's legitimate, non-pre-textual reasons for the termination.

#### 2. Handloser's Discriminatory Termination Claim Fails Because He Cannot Support His Prima Facie Burden in the Context of a Performance-Based RIF.

Handloser cannot establish a *prima facie* case that Infosys discharged him based on his race or national origin. The record is undisputed that Handloser lost his job through a performance-based reduction-in-force. SOF ¶ 194. Under Seventh Circuit precedent, a prima facie case in the context of a RIF requires the plaintiff to show that: "(1) he was in a protected class; (2) he performed his job well enough to meet his employer's legitimate expectations; (3) despite his performance, he was discharged; and (4) in Title VII cases, his employer sought a replacement for him[.]" *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982-83 (7th Cir. 1999). Handloser, by contrast, cannot satisfy even this minimal showing.

31

First, Handloser cannot dispute his failure to meet Infosys's legitimate performance expectations. Infosys provided Handloser with bi-annual performance appraisal reviews, including a final "Consolidated Relative Rating" or "CRR" ranging from one-plus (for the highest performers) to four. SOF ¶¶ 175-181. In the appraisal period preceding his termination (*i.e.*, April 2012 through September 2012), Handloser received a CRR score of four–the equivalent (in Handloser's own words) of "you should be in another job or in another company." SOF ¶¶ 181, 189. This fact alone entitles Infosys to summary judgment. *See Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006) (explaining that what matters in a discriminatory discharge case is whether the plaintiff was meeting his employer's expectations at the time of his discharge.). Even a score of three would have meant Handloser did not meet Infosys's expectations. SOF ¶ 181.

Nor does the record supply any basis for challenging the score itself. Unlike many performance appraisals, the CRR score is almost entirely numbers-based and objective. What's more, Handloser cannot dispute that he failed to satisfy either of the weightiest performance indicators: New Revenue (which reflected for Handloser an 18-month deficit of $400,000 below target) and New Accounts Opened (which reflected Handloser's opening of zero rather than his targeted two new accounts).[11] SOF ¶ 185-186. Indeed, whereas the primary function of a sales manager is to open new accounts, Handloser's new account revenues were "stuck" and he had failed to initiate any new campaigns. SOF ¶¶ 186-188. No reasonable juror could conclude that this performance satisfied Infosys's expectations.

---

[11] Handloser's self-appraisal recorded the opening of one new account, but that account—which reflected no billing in the relevant period—did not satisfy the Infosys definition of "new accounts." SOF ¶ 186. Even crediting Handloser with that account would not change his score on this metric (or his overall evaluation) since he achieved only 50 percent of the target, which is considered unacceptable. SOF ¶ 186.

Second, Handloser's *prima facie* case fails because Infosys did not seek to replace him. As with most RIFs, Infosys did not just discharge employees like Handloser, but eliminated their positions. The record thus contains no evidence that Handloser's Sales Manager position within the Manufacturing Business Unit for Resources went to another job applicant or employee. This undisputed fact is also fatal. *Jackson*, 176 F.3d at 982-83.

Finally, there is no evidence to support the "purge" of non-Asian employees that Handloser alleges in his Complaint. 2nd Am. Compl. ¶ 6 ("In or around 2011, Infosys began a concerted effort in the U.S. to purge non-South Asian employees . . . [and in] 2011 and 2012, Infosys began to set unrealistic goals for Mr. Handloser"). In fact, Infosys's hiring practices were to the contrary. In 2011, Infosys not only increased its hiring of U.S.-resident employees, but it also dramatically increased the percentage of non-Asian hires – resulting in a significant shift in the demographics of its workforce. SOF ¶¶ 200-201. Infosys hired 339 non-Asian employees resident in the U.S. in 2011, and 382 in 2012, which was higher than in previous years. SOF ¶ 201. This data disproves Handloser's "purge" allegation. [12]

A sales manager with poor sales and who was not replaced after being discharged in a RIF, Handloser cannot support even a *prima facie* case of reverse discrimination. His discriminatory discharge claim fails for this reason alone.

> **3.** **Handloser's Discriminatory Termination Claim Fails Because He Cannot Dispute That Infosys Discharged Him As Part of a Legitimate and Non-discriminatory RIF.**

Neither can Handloser challenge the legitimate, non-discriminatory reason for his termination: namely, that his CRR score of "4" subjected him to a nationwide RIF. Statement of Facts ¶¶ 189-191. In *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir.

---

[12]     For the same reason, Handloser cannot satisfy the *prima facie* requirement for "reverse discrimination" claims by identifying background circumstances which demonstrate that Infosys has reason or inclination to discriminate invidiously against people in the "majority." *Mills*, 171 F.3d at 454-56.

US.108296829.02

1998), the Seventh Circuit explained that "an employee discharged in a RIF does not need to produce evidence tending to prove" that the RIF itself is a fabrication; rather, he must offer evidence "which would support an inference that, given his shortcomings as an employee, he nevertheless would not have been fired-would not have been ranked below other employees-but for' his" protected trait. *Id.* (addressing standard under the ADEA, which is the same standard as applicable here). Here, there is no such evidence. To the contrary, the RIF in the United States targeted *all* employees at Handloser's job level who received CRR score of 4 in the most recent performance appraisal cycle. SOF ¶ 193. Indeed, the RIF resulted in the discharge of significant numbers of South Asians and non-South Asians alike. SOF ¶¶ 194-195.

Where an employee terminated through a RIF can identify no evidence of any improper motive, the employer is entitled to summary judgment. *See e.g.*, *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875-78 (7th Cir. 2002) (finding no discrimination where plaintiff was terminated in a RIF pursuant to reorganization plan); *Jones v. Advocate N. Side Health Network*, No. 13 C 6432, 2016 WL 3568724, at *9 (N.D. Ill. June 29, 2016) (finding plaintiff suffered no unlawful discrimination where his shift was eliminated pursuant to a RIF); *Johnson-Carter v. B.D.O. Seidman, LLP*, 169 F. Supp. 2d 924, 941 (N.D. Ill. 2001) (finding no discrimination where plaintiff was terminated pursuant to a company reorganization).[13] The Court should therefore grant summary judgment on Handloser's claims in their entirety.[14]

---

[13]    Handloser's poor performance is itself a non-pretextual reason for his discharge. *See, e.g., Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000) (holding that plaintiff's failure to meeting sales quota is a legitimate, non-discriminatory reason supporting his termination).

[14]    In his Complaint, Handloser alleges that other spoke Hindi in his presence. Although he has never asserted a hostile work environment claim, any such claim would fail for all the reasons discussion in section C.4. Further, to the extent Handloser may attempt to assert discrimination claims based on his compensation (including commissions) or promotions, those claims also fail as a matter of law. Not only does Handloser lack "background information" supporting an inference of reverse discrimination, but he can identify no similarly situated employee whom Infosys treated better. *See Antonetti*, 563 F.3d at 591-92 (affirming summary judgment when plaintiffs could not identify a similarly situated employee outside of their

US.108296829.02

## II.    Infosys Is Entitled To Summary Judgment On Plaintiffs' Pattern-And-Practice Claim.

### A.    Legal Framework.

Plaintiffs allege that Infosys engaged in a pattern or practice of intentional discrimination. 2nd Am. Compl. ¶ 132.  Pattern-and-practice claims are not a wholly different type of Title VII claim but rather "another means by which a Title VII's plaintiff's initial burden of proof can be met."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 334-35 & n.15, 358-59 (1977).  As the Seventh Circuit put it, "plaintiffs who raise a pattern or practice class claim have as their initial burden the task of demonstrating that unlawful discrimination has been the regular policy of the employer."  *Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir. 1985).  Plaintiffs must show there is "regular, purposeful, less-favorable treatment of a protected group," not just mere isolated, accidental, or sporadic discriminatory acts.  *Teamsters*, 431 U.S. at 336; *King v. Gen. Elec. Co.*, 960 F.2d 617, 623 (7th Cir. 1992).

Pattern-and-practice cases are not to be taken lightly.  Because of the seriousness of the charge, it is essential that plaintiffs adequately support allegations that an employer routinely engages in wide-spread discriminatory practices.  *King*, 960 F.3d at 625.  That means Plaintiffs must present "significant evidence" or "substantial proof" of the alleged routine.  *Id.* at 624. Usually, statistical evidence constitutes the core of a plaintiff's *prima facie* case, buttressed by evidence of general policies or specific, anecdotal instances of discrimination.  *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 553 (7th Cir. 2000); *Coates*, 756 F.2d at 532.  But "[w]ithout significant individual testimony to support statistical evidence, courts have refused to find a pattern or practice of discrimination."  *King*, 960 F.3d at 624.

---

protected class who was treated more favorably); *Hildebrandt v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1030-31 (7th Cir. 2003) (no prima facie case of disparate compensation when plaintiff failed to identify any "similarly situated" comparators who were given higher compensation).

US.108296829.02

**B. Plaintiffs Cannot Carry Their Burden Of Proving That Discrimination Is Infosys's Standard Operating Procedure.**

Plaintiffs cannot carry their burden of proving that discrimination is Infosys' standard operating practice – because it is not. Plaintiffs do not have evidence that comes close to the necessary "significant evidence" or "substantial proof," either in the form of statistical evidence or the necessary supporting additional evidence, including "significant individual testimony." As reflected in their Complaint, Plaintiffs rely heavily on their calculation that more than 90 percent of Infosys's U.S. workforce is South Asian. *E.g.,* 2nd Am. Compl. at ¶ 21. But the Seventh Circuit has plainly stated that general workforce statistics, standing alone, are insufficient to prove discrimination. Instead, "if the plaintiffs rely on the racial composition of a workforce as evidence of discrimination, it must subject all of the employer's decisions to statistical analysis to find out whether race makes a difference." *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002) (modification, citation, and internal quotation marks omitted).

As just one example of the flaw of Plaintiffs' purported "evidence" of systemic discrimination, it is undisputed that Infosys is an Indian-headquartered company with an extensive workforce in India, and that Infosys (unsurprisingly) staffs projects with employees from India working in the United States on a temporary basis. But in offering their dramatic 90 percent statistic, Plaintiffs make no effort to parse out the different types of employees (workers from India temporarily in the U.S. vs. long-term U.S.-based hires) that make up Infosys' U.S. workforce. Without such analysis, the statistic is meaningless. As the Seventh Circuit has admonished, Plaintiffs must do more than merely point to race and proclaim: "'Aha! Discrimination.'" *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 829 (7th Cir. 2006). But that is exactly what Plaintiffs are attempting to do here.

36

Not only do Plaintiffs' descriptive statistics fail to account for necessary variables, but they are also unhelpful when compared to the claims in this case. Demographic comparisons cannot explain hiring decisions that favored Caucasian Americans over South Asians (as relevant to Parker and Koehler's hiring claims); they cannot establish a non-existent racial "purge" in 2011 and 2012 (as relevant to Handloser's termination claim); and they cannot explain how Bolten has a viable promotion claim without a relevant comparator who was promoted on the DC Health Exchange Project during the period of her brief employment.

As for individual testimony, Infosys has amply demonstrated why Plaintiffs' failed claims do nothing to support a finding of any form of discrimination. But even if their claims did not so plainly fail, the evidence of four individuals—two applicants, one former Infosys employee, and one Infosys Public Services former employee—is simply not enough to support the claim that Infosys engaged in a widespread practice of intentional discrimination. As district courts in the Seventh Circuit recognize, evidence of a few employees within a large company— Infosys has 198,000 employees and 21,000 in the U.S.—is not enough to survive summary judgment. *E.g.*, *Gammage v. Fed. Reserve Bank of Chi.*, No. 03 C 9209, 2005 WL 43259, at *7 (N.D. Ill. Jan. 6, 2005) (anecdotal evidence of one employee in one department is insufficient, especially where defendant employed over 1,400 employees in the subject location); *Reeves v. Fed. Reserve Bank of Chi*, No. 00 C 5048, 2003 WL 21361735, at *13 (N.D. Ill. June 12, 2003) (anecdotal evidence of a few employees in one department of one location is not enough for pattern and practice where employer employs over 2,000 in multiple departments and locations). Even if Plaintiffs were to prove they were individually discriminated against (they were not), they still have to prove the existence of a companywide policy and Plaintiffs simply cannot do that. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 877-78 (1984).

US.108296829.02

Finally, putting all this aside, Plaintiffs' pattern and practice claims must be dismissed to the extent they go beyond the scope of the injuries these individual plaintiffs allege. Plaintiffs make allegations in their Complaint regarding discrimination in "decisions concerning positions, promotions, compensation, performance standards or ratings," (*see, e.g.* 2nd Am. Compl. ¶¶ 123, 132). But the law is clear that the class claims in this case are limited to those that the individual named Plaintiffs may represent. *Gen'l Tele. Co. of SW v. Falcon*, 457 U.S. 147, 156 (1982) ("We have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."); *see also East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (Court of Appeals had "plainly erred in declaring a class action" because plaintiffs "could have suffered no injury as a result of the allegedly discriminatory practices, and [were] simply not eligible to represent a class of persons who did allegedly suffer injury." ). Therefore, any pattern and practice claims that extend beyond these four named Plaintiffs' alleged injuries and/or the alleged practices causing them[15] should be summarily dismissed on that basis.

## III. Plaintiffs Koehler's And Parker's Disparate Impact Claims Fail As A Matter Of Law.

Plaintiffs Koehler and Parker allege in their Complaint that Infosys uses "policies and practices related to hiring . . . [including] reliance upon visa and/or green-card employees . . . that have had a disparate impact on the basis of national origin or gender." 2nd Am. Compl., ¶ 141.[16] They have since clarified that this claim is based on Infosys's "practice to secure visas for foreign workers," which includes "set[ing] visa quotas for each [Infosys United

---

[15]     For example, as discussed in Section III, neither Parker nor Koehler have standing to challenge an alleged practice of using visa workers to fill vacancies, because neither was impacted by such practices.

[16]     Plaintiffs Handloser and Bolten do not assert a disparate impact claim.

38

States] office, recruit[ing] persons of the South Asian race and Indian, Bangladeshi or Nepalese national origin to fill employment spots, and secur[ing] visas for those persons to work in the U.S." Plffs.' Br. in Opp. to Mot. to Dismiss at 20 [Dkt. 9]; Order on Defs' Mot. to Dismiss Plffs.' 2nd Am. Compl. at 14[Dkt. 31].[17]

To establish a disparate-impact claim under Title VII, Koehler and Parker must show "that a facially neutral test or employment practice in fact impacts more harshly upon a protected group than upon others." *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1254 (7th Cir. 1990) (citation and internal quotation marks omitted).[18] Plaintiffs cannot make this showing here

### A.    Koehler Lacks Standing To Assert Her Disparate Impact Claim.

Koehler's disparate impact claim fails as a matter of law because she has no standing to assert it. Under Article III of the Constitution, a named plaintiff in a putative class action must show that she was personally injured by the defendant's alleged discriminatory practice in order to sue. U.S. CONST. ART. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (a class action plaintiff must show personal, injury-in-fact standing). Here, Koehler cannot make that showing for two reasons: 1) she applied

---

[17]        Plaintiffs' reference to "quotas" for visas is part of their allegation that Infosys "us[es] the visa process to . . . improperly bring visa workers from South Asia to perform work . . . for which American workers are available, willing, and qualified to perform." 2nd Am. Compl., ¶ 31. For example, Plaintiffs allege that Infosys sets budgets for visa-related expenses, which results in "annual visa quotas . . . for South Asian workers to be employed within the U.S., irrespective of the fact that qualified workers exist in the U.S. that Infosys could use to support its U.S. business." *See, e.g.*, 2nd Am. Compl., ¶ 33; *see also id.*, ¶ 38 ("H-1B visas are expressly not intended to displace qualified U.S. workers.") Putting aside the lack of relevance of allegations regarding Infosys' compliance with immigration laws, Plaintiffs misstate H-1B requirements. Infosys is an H-1B dependent employer who seeks visas only for exempt H-1B nonimmigrants. As such, Infosys would not be prohibited from displacing U.S. workers whether directly (in its own workforce) or secondarily (at a worksite of a second employer). *See* 20 C.F.R. 655.737 and 20 C.F.R. 655.738. Infosys also is not required to take good faith steps to recruit U.S. workers in the U.S. for the U.S. job for which an H-1B nonimmigrant is sought. *See* 20 C.F.R. 655.737 and 20 C.F.R. 655.739.

[18]        It is not enough to point to a generalized policy; Koehler must "isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Welch v. Eli Lilly & Co.*, 585 F. App'x 911, 912 (7th Cir. 2014) (emphasis added).

US.108296829.02

for an Infosys position that was not open to visa candidates; and 2) Koehler was unqualified for the job she sought.

### 1. Koehler Applied For A Job Closed To Visa Candidates.

The visa practices challenged by Koehler could not have injured her for a simple reason: the job for which she applied was not open to individuals needing employer sponsorship to work in the United States (*e.g.*, visa candidates). SOF ¶ 24. Instead, with limited exceptions not applicable here, only United States citizens or individuals with permanent authorization to work in the United States were eligible for the position of VMware/Windows Administrator for which she applied. Thus, regardless of whether Infosys had a practice of using workers on visa to fill open positions, this alleged practice did not (and could not) harm Koehler.

"A plaintiff who was not injured by a challenged employment practice–even an objectionable practice–has no ground to complain, whether the theory be disparate impact or any other." *Welch*, 585 F. App'x at 913. Thus under the settled law of this Circuit, Koehler's disparate impact claim fails as a matter of law. *See, e.g., Carpenter v. Bd. of Regents of the Univ. of Wis. Sys.*, 728 F.2d 911, 915 (7th Cir. 1984) (affirming dismissal of disparate impact claim where plaintiff failed to show that the university's practice of considering candidates for tenure after seven years of service affected him personally); *Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir. 2005) (holding that professor deemed eligible for award and actively considered by selection committee could not complain that eligibility requirements disparately impacted women by making them less likely to be "eligible" for consideration).

### 2. Koehler Was Unqualified For The Position She Sought.

Koehler also lacks standing to assert her disparate-impact claim because she was indisputably unqualified for the Lead VMware/Windows Administrator position that she applied for. SOF ¶¶ 35-37. The Seventh Circuit has repeatedly held that unqualified job applicants lack

standing to assert disparate-impact claims because they cannot claim to be "injured, much less affected, by [a] defendant's use of an employment practice with an allegedly disparate impact." *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996). *See, e.g., Gilty,* 919 F.2d at 1248-49, 1254-55 (police officer who lied about credentials in applying for promotion was not qualified for promotion *and* thus lacked standing to claim that test given to applicants had disparate impact on black officers); *Carpenter*, 728 F.2d at 915 (affirming dismissal of disparate impact claim where plaintiff failed to show that the university's practice of considering candidates for tenure after seven years of service affected him). Koehler is no different. Lacking even basic qualifications for and thus having no legitimate claim to the Lead VMware/Windows Administrator position, Koehler has no standing to assert a disparate impact claim on behalf of a putative nationwide class under Article III of the Constitution. *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (a named plaintiff without injury may not "seek relief on behalf of himself or any other member of the class.").

**B.     Kelly Parker's Disparate Impact Claims Fail For Multiple Reasons.**

Infosys is entitled to summary judgment on Parker's disparate impact claim because: 1) it lies beyond the scope of her administrative charge;[19] 2) she lacks standing to bring it; 3) this effort to challenge visa practices unrelated to hiring is analytically flawed; and 4) Parker cannot satisfy her *prima facie* burden to identify meaningful statistical evidence of a disparate impact.

**1.     The Specific Employment Practices That Parker Seems To Challenge Are Beyond The Scope Of Her Administrative Charge.**

As clarified by the briefing on the Motion to Dismiss, Parker alleges that Infosys "use[s] a customary and repeated practice of growing their U.S. offices by setting visa quotas for

---

[19]     Count III of Plaintiffs' Second Amended Class Action Complaint alleges disparate impact in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. *See* Petition, ¶ 140-42. Disparate impact is not a cognizable theory of discrimination under Section 1981.

additional South Asian workers, budgeting for the associated expenses of securing the visas, and filling employment vacancies by assisting persons of the South Asian race to enter this country to work in the defendants' U.S. offices," *see* Order on Defs.' Mot. to Dismiss Plffs.' 2nd Am. Compl. at 14 [Dkt. 31]. This claim, however, lies beyond the scope of her administrative charge.

The only "employment practices" Parker identified in her charge were the non-specific and inadequate claims that Infosys has "a company-wide employment policy and practice of hiring, retaining, and promoting employees of South Asian race and Indian, Bangladeshi, or Nepalese national origin (including workers with H-1B visas, B-1 visas, L-1 visas, and local hires, *e.g.* non-visa dependent individuals over non-South Asian employees . . . ." SOF ¶¶ 118-119. Her charge also states that, "Infosys's policies, procedures and actions described above (including, for instance, the hiring of visa-dependent and/or green card holding foreign-born workers) have had a disparate impact on individuals of non-South Asian employees [sic] . . . ." *Id*. Nowhere in Parker's administrative charge does she mention Infosys "growing their U.S. offices by setting visa quotas for additional South Asian workers," budgeting for visa-related expenses, or "filling employment vacancies by assisting persons of South Asian race to enter this country to work." Nor does she even identify visas as being the source of the alleged disparate impact. To the contrary, in both places in her charge where visas are mentioned, she alleges that Infosys discriminates by hiring "visa-dependent and/or green card holding workers"; in other words that Infosys discriminates by hiring *both* individuals who need visas and those who do not.

This is insufficient. "Where an administrative charge fails to identify or describe the . . . employment practice later alleged to disproportionately affect a protected group, that policy cannot support a disparate impact claim." *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 906 (N.D. Ill. 2011). This is even true when plaintiffs present purported employment

practices that are allegedly steps of an alleged scheme. For example, in *McQueen*, a plaintiff identified only the employment practice of granting discretion to Sergeants and Lieutenants without sufficient human resources oversight. *Id.* In the litigation complaint, however, the plaintiff expanded the employment practices to include the subsequent step in his disparate impact theory: that the employer's policy of not promoting individuals with a recent history of discipline had a disparate impact on African Americans. *Id.* But the court correctly held that the policy was not included in the plaintiff's charge. *Id.* Just so here: while Parker arguably alleged a practice of hiring South Asians, she did not identify visa quotas, budgeting, or filling employment vacancies by assisting persons of South Asian race to enter this country as challenged practices.

Accordingly, to the extent Parker tries to bring a disparate impact claim based on the alleged employment practice the Court identified as sufficient for motion to dismiss purposes, she cannot. She is limited to her charge.

### 2. Parker Does Not Have Standing To Bring A Disparate Impact Claim Based on Infosys's Failure to Hire Her in 2012 or 2013.

Parker also lacks standing to bring any claim that Infosys's visa practices disparately impact Caucasian Americans. As Infosys has explained: "To have standing to bring a disparate impact claim, a plaintiff must show that she was personally injured by the defendant's alleged discriminatory practice." *Farrell*, 421 F.3d at 617. Parker, in contrast, cannot show she was qualified for any job that she sought at Infosys. Neither can Parker demonstrate that any position she applied for was given to a South Asian applicant with a visa. For both reasons, Infosys's visa practices could not have injured Parker within the meaning of Title VII. This lack of injury–and thus standing–entitles Infosys to judgment as a matter of law.

US.108296829.02

### 3.      Parker's Disparate Impact Claims Are Conceptually Flawed.

Parker's disparate impact claim also fails because it is conceptually flawed.  Like Koehler, Parker alleges that Infosys's alleged quota-setting for visas, its recruiting of workers of South Asian race or national origin, and its securing of "visas for those persons to work in the U.S." caused an unlawful disparate impact on the "hiring subclass" throughout its United States facilities.  *See* Order on Defs.' Mot. to Dismiss Plffs.' 2nd Am. Compl. at 14 [Dkt. 31].  But even without considering the factual record, Parker's claim fails for three reasons.  First, although presented as a "hiring" claim, the use of existing employees to meet staffing needs does not involve hiring.  Second, Infosys's practice of transferring employees (on visa) from India to the United States has the same impact on all individuals residing in the United States, regardless of race, citizenship, or any other characteristic.  Third, Parker's claim fails because Title VII does not prohibit Infosys from preferring existing employees to job applicants, the most Parker can complain about here.  And finally, the logical implication of Plaintiffs' position means *any* employer from outside the United States that uses visa workers to staff projects would be violating Title VII.

### a.      Parker's Failure-to-Hire Claim Does Not Involve Hiring.

Parker alleges that Infosys's visa practices violate Title VII by disparately impacting her and members of a "hiring subclass" that includes other non-South Asian job applicants.  But as Parker's individual claim demonstrates, the challenged practices do not involve hiring–but at best, the temporary transfer of existing Infosys employees.  Parker did not apply for any vacant position at Infosys in 2013; nor did her alleged "replacement" (Kapil Kulkarni) fill one.  SOF ¶ 109-111.  Instead, Technology Analyst Kulkarni transferred from India to Tomahawk to perform work that he had long been providing from a remote location.  In this way, Parker's allegations and circumstances are different than those the Court found sufficient to withstand a

motion to dismiss.  *See* Order on Defs.' Mot. to Dismiss Plffs.' 2nd Am. Compl. at 14 [Dkt. 31] (describing Plaintiffs' argument that Infosys "fill[s] employment *vacancies* by assisting persons of the South Asian race to enter this country to work in the Defendants' U.S. offices." (emphasis added)).

To be clear, when Infosys uses visa-dependent employees  to work on U.S.-based projects on a temporary basis, Infosys is transferring *employees* to the U.S. from elsewhere in the world, not *hiring*.  And in challenging this practice (at least as it relates to her individual circumstances), Parker is essentially arguing that Title VII requires Infosys to *create* jobs.

There is no such duty.  Simply put, Title VII creates no obligation for employers to create jobs when it has existing employees to perform the work.  *See generally Griggs*, 401 U.S. at 430-31.  To the contrary, the Seventh Circuit has held that absent evidence of an open position, unsuccessful job applicants "cannot be said to have suffered any adverse employment action." *See Wilson v. Cook Cnty.*, 742 F.3d 775, 784 (7th Cir. 2014) (finding no Title VII sex discrimination or adverse action where advertised massage therapist position did not actually exist).  *See also Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009) (rejecting disparate treatment hiring claim because the plaintiff "presented evidence showing that an open position *could* have been created for him, but he simply has not presented enough evidence from which a jury could find that an open position actually existed."); *Pruitt v. Captain D's LLC*, CV 3:15-cv-00013-RLY-MPB, 2016 WL 2989060, at *4 (S.D. Ind. May 24, 2016) (rejecting hiring claim where the employer "was considering transferring Caldwell to Vincennes and hiring Plaintiff to replace him at the Evansville location," but had no "actual opening" when Plaintiff applied for a job).

45

Infosys's decision to bring an employee to the United States to perform duties here is a staffing decision, not a hiring decision. And the law is clear that Infosys's alleged failure to create a job vacancy is not an actionable adverse action. For this reason alone, Parker's disparate impact claim fails.

### b. Infosys Visa Practices Have The Same Impact All Job Applicants.

Parker's failure-to-hire claim also fails because Infosys visa practices have exactly the same impact all job applicants and potential applicants. Parker complains that Infosys discriminates by: 1) recruiting and hiring South Asians outside the United States to fill visa quotas; and 2) securing visas for and transferring those employees to its facilities in the United States. 2nd Am. Compl. ¶ 141. But neither practice is actionable. Infosys's recruitment and hiring practices abroad lie beyond the reach of Title VII altogether. See 42 U.S.C. § 2000e–1 (c)(2) (providing its anti-discrimination provisions "shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer"). Thus, Infosys's decision to hire Indian employees in India and to staff them in temporary projects in the United States does not violate Title VII.

And even assuming *arguendo* that such practices did "take jobs away" from U.S.-based employees, that alleged harm is not cognizable under Title VII because it would equally affect all U.S.-based employees regardless of race, national origin, immigration status, or any other factor. Any time that Infosys decides not to create a job in the United States, that decision impacts anyone resident in the United States, regardless of protected status. By definition, an employment practice that has precisely the same impact on workers within and outside the protected group cannot violate Title VII. *See, e.g., O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) (employment agreement that presented the same choice–sign or be

46

terminated–to male and female employees could not disparately impact women).  For this reason as well, Parker's disparate impact claim fails as a matter of law.

> c.      **Title VII Does Not Require Infosys To Treat Job Applicants The Same As Employees.**

Parker's disparate impact claim also fails because Title VII does not require Infosys to treat job applicants the same as employees.  Indeed, Parker bases her claim on Infosys practices that allegedly favor visa-dependent Infosys employees from other countries over non-South Asian job seekers in the United States.  But this approach fails at the outset:  as mere applicants (or even, in Parker's case, a temporary staffing agency employee), Parker and those similarly situated to her are not comparable to Infosys *employees* transferred into a United States position with the aid of a visa.  *See generally Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 877 (7th Cir. 1989) (holding that plaintiff was not similarly situated to a longer-tenured employee); *Neal v. Sandia Nat'l Labs.,* 157 F. App'x 67, 70 (10th Cir. 2005) (holding applicant was not similarly situated to existing employee).  Infosys's visa practices fall no more harshly on one protected group than others; they just give current employees of all races and national origins priority over applicants.  *See, e.g., Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576-77 (2d Cir. 2003) (explaining that plaintiffs "must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy"), *superseded on other grounds*; *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 546 (11th Cir. 1991) (requiring proof "that some employment practice that is facially neutral in its treatment of similarly situated employees has a disproportionately adverse effect on those employees who are a member of some protected class").[20]  But just as the law does not require

---

[20]      Put another way, Parker could show a disparate impact only by comparing workers *qualified* for those jobs given to visa-dependent employees; yet she offers no evidence that Infosys deems mere applicants "qualified" for any such position.  *See Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 650–51

47

Infosys to create jobs, so too it does not prohibit Infosys from treating its current employees differently than job applicants. If it did, then every employer in the U.S. would be in violation of Title VII.

                **d.**     **If Accepted, Parker's Unsupported "Disparate Impact" Theory Would Subject Every Employer Who Participates In Visa Programs To A Title VII Lawsuit.**

These fundamental flaws in Parker's claims have implications far beyond the personnel decisions of one company. Almost *every* employee brought into the United States on a visa arguably forecloses the hiring of one or more domestic employees (of *all* national origin and races)–and irrespective of how many domestic jobs these workers ultimately create.[21] If accepted, Parker's theory would thus mean employers who do nothing more than participate in federal immigration programs "could be haled into court and made to undertake the expensive and time-consuming task of defending the business necessity of its selection methods." *Wards Cove,* 490 U.S. 642, 643 (1989) (explaining consequences of flawed comparisons for purposes of disparate impact claim) *superseded on other grounds.* Nor would the expansion of liability stop with visas. Consider the consulting firms who bring teams of employees to various locations–or law firms that decide to open offices in new locations with existing lawyers or staff. Any mismatch in demographics between the original and new office sites could invite a disparate impact lawsuit, and despite the equal impact on *all* potential hires in the new area.[22] Parker

---

    (1989) (explaining "the proper comparison [is] between the racial composition of the [at-issue jobs] and the racial composition of the qualified population in the relevant labor market.") (alterations in original) *superseded on other grounds.*

[21]    Although Parker may argue that Infosys obtains more visa than many other employers, this difference in scale does not impact the analysis. Under Parker's theory, any employer who transfers workers into the U.S. on visas – regardless of the number of workers – is violating Title VII.

[22]    Contrary to basic principles of statutory interpretation, she would bring Title VII into needless conflict with U.S. immigration policy and legislation. *See generally U.S. v. Valenzuela-Bernal,* 458 U.S. 858, 864 (1982) ( "The power to regulate immigration–an attribute of sovereignty essential to the preservation of any nation–has been entrusted by the Constitution to the political branches.").

48

US.108296829.02

Case 2:13-cv-00885-PP-DEJ   Filed 09/23/16   Page 58 of 61   Document 80

would leave as "the only practicable option" for such employers the very racial and national origin quotas "Congress expressly rejected in drafting Title VII." *Id* at 652.

### 4. Parker Has No Statistical Evidence Of A Disparate Impact.

Finally, Parker's disparate impact claim fails because she cannot identify meaningful statistical evidence of any disparate impact. A disparate impact plaintiff cannot meet her *prima facie* burden without "statistical evidence of a kind and degree sufficient to show that [specific Infosys visa practices have] caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996). Here, the statistics are to the contrary: all but one of the 39 Systems Engineers or Senior Systems Engineers hired for the Harley-Davidson project were non-Asian, and the only two positions at the Tomahawk facility were given to non-Asian American employees. Offering no evidence of adverse impact, Parker cannot bring her claim to trial.

### CONCLUSION

For all the reasons stated above, Infosys respectfully requests that the Court grant summary judgment in its favor on all claims.

49

Date: September 23, 2016                    Respectfully submitted,


                                            FAEGRE BAKER DANIELS LLP


                                            /s/ Ellen E. Boshkoff
                                            Ellen E. Boshkoff
                                            Rozlyn M. Fulgoni-Britton
                                            FAEGRE BAKER DANIELS LLP
                                            300 North Meridian Street, Suite 2700
                                            Indianapolis, IN 46204
                                            (317) 237-0300
                                            (317) 237-1000 (fax)
                                            ellen.boshkoff@FaegreBD.com
                                            rozlyn.fulgoni-britton@FaegreBD.com


                                            George A. Stohner
                                            Gregory P. Abrams
                                            Lindsey M. Hogan
                                            FAEGRE BAKER DANIELS LLP
                                            311 S. Wacker Drive, Suite 4400
                                            Chicago, IL 60606
                                            (312) 212-6500
                                            (312) 212-6501 (fax)
                                            george.stohner@faegrebd.com
                                            gregory.abrams@FaegreBD.com
                                            lindsey.hogan@FaegreBD.com


                                            Dulaney Lucetta Pope
                                            FAEGRE BAKER DANIELS LLP
                                            202 S Michigan Street, Suite 1400
                                            South Bend, IN 46601
                                            574-234-4149
                                            574-239-1900 (fax)
                                            lucetta.pope@FaegreBD.com


                                            Attorneys for Defendants, Infosys Technologies
                                            Limited, Inc. and Infosys Public Services, Inc.

50

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true and correct copy of the foregoing

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT** was served on all counsel of record by electronic service through the Clerk of the

Court's CM/ECF filing system on September 23, 2016.

Daniel A Kotchen
dkotchen@kotchen.com

Michael F Brown
mbrown@dvglawpartner.com

Michael J von Klemperer
mvonklemperer@kotchen.com

**Notice has been delivered by other means to:**

Vonda K. Vandaveer
VK Vandaveer PLLC
PO Box 27317
Washington, DC 20038-7317
atty@vkvlaw.com

/s/ Ellen E. Boshkoff

51

US.108296829.02